SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

DILIGENT ENTERPRISE MANAGEMENT, LLC,

                Plaintiff,

       -against-

AML GLOBAL ECLIPSE, LLC, DWC PINE
INVESTMENTS I, LTD., ALAN KLAPMEIER,
JAMES CARROLL, STEVE SERFLING, RJ
SIEGLE, and MIKE WYSE,

                Defendants.

Index No.:

**COMPLAINT**

---

Plaintiff, Diligent Enterprise Management, LLC (the "Plaintiff"), by and through its counsel, Akerman LLP, for its complaint against defendants, AML Global Eclipse, LLC ("AML"), DWC Pine Investments I, Ltd., ("DW"), Alan Klapmeier ("Klapmeier"), James Carroll (Carroll"), Steve Serfling ("Serfling"), RJ Siegle ("Siegle"), and Mike Wyse ("Wyse") individually (collectively, the "Defendants") alleges as follows:

## THE PARTIES

1.      Plaintiff Diligent Enterprise Management LLC is a limited liability company organized and existing under the laws of Delaware with offices at 257 Old Churchmans Road, New Castle, DE 19720.  The Plaintiff is the proper party in interest and has standing to bring these claims pursuant to the Assignment of Claims and Causes of Action dated June 23, 2023 from Citiking International US LLC ("Citiking") as assignor to the Plaintiff as assignee.

2.      Defendant AML is a limited liability company organized and existing under the laws of Delaware.  AML transacts business in the State of New York and committed a tort within

71809983;2

Case 1:25-cv-02865-DKC Document 1 Filed 08/26/24 Page 25 of 103 PageID #: 14

this state and regularly does or solicits business, or engages in other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this state.

3.      Defendant DW is a limited liability partnership organized and existing under the laws of the Cayman Islands.  DW transacts business in New York and committed a tort within this state and regularly does or solicits business, or engages in other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this state.

4.      Defendant Klapmeier is a resident of Wisconsin and transacts business in New York and is over the age of 18 and *sui juris*.  Klapmeier is the former CEO of One Aviation Corp. ("One Aviation"), serving as CEO from approximately April 2015 until February 2021.

5.      Defendant Carroll is a resident of Florida and transacts business in New York and is over the age of 18 as *sui juris*.  Carroll is a former board member of One Aviation who served as an Independent Director for One Aviation from approximately 2018 to 2020.

6.      Defendant Serfling is a resident of the Minnesota and transacts business in New York and is over the age of 18 and *sui juris*.  Serfling is the former COO and Executive Vice President of One Aviation who served as COO from approximately July 2010 to December 2020.

7.      Defendant Siegle is a resident of Wisconsin and transacts business in New York and is over the age of 18 and *sui juris*.  Siegle is a former board member of One Aviation who served as an Independent Director for One Aviation from approximately November 2012 to October 2021.

8.      Defendant Wyse (together with Klapmeier, Carroll, Serfling, and Siegle, the "D&O Defendants") is a resident of New Jersey and transacts business in New York, and is over the age of 18 and *sui juris*.  Wyse is a former board member of One Aviation who served as an Independent Director for One Aviation from approximately September 2017 to February 2021.

71809983;2

## JURISDICTION AND VENUE

9.    Importantly, Citiking and DW agreed in multiple agreements that DW and Citiking submit to jurisdiction in New York County and agreed that venue is appropriate, and can only be brought, in New York County.

10.    Additionally, this Court has personal jurisdiction over Defendants pursuant to N.Y. C.P.L.R. § 302 because Defendants regularly transact business within the State of New York.

11.    Further, the Court retains subject matter jurisdiction over Defendants because the events that gave rise to this matter occurred in the State of New York.

12.    Venue is proper because a substantial part of the events that gave rise to this matter occurred in New York County.

## FACTUAL BACKGROUND

**One Aviation Corporation**

13.    One Aviation was formed in 2015 and maintained its principal place of business in Albuquerque, New Mexico.  The operations of One Aviation and its affiliates was focused on aircraft service and upgrades, aircraft remanufacturing, and new aircraft manufacturing and sales. One Aviation was an Original Equipment Manufacturer of twin-engine light jet aircraft, primarily serving the owner/operator, corporate, and aircraft charter markets as well as international markets.

**Citiking's Purchase of the First Tranche Loans from DW**

14.    On or about November 10, 2017, Citiking and DW entered into a Purchase and Sale Agreement for Distressed Trades (the "First PSA"), pursuant to which DW sold and assigned loans in the approximate amount of $21,000,000 to Citiking (the "First Tranche Loans"). A true and correct copy of the First PSA is attached hereto as **Exhibit 1**.

71809983;2

15.     The First Tranche Loans consisted of loan obligations due to DW from borrowers, Eclipse Aerospace, Inc. ("Eclipse") and Brigadoon Aircraft Maintenance. LLC ("Brigadoon"), affiliates of One Aviation (Eclipse and Brigadoon are collectively referred to as "Affiliates"). The First Tranche Loans were secured by a blanket lien against the assets of the Affiliates and One Aviation and was guaranteed by One Aviation.

16.     Citiking made the payments to DW required under the First PSA and is the owner of the First Tranche Loans. A true and correct copy of the Assignment and Assumption Agreement assigning the First Tranche Loans to Citiking is attached hereto as **Exhibit 2**.

**The Intercreditor Agreement and Citiking's Right of First Refusal**

17.     At the time of the closing of the sale of the First Tranche Loans to Citiking, DW continued to own other loan obligations due to DW from the Affiliates (the "Second Tranche Loans"). The Second Tranche Loans were also secured by a blanket lien against the assets of the Affiliates and One Aviation and was guaranteed by One Aviation.

18.     At the time of the closing of the sale of the First Tranche Loans, DW and Citiking entered into an Intercreditor Agreement that governed their relationship. A true and correct copy of the Intercreditor Agreement is attached hereto as **Exhibit 3**.

19.     The Intercreditor Agreement provides, among other items, both DW and Citiking with a Right of First Refusal requiring that in the event that either DW or Citiking accepts an offer from a third party for the purchase and sale of any rights, title, and interests in the First Tranche Loans or the Second Tranche Loans, the other party shall have the opportunity to enter into the same agreement stating:

> [E]ach lender agrees that in the event that it receives an offer for the purchase and sale of any or all of its right, title and interest in and to the Obligations or the Loan Documents from an unaffiliated third party…*prior to accepting the Third Party Purchase Offer, the*

> *receiving Lender shall make an offer in writing to the other Loan Party (the "ROFR") to enter into the same purchase and sale transaction on the same terms as the Third Party Purchase Offer.*

Intercreditor Agreement at ¶ 5 (emphasis supplied).

**Citiking's First Purchase of the Second Tranche Loans From DW**

20.     On or about July 10, 2018, Citiking and DW entered into a second Purchase and Sale Agreement for Distressed Trades (the "Second PSA"), pursuant to which DW sold and assigned the Second Tranche Loans in the amount of $26,105,837.10 to Citiking (the First Tranche Loans and the Second Tranche Loans are collectively referred to as the "Loans").  A true and correct copy of the July 10, 2018 Purchase and Sale Agreement for Distressed Trades for the Second Tranche Loans is attached hereto as **Exhibit 4**.

21.     The Second PSA defines the "Settlement Date" as "the date on which [DW] receives the First Installment."

22.     In accordance with the Second PSA, Citiking made the first installment payment to DW in the amount of $2,000,000 on or about July 10, 2018.  As such, on the Settlement Date, the Second Tranche Loans were assigned by DW to Citiking.  A true and correct copy of the Assignment and Assumption Agreement assigning the Second Tranche Loans from DW to Citiking is attached hereto as **Exhibit 5**.

**The Continuing Obligations Agreement and the Repurchase Obligation**

23.     Contemporaneously with the purchase and sale of the Second Tranche Loans, on or about July 10, 2018, Citiking and DW entered into a Continuing Obligations Agreement (the "COA").  A true and correct copy of the COA is attached hereto as **Exhibit 6**.

24.     The COA provided DW with remedies in the event of a default by Citiking under the Second PSA.

25.     Specifically, if Citiking defaulted by failing to make the second or third installment payments under the Second PSA, then DW would have the right, after delivery of a default notice, to repurchase from Citiking the Second Tranche Loans (the "Repurchase").

26.     Pursuant to the COA, DW could repurchase the Second Tranche Loans by "directing the Agent to record the Escrowed Assignment" of the Second Tranche Loans to DW, making DW the owner of the Second Tranche Loans.

27.     Because Citiking was the owner of the First Tranche Loans, even if DW exercised its right to Repurchase the Second Tranche Loans under the COA, DW and the Second Tranche Loans remained subject to and bound by the Intercreditor Agreement.

28.     The Repurchase required DW to pay Citiking an amount equal to the sum of (1) any portion of the purchase price previously paid by Citiking, minus (2) any default interest and other amounts owing or payable by Citiking to DW under the Second PSA, minus (3) $1,000,000.

29.     Additionally, under the COA, Citiking agreed that in the event of default following the Repurchase, any indebtedness of One Aviation and its Affiliates to Citiking that exceeded the amount of the loans obtained by DW in the Repurchase, would be subordinate to any and all obligations of One Aviation and its Affiliates to DW with respect to the obligations repurchased.

**The Escrow Agreement**

30.     On July 10, 2018, contemporaneously with the execution of the Second PSA, Citiking and DW entered into an Escrow Agreement.  A true and correct copy of the Escrow Agreement is attached hereto as **Exhibit 7**.

31.     Pursuant to the Escrow Agreement, Citiking delivered to Cantor Fitzgerald Securities (the "Escrow Agent"), an executed Assignment and Assumption Agreement (the "DW

Assignment"), wherein Citiking assigned the Second Tranche Loans it was purchasing from DW back to DW.

32.      The obligation of the Escrow Agent to release from escrow and deliver the DW Assignment could be triggered by one of two events. In the first instance, the Escrow Agreement provided that the Escrow Agent would release the DW Assignment from escrow and deliver it to DW upon DW certifying its right to Repurchase the Second Tranche Loans.  In the second instance, the Escrow Agent would release the DW Assignment from escrow and deliver it to Citiking upon notice from DW that it was fully paid, **or the passage of 120 days without a default notice from Seller DW**.  Paragraph 2 of the Escrow Agreement provides in pertinent part:

> Escrow Agent shall deliver the Assignment Agreement to Buyer or to the Administrative Agent to effect the assignment for Seller's benefit, as the case may be, as follows:
>
>     (a) to the Administrative Agent to effect the assignment for Seller's benefit, after receipt by the Escrow Agent of a notice from Seller certifying that it is entitled to Repurchase the Loans pursuant to Section 6(b) of the Agreement (a "<u>Default Notice</u>"); or
>
>     (b) to the Buyer upon (i) receipt by the Escrow Agent of a notice from Seller that the Purchase Price has been paid in full or (ii) upon the passage of 120 days from the execution of this agreement if no Default Notice has been delivered to the Escrow Agent by Seller.

*See* Ex. 7 (emphasis in original).

**DW Declarations of Default Under the Second PSA and DW's Repurchase of the Second Tranche Loans**

33.      DW issued Default Notices to Citiking on August 24, 2018, September 10, 2018, September 24, 2018 and October 10, 2018, though it appears that these notices were not copied on the Escrow Agent.

71809983;2

34.     On January 18, 2019, **more than 184 days after execution of the Escrow Agreement**, DW provided a Default Notice to the Escrow Agent, certifying that DW was entitled to Repurchase from Citiking the Second Tranche Loans.  A true and correct copy of the Default Notice is attached as **Exhibit 8**.  DW further stated that the Escrow Agent was "now obligated to deliver" the DW Assignment to DW's administrative agent.

35.     DW's Default Notice attached a Repurchase Notice to Citiking, also dated January 18, 2019, in which DW, citing the Second PSA and the COA, declares itself the "sole owner" of the Second Tranche Loans.  The Repurchase Notice refers to the return of $316,500.00 to Citiking allegedly on account of the Repurchase.  The $316,500.00 paid to Citiking allegedly represented the return of the $2,000,000 that Citiking paid under the Second PSA, less a charge of $1,000,000 (the "Default Penalty") and Default Interest allegedly in the aggregate amount of $683,500.00.

**The Letter Agreement and Citiking's Second Purchase of the Second Tranche Loans**

36.     On July 25, 2019, Citiking and DW entered into a Letter Agreement (the "Letter Agreement"), whereby Citiking agreed to purchase, for the second time, the Second Tranche Loans that were now held by DW pursuant to the Repurchase. A true and correct copy of the Letter Agreement is attached hereto and incorporated herein as **Exhibit 9**.

37.     Pursuant to the Letter Agreement, the purchase price for Citiking's second purchase of the Second Tranche Loans was $16,150,000 (the "Purchase Price") with interest accruing on unpaid installments at the per annum rate of 12%.  The Letter Agreement provides Citiking a credit in the total amount of $1,683,500 representing the Default Penalty and Default Interest that DW had previously charged Citiking in connection with the Repurchase of the Second Tranche Loans.

38.     The Letter Agreement incorporates the terms of the Second PSA requiring DW to deliver the Second Tranche Loans to Citiking on the Settlement Date.

71809983;2

Case 1:25-cv-00892-JKS-DKS Doc 4    Filed 03/25/25    Page 9 of 105 PageID #: 21

39.     The Second PSA defines the Settlement Date as the date that DW receives the first installment payment from Citiking.

40.     On July 25, 2019, Citiking made the first installment payment to DW in the amount of $4,000,000, making the Settlement Date July 25, 2019.

41.     The Letter Agreement required Citiking to make an additional payment of $2,500,000 on or before October 31, 2019, which payment Citiking remitted to DW on October 31, 2019.

42.     In total, Citiking paid DW approximately $6,500,000 in principal payments towards the $16,150,000 purchase price for its second purchase of the Second Tranche Loans. Citiking also paid DW monthly interest payments in the amount of 12% per annum.

43.     To date, DW has failed to deliver the Second Tranche Loans to Citiking notwithstanding DW's receipt of the first installment payment of $4,000,000 and the subsequent installment payment of $2,500,000.

**One Aviation Debtors' Chapter 11s**

44.     On October 9, 2018, One Aviation and the Affiliates filed voluntary petitions under Chapter 11 of the Bankruptcy Code, 11 U.S.C. section 101 *et seq.* in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court"), Case No. 18-12309 (CSS) (the "Bankruptcy Case").

45.     Other affiliates of One Aviation also filed for relief under Chapter 11 in the District of Delaware, including ACC Manufacturing, Inc., Aircraft Design Company, DR Management, LLC, Innovatus Holding Company, Kestrel Aircraft Company, Inc., Kestrel Brunswick Corporation, Kestrel Manufacturing, LLC, Kestrel Tooling Company, and OAC Management, Inc. (collectively the "Additional Affiliates" and together with One Aviation and the Affiliates the

"Debtors").  The chapter 11s of the One Aviation Debtors were jointly administered in the Bankruptcy Court.

**Citiking's DIP Loan to the Debtors and Additional Amounts Citiking Funded**

46.    On October 10, 2018, the Debtors filed a motion in the Bankruptcy Case for approval of debtor in possession financing (the "DIP Loan") pursuant to the terms and conditions of the Senior Secured Superpriority Debtor in Possession Credit and Security Agreement dated October 9, 2018, among Citiking as the debtor in possession lender, the Affiliates as borrowers and guaranteed by One Aviation as guarantor.

47.    On November 27, 2018, the Bankruptcy Court entered the Final Order (I) Authorizing Debtor Borrowers to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(3), 364(d)(1) and 364(e), (B) Grant Senior Liens and Superpriority Administrative Expense Status, and (C) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364; and (III) Granting Related Relief ("Final DIP Order"), approving the DIP Loan and granting Citiking a senior lien and super priority administrative status.

48.    Pursuant to the Final DIP Order:

A.    The Affiliates, One Aviation and related debtors were granted permission to enter into a senior secured super priority revolving loan facility with Citiking (the "DIP Loan"), with commitments to lend up to approximately $19.1 million, and such other financial accommodations, allocated as follows: (i) a superpriority priming *new money* revolving facility with commitments to lend up to approximately $8.0 million (the "DIP New Money") and (ii) roll up loans in the amount of approximately $11.13 million (the "DIP Roll-Up");

B.    Citiking's lien securing the DIP Loan was deemed senior and had priority over competing liens against the assets of the Affiliates, One Aviation and related debtors, including the First Tranche Loans and the Second Tranche Loans; and,

Case 1:25-cv-00852-JKS Document 4   Filed 06/18/25   Page 14 of 103 PageID #: 23

C. the DIP Loan was deemed an administrative expense claim with priority over all other administrative expense claims, including the administrative expense claims.

49. D&O Defendants were integral in obtaining the DIP Loan from Citiking, including negotiating the terms and documentation of the DIP Loan, preparing the restructuring budget related to the use of the DIP Loan, requesting the DIP Loan include monies to purchase parts even through the purchase of the parts was prepaid, and providing "critical vendor" status to the company owned by Klapmeier and holding Klapmeier's personal plane to ensure that the company was paid as a critical vendor from the DIP Loan provided by Citiking.

50. Citiking funded $19.1 million, the full amount of the DIP Loan, plus approximately $7 million post-confirmation pursuant to the Debtors' Second Amended Joint Prepackaged Plan of Reorganization (the "Plan"). Citiking had no obligation to fund the $7 million under the DIP Loan.

51. The $7 million payment included #1.7 million earmarked for distribution to the unsecured creditors (the "$1.7 Million"). The $1.7 Million was required to be placed in an escrow account for the benefit of the unsecured creditors.

52. The D&O Defendants promised Citiking that the $1.7 Million would be placed in an existing escrow account for the protection of Citiking (the "Escrow Account"). As grantor of the $1.7 Million into escrow, Citiking was entitled to the return of the escrowed $1.7 Million if the order confirming the Plan was vacated which subsequently occurred.

53. The D&O Defendants promised advised that the wire instructions provided to Citiking for delivery of the $1.7 Million were to the Escrow Account.

71809983;2

Case 1:25-cv-00825-JKS Doc 4  Filed 03/15/24  Page 15 of 163 PageID #: 24

**The Debtors' Motions to Sell Their Assets Free and Clear of Liens and the Elimination of Citiking's Right to Credit Bid**

54.     On June 17, 2019, the Debtors filed in the Bankruptcy Case a motion for entry of an order approving, among other things, the sale of the Debtors' assets free and clear of liens, bidding procedures and a Stalking Horse Agreement with Citiking as the Stalking Horse Buyer (The "First Sale Motion").

55.     The terms of the bidding procedures in the First Sale Motion allowed credit bidding and permitted Citiking to credit bid the amounts due and owing Citiking by the Debtors. Utilizing its credit bid meant that Citiking did not need to come out of pocket and bid cash at the sale. Rather, by credit bidding, Citiking could "credit" bid up to the amount it was owed by the Debtors. If it were outbid, Citiking would walk away with the cash from the sale to the successful bidder in satisfaction of the amounts owed to Citiking.

56.     Citiking always intended to exercise its right to credit bid at the sale of the Debtors' assets.

57.     The bidding procedures in the First Sale Motion did not provide for a "good faith deposit" or require any deposit on the part of Citiking as the Stalking Horse Buyer.

58.     A few weeks later, on July 10, 2019, the Debtors filed a notice of withdrawal of the First Sale Motion.

59.     On August 28, 2020, the Debtors filed their second motion to approve the sale of assets (the "Second Sale Motion"). This time the stalking horse buyer was SEF OA LLC ("SE Falcon"). Importantly, the Second Sale Motion continued to allow credit bidding by Citiking.

60.     On October 8, 2020, the Debtors filed a notice of withdrawal of the Second Sale Motion, which appeared to be a sham.

Case 1:25-cv-00852-JKS Document 4    Filed 03/13/25    Page 13 of 103 PageID #: 25

61.     Twelve days later, on October 20, 2020, the Debtors filed their third motion for approval of sale, this time to AML Global Eclipse LLC ("AML") as the Stalking Horse Bidder (the "Third Sale Motion").

62.     AML was undeniably an integral part of the Bankruptcy Case and was fully aware of the obligations and rights retained by DW and Citiking with respect to the Second Tranche Loans and the ROFR associated with the Loans in their entirety.

63.     Debtors' Third Sale Motion provided that AML, as Stalking Horse Bidder, would purchase the Debtors' assets for $5,250,000, subject to higher and better offers, and the proceeds would be used to pay "Administrative Expense Claims."

64.     In the Third Sale Motion, the Debtors acknowledged that DW intended to exercise its alleged right to credit bid against AML stating that "DW has informed the Debtors that it may submit a competing offer in the form of a credit bid up to and/or at the Sale Hearing."

65.     On November 5, 2020, the Debtors filed yet another Notice of Bidding Procedures, providing that a qualifying bid "shall…generally contain terms no less favorable (in the Debtors' reasonable business judgment) than the Stalking Horse Agreement" with AML.

66.     On or about November 10, 2020, AML voluntarily increased its cash deposit to the full amount of the purchase price which remained subject to higher and better offers at auction.

67.     Inexplicably, on November 10, 2020, after AML deposited the full purchase price, the Debtors filed a Notice of Revised Bidding Procedures that effectively barred credit bidding by requiring bidders to make a cash deposit in an escrow account for the full price of the bid.

68.     The effect of the November 5, 2020 Bidding Procedures, coupled with AML's deposit of the full cash purchase price, was to require that all bidders, including Citiking, deposit cash in the amount of the entire purchase price of $5,250,000 to qualify as a bidder. This change

Case 1:25-cv-04652-JGK Document 4 Filed 06/05/25 Page 47 of 103 PageID #: 26

in the bidding procedures completely thwarted and eliminated the ability for Citiking to credit bid the amount of the First Tranche Loans it owned in the approximate amount of $21,000,000.

69. On November 20, 2020, the Bankruptcy Court approved the sale of the Debtors' assets to AML for a cash price of $5,250,000, free and clear of all liens, claims, encumbrances, and other interests, other than permitted encumbrances as defined in the purchase agreement.

70. Citiking was completely and unjustly deprived of the opportunity to credit bid causing Citiking significant harm and providing a windfall to AML.

**The Sale Hearing and AML's Alleged Purchase of the Second Tranche Loans from DW**

71. On November 20, 2020, at the outset of the sale hearing to AML as stalking horse, counsel for DW boldly stated that AML had a deal with DW to purchase DW's secured debt consisting of the Second Tranche Loans conditioned upon entry of the order approving of the sale of the assets to AML.

72. AML's counsel advised the Bankruptcy Court that "just within the last hour or so [DW was] able to document our sale of our debt to AML subject to closing of – subject to entry of a sale order."

73. At the same time, DW's counsel announced DW's support for the sale of the Debtors' assets to AML, which was a stark change in position from DW's prior representation that it would submit a competing offer for the purchase of the assets in the form of a credit bid.

74. This was the first time that Citiking, and seemingly the other creditors and the Bankruptcy Court, were made aware of DW's alleged sale of the Second Tranche Loans to AML. Clearly, this purchase and sale of the Second Tranche Loans was negotiated during the Debtors' sale process and outside the purview of Citiking and the Bankruptcy Court.

75.     Notably, at the time of DW's alleged sale of the Second Tranche Loans to AML, DW had already sold the Second Tranche Loans to Citiking and DW was in default of the Second PSA and Letter Agreement by failing to deliver the Second Tranche Loans to Citiking on the Settlement Date.

76.     Even if DW had not sold the Second Tranche Loans to Citiking, which it did, DW was required to provide Citiking with a ROFR under the Intercreditor Agreement before selling the Second Tranche Loans to AML.

77.     DW failed to provide Citiking with the ROFR to purchase the Second Tranche Loans.

78.     Notably, neither DW nor AML filed a notice of transfer of DW's secured claim.

79.     By allegedly selling the Second Tranche Loans to AML, DW was able to obtain value in the form of a cash payment from AML eliminating the need for DW to protect its loans and collateral by credit bidding at the sale.

80.     To be clear, there was no valid business reason for AML to acquire the secured indebtedness from DW unless there was an undisclosed side deal between DW and AML.

81.     Upon information and belief, while AML and the Debtors were negotiating the bidding procedures, AML was also negotiating with DW to acquire the Second Tranche Loans.

82.     This multi-layer conspiracy between AML and DW was designed to freeze Citiking out by stripping it of its ability to credit bid, satisfy the claim of DW on the Second Tranche Loans and allow AML to purchase the Debtors' assets at a theoretical "face value" far below market value.

Case 1:25-cv-00852-JKS Document 4   Filed 06/03/25   Page 16 of 103 PageID #: 28

83.     This conspiracy enabled AML and DW, with the assistance and cooperation of the D&O Defendants, to eliminate Citiking's credit bidding, paving the way for AML to purchase the Debtors' assets without competition from Citiking.

84.     The end result of AML and DW's secret purchase and sale of the Second Tranche Loans in breach of the ROFR and in violation of Citiking's ownership rights, left Citiking holding the proverbial bag.  AML was able to purchase the Debtors' assets for pennies on the dollar in an amount much lower than what AML would have, and should have, paid.

85.     The discontinued sale to AML also enabled the D&O Defendants to achieve their goal of selling the assets to AML instead of Citiking.  Importantly, during this time there was friction between the D&O Defendants and Citiking.  Indeed, Citking was demanding financial information and accountability from the D&O Defendants concerning the tens of millions of dollars that Citiking had funded to the Debtors from 2018 to 2020 but the D&O Defendants were not providing Citiking with that information.

**Debtors Conversion to Chapter 7**

86.     On February 18, 2021, Debtors' Bankruptcy Cases were converted to Chapter 7. George L. Miller was appointed as the chapter 7 Trustee.

87.     The Debtors were left with little money from the sale proceeds and were unable to satisfy the debts owed to creditors, including Citiking.

88.     As a result of Defendants' improper and concealed tactics, Citiking suffered millions of dollars.

## <u>COUNT I</u>
### (Breach of Intercreditor Agreement Against DW)

89.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 88 as if fully set forth herein.

90.     On or about November 10, 2017, DW and Citiking executed the Intercreditor Agreement.

91.     The Intercreditor Agreement is a valid and enforceable contract that was supported by adequate consideration.

92.     The Intercreditor Agreement required, among other terms, that DW and Citiking are entitled to a ROFR to match the third-party offer. Specifically, the entity that receives a third-party purchase offer shall make an offer in writing to the other loan party enabling that other party to enter into the same purchase and sale transactions as the third-party, the ROFR. *See* Exhibit 3.

93.     To the extent that DW had the right to sell the Second Tranche Loans to AML (which Citiking denies), DW breached the terms of the Intercreditor Agreement by failing to provide Citiking the required ROFR prior to allegedly selling the Second Tranche Loans to AML.

94.     As a result of DW's breach of the Intercreditor Agreement and refusal to honor Citiking's ROFR, Citiking has been damaged.

## <u>COUNT II</u>
### (Breach of the Letter Agreement Against DW)

95.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 94 as if fully set forth herein.

96.     On or about July 25, 2019, DW and Citiking entered into the Letter Agreement. *See* Exhibit 9.

97.     The Letter Agreement is a valid and enforceable contract that was supported by adequate consideration.

98.     DW breached the Letter Agreement by failing to deliver and assign to Citiking the Second Tranche Loans.

99.     As a result of DW's breach of the Letter Agreement, Citiking has been damaged.

## COUNT III
### (Breach of COA Against DW)

100.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 99 as if fully set forth herein.

101.     On or about July 10, 2018, DW and Citiking entered into the COA. *See* Exhibit 6.

102.     The COA is a valid and enforceable contract that was supported by adequate consideration.

103.     DW breached the COA by failing to transfer and assign the Second Tranche Loans back to Citiking, in direct violation of the COA.

104.     The COA required DW to Repurchase the Second Tranche Loans from Citiking upon Citiking's default.

105.     But, because DW breached the Second PSA by not assigning Citiking the loans, because DW still possessed the Second Tranche Loans, DW did not Repurchase the loans and refund Citiking its principal paid as required under the COA.

106.     DW breached its obligations under the COA by failing to refund to Citiking the principal Citiking paid to DW .

107.     Citiking has been damaged in the amount that Citiking paid for the purchase of the Second Tranche Loans, $7,500,000 plus interest, reasonable attorneys' fees, and costs.

## COUNT IV
### (Tortious Interference with Contract Against AML)

108.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 107 as if fully set forth herein.

109.     The Intercreditor Agreement was a valid contract and in effect at all material times.

110.     AML was aware and had knowledge of the Intercreditor Agreement and the ROFR set forth therein.

Case 1:25-cv-04855-JGK Document 4 Filed 06/18/25 Page 192 of 103 PageID #: 31

111. AML is the proximate and direct cause of DW's breach of the Intercreditor Agreement.

112. Because AML and DW were colluding with one another to effectively freeze Citiking out of the bidding process by eliminating the opportunity to credit bid, DW did not offer Citiking the right of first refusal to match AML's offer as required under the Intercreditor Agreement.

113. As a result of AML's misconduct, Citiking has been damaged in an amount exceeding $7,500,000, the amount that Citiking paid for the purchase of the Second Tranche Loans, $7,500,000 plus interest, reasonable attorneys' fees, and costs.

## COUNT V
### (Civil Conspiracy Against AML and DW)

114. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 113 as if fully set forth herein.

115. DW and AML conspired together to eliminate credit bidding at the auction in the Debtors' Bankruptcy Case for the purpose of enabling AML to purchase the Debtors' assets at far below market value and DW to recover on the Second Tranche Loans through the sale of the loans to AML

116. DW and AML unlawfully conspired together to tortiously interfere with Citiking's rights under the Intercreditor Agreement.

117. Specifically, DW was well aware of its obligations owed to Citiking pursuant to the Intercreditor Agreement.

118. AML was also aware of the obligations owed to Citiking based upon AML's involvement in the Bankruptcy Case and DW's express mention of the Intercreditor Agreement and the rights provided to Citiking thereunder.

19

71809983;2

Case 1:25-cv-02065-JKS Document 4 Filed 03/15/24 Page 22 of 103 PageID #: 32

119.    Upon information and belief, DW and AML devised a scheme whereby they sought to eliminate Citiking's right to credit bid and did so by violating the rights owed to Citiking under the Intercreditor Agreement.

120.    The conspiracy between AML and DW is evidenced by AML's inexplicable and nonsensical purchase of the Second Tranche Loans and the elimination of the credit bid, without objection from DW.

121.    AML purchased the Debtors' assets at a fraction of their value while DW received cash for its debt and avoided a priority dispute with Citiking concerning the priority of payment for the sale proceeds.

122.    Citiking was damaged in an amount to be proven at trial as a result of the conspiracy between AML and DW.

## <u>COUNT VI</u>
### (Fraudulent Inducement Against D&O Defendants)

123.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 122 as if fully set forth herein.

124.    In the state of New York, the "trust fund doctrine" provides that officers and directors of an insolvent corporation hold the remaining corporate assets in trust for the benefit of its creditors.

125.    At all material times, Citiking was a creditor of the Debtors.

126.    Therefore, the D&O Defendants (i.e., the Debtors' directors and officers) owed Citiking a duty not to engage in misconduct and to act in the best interest of Citiking and its fellow creditors.

127.    The D&O Defendants served as officers and directors of the Debtors at all material times hereto.

71809983;2

128.     As Debtors' directors and officers, the D&O Defendants owed Citiking a duty to act in the best interest of Citiking and its fellow creditors, and to share all material information truthfully and without reservation.

129.     The D&O Defendants made misrepresentations of material fact with respect to (i) the One Aviation restructuring budget, (ii) inventory funding requests for customer parts, (iii) the $1.7 Million payment earmarked for the unsecured creditors and to be held in the Escrow Account and (iv) payments for Klapmeier's personal plane.

130.     The D&O Defendants misrepresented to Citiking: (a) the amount of the Debtors' restructuring budget to be $6 to $7 million less than the actual budget, (b) that inventory funding was necessary for  customers' parts notwithstanding that the customers had prepaid for the parts, (c) that the Escrow Account was in place and the wire transfer instructions provided to Citiking for delivery of the $1.7 Million were to the Escrow Account, and, (d) the company owned by Klapmeier and holding Klapmeier's personal plane was a "critical vendor" to be paid from the DIP Loan provided by Citiking.

131.     The D&O Defendants knew at the time of making their misrepresentations that the misrepresentations were false.

132.     The D&O Defendants knowingly made the misrepresentations with the intention that Citiking would rely on the misrepresentations to its detriment.

133.     Citiking justifiably relied upon the D&O Defendants' misrepresentations.

134.     As a result of these misrepresentations, Citiking was damaged in an amount to be determined at trial.

## <u>COUNT VII</u>
### (Fraudulent Inducement Against Klapmeier and Siegle)

135.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 134 as if

71809983;2

INDEX NO. 651374/2024
RECEIVED NYSCEF: 03/15/2024

fully set forth herein.

136.    Defendants Klapmeier and Siegle made misrepresentations of material fact to Citiking with respect to the alleged need to retain all of Klapmeier's incumbent team of directors and officers and provide them with large and unwarranted compensation packages (the "Klapmeier Team") in order to successfully reorganize the One Aviation Debtors and (ii) deliberately failed to disclose material information regarding credible allegations as to director Siegle's criminal and fraudulent conduct while serving as a director on the board of another company.

137.    Defendants Klapmeier and Siegle knew at the time of making their misrepresentations that the misrepresentations were false regarding the need to retain the Klapmeier Team with the large and unwarranted compensation packages.

138.    Defendants Klapmeier and Siegle intentionally made the misrepresentations and intentionally and knowingly concealed the highly-relevant information regarding Siegle's sullied history on corporate boards.

139.    These misrepresentations were made with the intent to induce Citiking to rely upon the misrepresentations for the ultimate purpose of inducing Citiking into funding tens of millions of dollars into the Debtors' Bankruptcy Case and purchasing from DW the First and Second Tranches of the Debtors' loan obligations.

140.    Citiking justifiably relied upon the intentional misrepresentations and/or knowing omissions of material fact by Klapmeier and Siegle, and as a result Citiking has suffered damages in an amount to be determined at trial..

### COUNT VIII
### (Fraudulent Misrepresentation Against Klapmeier)

141.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 140 as if fully set forth herein.

71809983;2

Case 1:25-cv-04559-JKB Document 4    Filed 06/26/25    Page 23 of 103  PageID #: 35

142.    Defendant Klapmeier made misrepresentations of material fact in offering to sell Citiking the "real Kestrel intellectual property assets" through a "side deal" he offered outside the Debtors' Bankruptcy Case.  Klapmeier misrepresented the true ownership structure of Kestrel IP assets, stating falsely that they were under his exclusive control and separate from the assets governed by the Debtors' Bankruptcy Case, and thus he could freely transfer these assets to Citiking via a separate transaction that Klapmeier would arrange.

143.    Klapmeier made the misrepresentations intentionally and with knowledge of their falsity.

144.    Such representations with respect to the Kestrel IP assets were intended to induce Citiking to act in reliance thereon.

145.    As a result of Klapmeier's misrepresentations, Citiking missed the opportunity to obtain the assets through a sale in the Debtors' Bankruptcy Case at a more opportune time and price.

146.    Citiking justifiably relied upon Klapmeier's misrepresentations and was damaged as a result in an amount to be determined at trial.

## COUNT IX
### (Fraudulent Misrepresentation Against Klapmeier, Siegel, and Serfling)

147.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 146 as if fully set forth herein.

148.    Defendants Klapmeier, Siegel, and Serfling made misrepresentations of material fact regarding an opportunity for One Aviation and Citiking to form a joint venture with Israel Aerospace Industries ("IAI") on the premise that such a collaboration would be extremely beneficial to both Citiking and the reorganized One Aviation.  Defendants Klapmeier, Siegle, and Serfling traveled to Israel for the purported purpose of negotiating the business deal with IAI.

Case 1:25-cv-00852-UKS Document 4 Filed 03/15/24 Page 24 of 103 PageID #: 36

However, after paying for all the expenses of the trip, Citiking later learned that these D&O Defendants misrepresented both the "business opportunity" with IAI and the premise of their trip as a pretext to get Citiking to pay for an all-expense-paid vacation for themselves and their families to Israel and Europe.

149.    Defendants Klapmeier, Siegel, and Serfling made the misrepresentations intentionally and with knowledge of their falsity.

150.    Such representations with respect to the IAI "business opportunity" and trip to Israel were intended to induce Citiking to act in reliance thereon.

151.    As a result of their misrepresentations, Citiking wasted precious economic resources and missed any opportunity to achieve a business deal with IAI.

152.    Citiking justifiably relied on the misrepresentations of D&O Defendants Klapmeier, Siegle, and Serfling and as a result has suffered damages in an amount to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays for relief and demands:

a)    Entry of a judgment in favor of Plaintiff and against DW awarding the Plaintiff compensatory and consequential damages in an amount to be proven at trial;

b)    Entry of a judgment in favor of Plaintiff and against AML awarding the Plaintiff compensatory and consequential damages in an amount to be proven at trial;

c)    Entry of a judgment in favor of Plaintiff and against the D&O Defendants Klapmeier, Carroll, Serfling, Siegle, and Wyse, awarding the Plaintiff compensatory and consequential damages in an amount to be proven at trial;

71809983;2

Case 1:25-cv-00826-JLS Document 4 Filed 03/18/25 Page 25 of 103 PageID #: 37

d)    Entry of a judgment in favor of Plaintiff and against Klapmeier and Siegle awarding the Plaintiff compensatory and consequential damages in an amount to be proven at trial;

e)    Entry of a judgment in favor of Plaintiff and against Klapmeier awarding the Plaintiff compensatory and consequential damages in an amount to be proven at trial;

f)    Awarding the Plaintiff such further and additional relief as the Court deems just and proper, including prejudgment interest.

Dated: New York, New York
      March 15, 2024

**AKERMAN LLP**

By: _/s/Darryl R. Graham_
      Darryl R. Graham, Esq.
      1251 Avenue of the Americas, 37th Floor
      New York, New York 10020
      Tel: (212) 880-3800
      Fax: (212) 880-8965

*Attorneys for Plaintiff*

71809983;2

25

# EXHIBIT 1



## PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES

### TRANSACTION SPECIFIC TERMS

THIS PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES is dated as of the Agreement Date and entered into by and between Seller and Buyer to govern the purchase and sale of the Loans, the Commitments (if any) and the other Transferred Rights, in accordance with the terms, conditions and agreements set forth in the LSTA Standard Terms and Conditions for Purchase and Sale Agreement for Distressed Trades published by the LSTA as of June 9, 2017 (the "Standard Terms"). The Standard Terms are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties and as specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through H below. The Standard Terms and the Transaction Specific Terms together constitute a single integrated Purchase and Sale Agreement for Distressed Trades governing the Transaction. With respect to the Transaction, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.

| TRANSACTION SUMMARY | |
|---|---|
| **Trade Date:** October 31, 2017 | |
| **Agreement Date:** November 7, 2017 | |
| **Seller:** DWC Pine Investments I, Ltd. ("DW") | |
| **Seller MEI[1]:** | |
| **Buyer:** Huiyin Chengtou Equity Investment Fund Management Co., Ltd./CITIKING International Limited, jointly and severally (together, "Citiking") | |
| **Buyer MEI[2]:** | |
| **Credit Agreement:** Credit and Security Agreement dated as of July 20, 2012 as amended, from time to time, through Amendment No. 17 as of August 9, 2017 | |
| **Borrower:** Eclipse Aerospace, Inc. | |
| **Purchase Amount(s):** USD 20,712772.54 | |
| **Tranche(s):** Senior Secured 1st Lien with a USD 41,425,545.07balance | |
| **CUSIP Number(s), if available:** N/A | |
| **Pre-Settlement Date Accruals Treatment:** | ☐ Settled Without Accrued Interest<br>☒ Trades Flat<br>☐ Paid on Settlement Date |
| **Type of Assignment:** | ☒ Original Assignment<br>☒ Secondary Assignment |
| **Borrower in Bankruptcy:** | Yes ☐　　　No ☒ |
| **Delivery of Credit Documents:** | Yes ☒　　　No ☐ |
| **Netting Arrangements:** | Yes ☐　　　No ☒ |

---

[1] Insert Markit Entity Identifier for Seller, if available.

[2] Insert Markit Entity Identifier for Buyer, if available.

Copyright © LSTA 2017. All rights reserved.

Case 1:25-cv-00825-JKB Document 4 Filed 03/18/25 Page 28 of 103 PageID #: 40

| | | |
|---|---|---|
| **Flip Representations:** | Yes ☒[3] | No ☐ |
| **Step-Up Provisions:** | Yes ☐[4] | No ☒ |
| | **Shift Date**[5]: | January 1, 2017 |
| **Transfer Notice** | Yes ☐[6] | No ☒ |

## A.  DEFINITIONS

Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the Transaction Specific Terms and as otherwise may be provided in other provisions of this Agreement.  Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement.  Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement.  If there is any inconsistency between the Transaction Specific Terms and the Standard Terms, the Transaction Specific Terms shall govern and control.

In this Agreement:

"Agent" means [Cantor Fitzgerald as successor agent to Crystal Financial SBIC LP.

"Assignment" means the [specify name of applicable document form] that is in the form specified in the Credit Agreement for an assignment of the Loans and Commitments (if any) and any Required Consents to such assignment [specify any other relevant assignment or consent documents required under the Credit Agreement, e.g., Notice of Assignment].

"Bankruptcy Case" select one:
☒ not applicable.
☐ means [the case under the Bankruptcy Code pending before the Bankruptcy Court in which Borrower is a debtor, In re _____, No. _____].

"Bankruptcy Court" select one:
☒ not applicable.
☐ means [the United States Bankruptcy Court for the _____District of _____ (and, if appropriate, the United States District Court for that District)].

"Bar Date" select one:

---

[3] The Parties cannot specify "Yes" to both "Flip Representations" and "Step-Up Provisions" unless they set forth appropriate modifications in Section H.  Neither "Flip Representations" nor "Step-Up Provisions" applies to original assignments.

[4] The Parties cannot specify "Yes" to both "Flip Representations" and "Step-Up Provisions" unless they set forth appropriate modifications in Section H.  Neither "Flip Representations" nor "Step-Up Provisions" applies to original assignments.

[5] Specify the Shift Date only if "Yes" is specified opposite "Step-Up Provisions" and if the second box is selected in the definition of Covered Prior Seller.  The Shift Date is the date published by the LSTA and is that date determined by the LSTA to be the date on which market convention for transferring the Debt shifted from par documentation to distressed documentation (the "Shift Date").  The Parties shall include the Shift Date published by the LSTA, or, if the Shift Date has not been published by the LSTA, either party may request in writing (a "Shift Date Request") that the LSTA determine whether market convention for transferring the Debt has shifted from par documentation to distressed documentation and, if it so determines, to select and publish the Shift Date.  To submit a Shift Date Request, send a request that includes the name of Borrower, the title and date of the Credit Agreement, the deal CUSIP (or facility CUSIP, if appropriate), and name of the administrative agent under the Credit Agreement to the LSTA at lstashiftdates@lsta.org.  The Shift Date published by the LSTA shall be binding on the parties.

[6] "Yes" can be elected only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary.

☒ not applicable.
☐ none has been set.
☐ means [specify applicable date, if any].

"Buyer Purchase Price" select one:
☒ not applicable.
☐ means the purchase price payable by Buyer to Original Buyer pursuant to the Netting Letter (this applies if there are three (3) parties involved in the netting arrangement).
☐ means the purchase price payable by Buyer to Penultimate Buyer pursuant to the Netting Letter (this applies if there are four (4) or more parties involved in the netting arrangement).

"Commitments" select one:
☒ none.
☐ means [identify applicable commitment tranche(s) using Credit Agreement definitions] in the principal amount of $/£/€_____ [in each case specify the aggregate amount of the Loans, the Unfunded Commitments and the portion, if any, of the Commitments that is irrevocably "frozen" (i.e., that is not subject to future drawing)].

"Covered Prior Seller" select one:
☒ not applicable.
☐ means each Prior Seller that transferred the Loans and Commitments (if any)[7] on or after the Shift Date [but prior to the transfer pursuant to which Crystal Financial SBIC LP[8] transferred such Loans and Commitments (if any) on a distressed documentation basis pursuant to the Purchase and Sale Agreement for Distressed Trades dated as of November 7, 2017, as set forth in the Annex].[9]

"Filing Date" select one:
☒ not applicable.
☐ means [identify date on which Borrower filed Bankruptcy Case].

"Loans" means [identify applicable loan tranche(s) using Credit Agreement definitions] in the outstanding principal amount of USD 41,425,545.07 [specify loan types by tranche or facility and outstanding principal amount].

"Netting Letter" select one:
☒ not applicable.
☐ means that certain Multilateral Netting Agreement in the form currently published by the LSTA dated on or as of the Agreement Date among Seller, Buyer [and] [,] Original Buyer [, Penultimate Buyer] and [describe any other parties to the Netting Letter]].

"Original Buyer" select one:
☒ not applicable.
☐ means [specify original buyer in the netting arrangement].

"Penultimate Buyer" select one:
☒ not applicable.
☐ none ("none" is applicable if there are only three (3) parties involved in the netting arrangement).
☐ means [_____].

---

[7] If applicable to only a portion of the Loans and Commitments (if any), specify the portion that applies, e.g., "each Prior Seller that transferred the [Name of applicable Covered Prior Seller] Loans (as defined in Section 1 of the Annex)."

[8] Specify the first Entity that transferred the Loans and Commitments (if any) on a distressed documentation basis on or after the Shift Date.

[9] The bracketed language applies where the relevant Predecessor Transfer Documents include a distressed trade that settled after the par/near par trade which settled on or after the Shift Date.

Case 1:25-cv-00585-JKS Document 1-4   Filed 03/26/25   Page 30 of 103 PageID #: 42

"Required Consents" means [specify consent(s), acknowledgement(s) and/or notice(s) required by the Transaction Documents to transfer the Transferred Rights].

"Seller Purchase Price" select one:
☒ not applicable.
☐ means the purchase price payable by Original Buyer to Seller pursuant to the Netting Letter.

"Transfer Fee" means the $/£/€_____ transfer or other similar fee payable to the Agent in connection with the Assignment.

"Unfunded Commitments" means that part of the Commitments that has not been funded in the form of loans, advances, letter of credit disbursements or otherwise under the Credit Agreement, which is in the principal amount of $/£/€_____ [including, if any, issued and undrawn letters of credit in the principal amount of $/£/€ _____] [specify any other Unfunded Commitments that may still be drawn; do not include any portion of the Unfunded Commitments that is irrevocably "frozen" (i.e., that is not subject to future drawing)].

**B.      SECTION 4 (SELLER'S REPRESENTATIONS AND WARRANTIES)**

The following specified terms shall apply to the sections referenced in this Section B:

|  | **Flat Representation** | **Flip Representation** | **Step-Up Representation** |
|---|---|---|---|
|  | If "No" is specified opposite both "Flip Representations" and "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Flip Representations" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: |
| Section 4.1(d) (Title) | Section 4.1(d)(i) | Section 4.1(d)(ii) | Section 4.1(d)(i) |
| Section 4.1(e) (Proceedings) | Section 4.1(e)(i) | Section 4.1(e)(i) | Section 4.1(e)(ii) |
| Section 4.1(f) (Principal Amount) | Section 4.1(f)(i) | Section 4.1(f)(ii) | Section 4.1(f)(i) |
| Section 4.1(g) (Future Funding) | Section 4.1(g)(i) | Section 4.1(g)(ii) | Section 4.1(g)(iii) |
| Section 4.1(h) (Acts and Omissions) | Section 4.1(h)(i) | Section 4.1(h)(i) | Section 4.1(h)(ii) |
| Section 4.1(i) (Performance of Obligations) | Section 4.1(i)(i) | Section 4.1(i)(i) | Section 4.1(i)(ii) |
| Section 4.1(l) (Setoff) | Section 4.1(l)(i) | Section 4.1(l)(i) | Section 4.1(l)(ii) |
| Section 4.1(t) (Consents and Waivers) | Section 4.1(t)(i) | Section 4.1(t)(i) | Section 4.1(t)(ii) |
| Section 4.1(u) (Other Documents) | Section 4.1(u)(i) | Section 4.1(u)(i) | Section 4.1(u)(ii) |
| Section 4.1(v) (Proof of Claim) | Section 4.1(v)(i) | Section 4.1(v)(ii) | Section 4.1(v)(i) |

Section 4.1(k) (<u>Purchase Price</u>); <u>Netting Arrangements</u>.
      If "Yes" is specified opposite Netting Arrangements in the Transaction Summary, Section 4.1(k) shall be amended in its entirety as follows:

             "(k) [intentionally omitted]."[10]

Section 4.1(r) (<u>Predecessor Transfer Agreements</u>).
☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to par/near par loans.
☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to distressed loans.
☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to both par/near par loans and distressed loans.
☐ Not applicable.

Section 4.1(u) (<u>Other Documents</u>).
☐ None.
☐ The following:

Section 4.1(v) (<u>Proof of Claim</u>).
☐ The Proof of Claim was duly and timely filed, on or prior to the Bar Date, by
    ☐ the Agent on behalf of the Lenders.
    ☐ Seller or a Prior Seller.
☐ The Bar Date specified in the Transaction Specific Terms has been set in the Bankruptcy Case and no Proof of Claim has been filed.
☐ No Bar Date has been set in the Bankruptcy Case and no Proof of Claim has been filed.
☒ Not applicable.

## C.    <u>SECTION 5 (BUYER'S REPRESENTATIONS AND WARRANTIES)</u>

**C.1**    Section 5.1(n) (<u>Buyer Status</u>).  [Specify Buyer's status for purposes of determining any Required Consents, minimum assignment amount requirements or Transfer Fee requirements.]

☒ Buyer is not a Lender.
☐ Buyer is a Lender.
☐ Buyer is an Affiliate [substitute Credit Agreement defined term if different] (as defined in the Credit Agreement) of a Lender.
☐ Buyer is an Approved Fund [substitute Credit Agreement defined term if different] of a Lender.

**C.2**    If "Yes" is specified opposite "Delivery of Credit Documents" in the Transaction Summary, Buyer represents and warrants that it (i) was not a Lender on the Trade Date and (ii) requested copies of the Credit Documents from Seller on or prior to the Trade Date.

## D.    <u>SECTION 6 (INDEMNIFICATION)</u>

Section 6.1 (<u>Seller's Indemnities</u>); <u>Step-Up Indemnities</u>.

      (i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(b) shall apply (and the alternate indemnities contained in Section 6.1(a) shall not apply).

      (ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(a) shall apply (and the alternate indemnities contained in Section 6.1(b) shall not apply).

---

[10] Seller should add, and Buyer should cause Original Buyer or Penultimate Buyer, as applicable, to add, a comparable representation to the Netting Letter in lieu of this representation.

**E.    SECTION 7 (COSTS AND EXPENSES)**

☐    The Transfer Fee shall be paid by Seller to the Agent and the Purchase Price shall be increased by an amount equal to
    ☐    one-half thereof.
    ☐    other relevant fraction or percentage, _____, thereof.
☐    The Transfer Fee shall be paid by Buyer to the Agent and Buyer shall receive a credit to the Purchase Price equal to
    ☐    one-half thereof.
    ☐    other relevant fraction or percentage, _____, thereof.
☐    The Transfer Fee shall be paid and allocated in the manner specified in the Netting Letter.
☐    The Transfer Fee has been waived by the Agent and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.
☒    There is no Transfer Fee and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.

**F.    SECTION 8 (DISTRIBUTIONS; INTEREST AND FEES; PAYMENTS)**

**F.1**    Section 8.2 (Distributions); Step-Up Distributions Covenant.

    (i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(b) shall apply (and the alternate covenants contained in Section 8.2(a) shall not apply).

    (ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(a) shall apply (and the alternate covenants contained in Section 8.2(b) shall not apply).

**F.2**    Section 8.5 (Wire Instructions).

Buyer's Wire Instructions:


Bank: China Merchants Bank, Hong Kong Branch, Hong Kong
Swift No: CMBCHKHH
Account No: ████3897
Attn.: Luo Wei
Ref.: Eclipse Aerospace

Bank:  China Guangfa Bank
Swift No: GDBKCN22
Acct No. ██████████0066
Attn.: Luo Wei
Ref.: Eclipse Aerospace


Seller's Wire Instructions:

Bank: Bank of America
ABA No.: 026009593
Acct.: DWC Pine Investments I Ltd
Acct. No.: ██████3128
Ref.: Eclipse Aerospace

G.    **SECTION 9 (NOTICES)**

Buyer's Address for Notices and Delivery:

Huiyin Chengtou Equity Investment Fund Management Co., LTD/CITIKING International Limited
Attention: Wei Luo
Telephone: +8613316855588
Email: wluofaith@aliyun.com

Seller's Address for Notices and Delivery:

DW Partners
590 Madison Avenue, 13th Floor
New York, NY 10022
Attention: DW Legal
Telephone: 1-212-751-6113
Email: DW.Legal@dwpartners.com cc: john.buck@dwpartners.com

H.    **SECTION 27 (ADDITIONAL PROVISIONS)**

The following additional provisions, including any modifications to existing provisions, apply:

As condition to this Trade Confirmation, Seller shall have received wire transfers from the Buyer in an aggregate amount equal to $1,000,000 (the "Deposit"), which shall be applied towards the Purchase Price at the closing. The Deposit is non-refundable and is due no later than 48 hours after receipt of the executed Trade Confirmation by the Seller and in any case no later than 3:00 PM New York Time on November 7, 2017.

Assignment of the debt by the Seller to the Buyer is subject to simultaneous assignment of 100% of outstanding debt held by Crystal Financial SBIC LP ("Crystal") to the Seller, each assignment documented using the Assignment and Assumption Agreement scheduled in the Credit Agreement and according to the same terms and conditions.

The terms of the Secondary Assignment shall be deemed to apply to that portion of the assigned Loans assigned by the Seller hereunder equal to 50% of the Loans assigned by Crystal to the Seller, and the terms of the Original Assignment shall apply to the balance of the Loans assigned by the Seller hereunder.

Release: The Buyer hereby remises, releases, and forever discharges Crystal and each of its parents, members, successors, predecessors, subsidiaries, affiliated entities, past and present shareholders, officers, directors, agents, representatives, attorneys, employees, subsidiaries, affiliates, and related entities (hereinafter collectively referred to as the "Crystal Released Parties") of and from all debts, demands, actions, causes of action, suits, accounts, contracts, agreements, and damages in any and all claims, counterclaims, demands, and liabilities whatsoever of every kind, nature, and description whatsoever, both in law and equity, known or unknown, whether based in tort, contract, or any other theory of recovery (including, but without limitation, claims for incidental, consequential, compensatory, and punitive damages), which the Buyer may have, or ever did have, against the Crystal Released Parties relating to or arising from the Credit Facility from the beginning of the world through the date hereof, but excluding any matters arising in connection with the agreements described herein and the Crystal/DWC Assignment Agreement. The Buyer specifically represents that (i) it has executed this instrument of its own free will and intends to be bound by its terms; (ii) that it has read and understands the provisions of this release; (iii) that it voluntarily signs same for the purpose of making a full and final settlement of all claims and causes of action against the Crystal Released Parties (iv) that it is the intention of such Buyer that this release be a complete and total release of any and all claims by such the Buyer; and (v) that it has reviewed same with counsel of its choosing, and that it is not relying upon any representation of law or fact set forth by any of the Crystal Released Parties.

Definitive documentation shall include an Intercreditor Agreement in the form attached hereto as Exhibit A.  All definitive documentation shall be executed by the parties by 3:00 PM New York Time on November 7, 2017 and the Buyer's funds shall be received by the Seller by 3:00 PM New York Time on

Case 1:25-cv-04856-JKB   Document 4   Filed 06/18/25   Page 34 of 103   PageID #: 46

November 10, 2017 (the "Settlement Date"). Failure to do so shall result, among other rights, powers, privileges and remedies that may be afforded to the Seller in the Buyer's forfeiture of the Advanced Capital and Deposit.

[Signatures Appear Next Page]

**IN WITNESS WHEREOF**, Seller and Buyer have executed this Agreement by their duly authorized officers or representatives as of the Agreement Date.

SELLER

**DWC Pine Investments I, Ltd.**

By: _____

    Name: Houdin Honarvar
    Title: Director

BUYER

**Citiking International Limited**

By: _____

    Name: Wei Tuo
    Title: General manager

BUYER

**Huiyin Chengtou Equity Investment Fund Management Co., Ltd.**

By: _____

    Name: Rong Huang
    Title: General Manager

**ANNEX TO PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES[1]**

1. If "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, list of Predecessor Transfer Agreements[2] and principal amount, as of the Settlement Date, of the portion of the Loans and Commitments (if any) thereunder assigned hereby for purposes of Section 4.1(r) and Section 5.1(k)(i) hereof, and designation as to whether such Predecessor Transfer Agreements relate to par/near par loans or distressed loans.

   Proceeds Waterfall Side Letter between Crystal Financial SBIC LP and DWC Pine Investments I, Ltd

2. List of Credit Agreement and any other Credit Documents delivered pursuant to Section 4.1(s) hereof.[3]

   The Buyer has received access to the Seller's Citrix Share File Folder containing the Credit Agreement and other Credit Documents

Description of Proof of Claim (if any).[4]

4. Description of Adequate Protection Order (if any).[5]

5. List any exceptions to Section 4.1(w) (Notice of Impairment).[6]

6. The amount of any PIK Interest that accreted to the principal amount of the Loans on or after the Trade Date but on or prior to the Settlement Date is [USD _____ ].[7]

---

[1] For purposes of Sections 1 through 6 in this Annex, terms such as "none", "not applicable", "n/a", "irrelevant" and "zero" should be given the same meaning.

[2] List (i) any Predecessor Transfer Agreement to which Seller is a party, (ii) any Predecessor Transfer Agreement of Prior Sellers relating to distressed loans delivered to Seller by Immediate Prior Seller and (iii) any Predecessor Transfer Agreement of Prior Sellers relating to par loans listed in any Predecessor Transfer Agreement described in the preceding clause (ii).

[3] If not applicable, so state.

[4] May apply only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary. If not applicable, so state. If applicable, note that according to the Standard Terms, failure to state is not failure to convey rights or obligations with respect thereto.

[5] May apply only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary. If not applicable, so state. If applicable, note that according to the Standard Terms, failure to state is not failure to convey rights or obligations with respect thereto.

[6] If none, so state.

[7] In addition to the terms listed in footnote 1 of this Annex, amounts listed as 0 or 0.00, with or without a currency sign, should be given the same meaning.

Annex

INDEX NO. 651374/2024
Case 1:25-cv-04452-JKB Document 4 Filed 08/26/24 Page 37 of 103 PageID #: 49
RECEIVED NYSCEF: 03/15/2024

# EXHIBIT 2

EXECUTION VERSION

## ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (the "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between DWC Pine Investments I, Ltd (the "Assignor") and Huiyin Chengtou Equity Investment Fund Management Co., LTD ("SFUND") and CITIKING International Limited, jointly and severally, (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, restated, supplemented and/or modified from time to time, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration as set forth in paragraph 2 of Annex 1 attached hereto, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as, the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.  **Assignor:**            DWC Pine Investments I, Ltd.

2.  **Assignee:**            Huiyin Chengtou Equity Investment Fund Management Co., LTD ("SFUND") and CITIKING International Limited, jointly and severally

3.  **Borrower:**            Eclipse Aerospace, Inc.

4.  **Agent:**               ~~Citibank, N.A.~~ Cantor Fitzgerald

5.  **Credit Agreement:**    The Credit and Security Agreement dated as of July 20, 2012, from time to time, though Amendment No. 17 as of August 9, 2017 with Eclipse Aerospace, Inc. as the Borrower

6.    Assigned Interest:

| Facility Assigned | Aggregate Principal Amount of Commitment / Loans for all Lenders as of the Amendment No. Effective Date | Principal Amount of Commitment / Loans Assigned (without giving effect to any accrued and unpaid interest that is paid-in-kind | Percentage Assigned of Commitment / Loans |
|---|---|---|---|
| Credit Facility | $42,069,002.73 | $21,034,504.37 | 50.00% |

7.    Effective Date: November 10, 2017

Seller

x _Houdin Honaros_

Director

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR

DWC PINE INVESTMENTS I, LTD.

By: _____
Title: Director

ASSIGNEES (Jointly and Severally)

CITIKING INTERNATIONAL LIMITED

By _____
Name: Wei Luo
Title: General Manager

HUIYIN CHENGTOU EQUITY INVESTMENT
FUND MANAGEMENT CO., LTD.

By _____
Name: Tony Huang
Title: general manager



ANNEX 1

STANDARD TERMS AND CONDITIONS FOR THE
ASSIGNMENT AND ASSUMPTION

1.    Representations and Warranties.

1.1    Assignor. The Assignor (a) represents and warrants that (i) it is the legal
and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any
lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken
all action necessary, to execute and deliver this Assignment and Assumption ("Assignment and
Assumption") and to consummate the transactions contemplated hereby; and (b) assumes no
responsibility with respect to (i) any statements, warranties or representations made in or in
connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality,
validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any
collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or
Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance
or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of
their respective obligations under any Loan Document.

1.2    Assignee. The Assignee (a) represents and warrants that (i) it has full
power and authority, and has taken all action necessary, to execute and deliver this Assignment
and Assumption and to consummate the transactions contemplated hereby and to become a
Lender under the Credit Agreement, (ii) from and after the Effective Date, it shall be bound by
the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned
Interest, shall have the obligations of a Lender thereunder, (iii) it is sophisticated regarding
decisions to purchase assets such as those represented by the Assigned Interest and either it, or
the Person exercising discretion in making its decision to purchase the Assigned Interest, is
experienced in acquiring assets of such type, and (iv) it has received a copy of the Credit
Agreement, together with copies of the most recent financial statements delivered pursuant to
Section 6.1 thereof, as applicable, and such other documents and information as it has deemed
appropriate to make its own credit analysis and decision to enter into this Assignment and
Assumption and to purchase the Assigned Interest on the basis of which it has made such
analysis and decision independently and without reliance on Assignor; and (b) agrees that (i) it
will, independently and without reliance on the Assignor or any other Lender, and based on such
documents and information as it shall deem appropriate at the time, continue to make its own
credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform
in accordance with their terms all of the obligations which by the terms of the Loan Documents
are required to be performed by it as a Lender.

2.    Payments. From and after the Effective Date, all payments in respect of
the Assigned Interest (including payments of principal, interest, fees and other amounts) shall be
made to the Assignee (including, for the avoidance of doubt, for amounts which have accrued to
but excluding the Effective Date).

3.    General Provisions.    This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York (without regard to its choice of law principles).

# EXHIBIT 3

Exhibit A

# INTERCREDITOR AGREEMENT

This INTERCREDITOR AGREEMENT (this "Agreement") is dated as of November 10, 2017, between Huiyin Chengtou Equity Investment Fund Management Co., Ltd. (together with its affiliates, "SFund") and Citiking International Limited (together its affiliates and with SFund and its affiliates and SFund, "Citiking"), and DWC Pine Investments 1, LTD. (together with its affiliates, "DWC"). All rights and obligations of SFund and Citiking International Limited under this Agreement shall be joint and several.

WHEREAS, Citiking has purchased from DWC fifty percent (50%) of the senior secured loans outstanding under the Credit and Security Agreement dated as of July 20, 2012, as amended through the Forbearance Agreement and Amendment No. 17 to Credit and Security Agreement dated as of August 9, 2017, among Eclipse Aerospace, Inc., Brigadoon Aircraft Maintenance, LLC, and One Aviation Corporation (collectively, the "Borrowers"), Crystal Financial SBIC LP as Administrative Agent and Collateral Agent (collectively, the "Agent"), and the Lenders parties thereto (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"); and

WHEREAS, one or more Events of Default (as defined in the Credit Agreement) have occurred and are continuing; and

WHEREAS, the Citiking and DWC as lenders (each a "Lender" and together, the "Lenders") under the Credit Agreement intend to cooperate in making decisions from time to time with respect to the Borrowers and the Credit Agreement and wish to agree on how certain issues will handled, as described herein;

NOW, THEREFORE, in consideration of the foregoing and the agreements contained herein, the parties as follows:

1. **Defined Terms.** Except as otherwise expressly defined herein, all capitalized terms used herein which are defined in the Credit Agreement have the same meanings herein as therein.

2. **Required Lenders.** Notwithstanding the provisions of Article 15 of the Credit Agreement and the definition of Required Lenders, it is agreed that, so long as each Lender holds Loans in an amount equal to at least twenty-five percent (25%) of the Loan and the agreement or assent of the Required Lenders is required, the agreement or assent of each Lender is also required in such instances. Without limiting the generality of the foregoing, notwithstanding the provisions of Section 10.11(b), neither Lender shall (i) assert or exercise any enforcement right or remedy in respect of the Term Loans or other Obligations, as against any Lender or any of their Collateral or other property of any Loan Party, or (ii) direct the Agent exercise any enforcement right or remedy in respect of the Term Loans or other Obligations, as against any Lender or any of their Collateral or other property of any Lender to without the prior consent of the other Lender.

AM 674924455.4

FILED: NEW YORK COUNTY CLERK 03/15/2024 11:21 AM    INDEX NO. 651374/2024

NYSCEF DOC. NO. 4    Case 1:25-cv-04682-JKB Document 4    Filed 08/18/24    Page 45 of 103    PageID #: 57    RECEIVED NYSCEF: 03/15/2024

3.    **Funding Requests from the Borrowers.**

(a)    *Discretionary Advances.*  From time to time, the Borrowers may request additional discretionary Loans under the Credit Agreement. The Lenders agree to cooperate in deciding whether to make additional Loans to the Borrowers. The Lenders agree that they will make additional discretionary Loans to the Borrowers to the extent that such Loans shall be entitled to the same priority and security as the outstanding Loans under the Credit Agreement.

(b)    *Non-Participated Loans.*  In the event that one of the Lenders is willing to make an additional discretionary Loan to the Borrowers and the other Lender is not willing to make its share of the Loan within two Business Days, upon the making of such discretionary Loan by one of the Lenders, the additional Loan made by such Lender (the "Non-Participated Loan") shall be reflected in the outstanding Loan amounts owed by the Borrowers, and the relative percentages of the outstanding Loans held by each Lender shall be adjusted to reflect the addition Loan. The Non-Participated Loans shall charge the Borrower the same annual interest rate as the Discretionary Advances.

(c)    *First-Out Payments.*  Notwithstanding the priorities of payment in the Credit Agreement, the Lenders agree that all payments, received after any Non-Participated Loan has been made by a Lender, that under the Credit Agreement would be applied to the payment of interest or principal on the outstanding Loans shall be applied (i) first, pro-rata to all accrued and unpaid interest (as calculated in accordance with the Credit Agreement) on all Non-Participated Loans, (ii) second, pro rata to the unpaid principal amount of all Non-Participated Loans, and (iii) thereafter, as provided in the Credit Agreement. The Lenders shall direct the Agent to make distributions in accordance with this Section 2(c) or shall otherwise make the necessary adjustments to amounts they receive to provide for the first-out payments of Non-Participated Loans as provided in this Section 2(c).

4.    **Deadlock and Buyout Right.**

(a)    *Right to Offer.*  Upon the occurrence of and continuance of a Deadlock, (i) each Lender shall have the right to offer to purchase the Other Lender's Loans for an amount not less than the Other Lender's notional value of its Loans less any purchase discount it received plus 250% of the Other Lender's pro rata share of Discretionary Advances plus 250% of the Other Lender's pro rata share of Non-Participated Loans.

(b)    *Acceptance or Match.*  The Lender making an offer pursuant to Section 3(a) (the "Offering Lender") shall make such offer by providing written notice thereof (the "Offer Notice") to the other Lender (the "Receiving Lender") within 20 Business Days after the occurrence of such Deadlock, which shall contain the price per dollar amount of the outstanding balance of the Receiving Lender's Loans at which the Purchasing Lender is offering to purchase the Receiving Lender's Loans (the "Offer Price"). The Receiving Lender shall, within 10 Business Days of receipt of the Offer Notice, elect (x) to accept the offer at the Offer Price and on the terms set forth in the Offer Notice (an "Accepted Offer"), or (y) match the offer by electing to purchase all of the Offering Lender's Loans at the Offer Price and on the terms set forth in the Offer Notice (an "Offer Match"). An Offer Match shall be deemed binding, and the Offering Lender shall be

2

Case 1:25-cv-00852-KSM Document 4 Filed 03/18/24 Page 46 of 103 PageID #: 58

required to sell its Loans to the Receiving Lender at the Offer Price and on the terms set forth in the Offer Notice.

(c)     *Two Offers*.  In the event that both Lenders submit an Offer Notice within the 20 Business Days following the occurrence of a Deadlock, the Lenders shall have an additional 10 Business Days to negotiate with each other with respect to their Buyout Rights.  If no resolution is reached during such 10 Business Day period, then neither Lender shall have the right to exercise its Buyout Right, and the Deadlock shall continue until otherwise resolved or new offers are made after such 10 Business Day period has expired, after which time the highest offer prevails.

(d)     *Purchase and Sale*.  Upon an Accepted Offer or an Offer Match, the Purchasing Lender shall purchase, and the Selling Lender shall sell, all Loans owned by the Selling Lender for a purchase price equal to Offer Price.  The Offer Price shall be payable by wire transfer of immediately available funds.

(e)     *Closing*.  The closing of any Buyout pursuant to this Section 3 shall take place no later than 35 Business Days following the occurrence of the Deadlock.  At the closing of any Buyout, the Selling Lender shall deliver to the Purchasing Lender such documents as are required under the Credit Agreement to transfer the Loans from the Selling Lender to the Purchasing Lender, including an Assignment and Assumption Agreement.  The Selling Lender shall take all actions as may be reasonably necessary to consummate the Buyout.

(f)     *Definitions*.

i.      "Buyout" means the purchase of Loans in accordance with Section 3.

ii.     "Buyout Right" means a Lender's right to purchase Loans from other Lender pursuant to Section 3(a).

iii.    "Deadlock" means a matter that occurs while each Lender holds Loans in an amount equal to at least 25% of the Loan Amount that requires a decision of the Lenders involving the exercise of remedies under the Credit Agreement or other material decision presented to the Lenders for which the Lenders have failed to reach a decision within thirty (30) days after the date on which the matter was identified to each of the Lenders.

iv.     "Purchasing Lender" means either (1) in the event of an Accepted Offer, the Offering Lender, or (2) in the event of an Offer Match, the Receiving Lender.

v.      "Selling Lender" means either (1) in the event of an Accepted Offer, the Receiving Lender, or (2) in the event of an Offer Match, the Offering Lender.

5.      **Right of First Refusal**: Notwithstanding anything to the contrary contained in the Credit Agreement, except in connection with a sale pursuant to Section 4 of this Agreement, each Lender agrees that in the event that it receives an offer for the purchase and sale of any or all of its right, title, and interest in and to the Obligations or the Loan Documents from an unaffiliated third-party (the "Third-Party Purchase Offer) to become a lender under the Credit

3

Agreement pursuant to Section 14 of the Credit Agreement, prior to accepting the Third-Party Purchase Offer, the receiving Lender shall make an offer in writing to the other Loan Party (the "ROFR Party") to enter into the same purchase and sale transaction on the same terms as the Third-Party Purchase Offer. The ROFR Party shall have three (3) business days to accept or reject the offer. Anything in this Agreement or in the Loan Documents to the contrary notwithstanding, (i) each Lender Party hereby agrees that either Lender may, subject to the terms of this Agreement, assign and delegate to any of its managed funds and accounts or its respective affiliates (to the extent such Persons would be permitted assignees pursuant to the terms of the Credit Agreement) any of the rights and obligations acquired by either Lender as a result of its exercise of its rights pursuant to this Section 5.

6. **Miscellaneous.**

(a) *Credit Agreement Remains in Effect.* Except to the extent specifically modified hereby, the Credit Agreement and all related documents shall remain in full force and effect. For all purposes in the Credit Agreement for which the Lenders are required to make any advances, the term "Business Days" shall no include days which are banking holidays in China and Hong Kong.

(b) *Counterparts.* This Agreement and any amendments, waivers, consents or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all of which counterparts taken together shall constitute but one in the same instrument.

(c) *Headings.* Section headings are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purposes or be given substantive effect.

(d) *Amendments.* Neither this Agreement nor any terms hereof may be amended, waived, discharged, or terminated unless such amendment, waiver, discharge, or termination is in writing signed by DWC and Citiking as lenders and such amendment, waiver, discharge, or termination shall be effective and binding as to the parties hereto only in the specific instance and for the specific purpose for which given.

(e) *Incorporation by Reference.* The terms and provisions of each of Section 13 of the Credit Agreement (*Choice of Law and Venue; Jury Trial Waiver*), Section 14 of the Credit Agreement (*Assignments; Successors*), Section 17.4 of the Credit Agreement (*Severability of Provisions*), and Section 17.6 of the Credit Agreement (*Counterparts; Electronic Execution*) are hereby incorporated herein by reference and shall apply to this Agreement *mutatis mutandis* as if fully set forth herein.

(f) *Applicable Law.* THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THAT RESULT IN THE APPLICATION OF THE LAWS OF A DIFFERENT JURISDICTION.

[Signature Pages Follow]

4

AM 67492455.4

IN WITNESS WHEREOF, the parties hereto have executed this Agreement which shall be deemed to be a sealed instrument as of the date first above written.

CITIKING INTERNATIONAL LIMITED

By _____
Name: Wei Lub
Title: General Manager

HUIYIN ZHENGTOU EQUITY INVESTMENT FUND MANAGEMENT CO., LTD.

By _____
Name: Yong Nuang
Title: general manger

DWC PINE INVESTMENTS I, LTD.

By _____
Name: Houdin Honarvar
Title: Director

[Signature Page of Intercreditor Agreement]

# EXHIBIT 4



**PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES**

_____

**TRANSACTION SPECIFIC TERMS**

THIS PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES is dated as of the Agreement Date and entered into by and between Seller and Buyer to govern the purchase and sale of the Loans, the Commitments (if any) and the other Transferred Rights, in accordance with the terms, conditions and agreements set forth in the LSTA Standard Terms and Conditions for Purchase and Sale Agreement for Distressed Trades published by the LSTA as of June 9, 2017 (the "Standard Terms").  The Standard Terms are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties and as specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through H below.  The Standard Terms and the Transaction Specific Terms together constitute a single integrated Purchase and Sale Agreement for Distressed Trades governing the Transaction.  With respect to the Transaction, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.

| TRANSACTION SUMMARY | |
| --- | --- |
| **Trade Date:** | July 10, 2018 |
| **Agreement Date:** | July 10, 2018 |
| **Seller:** | DWC Pine Investment I, Ltd. |
| **Seller MEI[1]:** | |
| **Buyer:** | Citiking International US, LLC |
| **Buyer MEI[2]:** | |
| **Credit Agreement:** | Credit and Security Agreement dated as of July 20, 2012 as amended, from time to time, through Amendment No. 21 as of February 15, 2018 |
| **Borrower:** | Eclipse Aerospace, Inc. |
| **Purchase Amount(s):** | $26,105,837.15 |
| **Tranche(s):** | Term Loan in the amount of $23,260,865.27, plus Revolving Loans in the amount of $2,844,971.88 |
| **CUSIP Number(s), if available:** | |
| **Pre-Settlement Date Accruals Treatment:** | ☐ Settled Without Accrued Interest<br>X Trades Flat<br>☐ Paid on Settlement Date |
| **Type of Assignment:** | X Original Assignment<br>☐ Secondary Assignment |

_____

[1] Insert Markit Entity Identifier for Seller, if available.

[2] Insert Markit Entity Identifier for Buyer, if available.

*[Signature Page for Purchase and Sale Agreement]*
LSTA EFFECTIVE JUNE 9, 2017          Copyright © LSTA 2017.  All rights reserved.

| | | |
|---|---|---|
| **Borrower in Bankruptcy:** | Yes ☐ | No **X** |
| **Delivery of Credit Documents:** | Yes ☐ | No **X** |
| **Netting Arrangements:** | Yes ☐ | No **X** |
| **Flip Representations:** | Yes ☐[3] | No **X** |
| **Step-Up Provisions:** | Yes ☐[4] | No **X** |
| **Transfer Notice** | Shift Date[5]:<br>Yes ☐[6] | No **X** |

**1.    DEFINITIONS**

Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the Transaction Specific Terms and as otherwise may be provided in other provisions of this Agreement.  Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement.  Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement.  If there is any inconsistency between the Transaction Specific Terms and the Standard Terms, the Transaction Specific Terms shall govern and control.

In this Agreement:

"Agent" means Cantor Fitzgerald Securities.

"Assignment" means the [specify name of applicable document form] that is in the form specified in the Credit Agreement for an assignment of the Loans and Commitments (if any) and any Required Consents to such assignment [specify any other relevant assignment or consent documents required under the Credit Agreement, e.g., Notice of Assignment].

"Bankruptcy Case" select one:

---

[3] The Parties cannot specify "Yes" to both "Flip Representations" and "Step-Up Provisions" unless they set forth appropriate modifications in Section H.  Neither "Flip Representations" nor "Step-Up Provisions" applies to original assignments.

[4] The Parties cannot specify "Yes" to both "Flip Representations" and "Step-Up Provisions" unless they set forth appropriate modifications in Section H.  Neither "Flip Representations" nor "Step-Up Provisions" applies to original assignments.

[5] Specify the Shift Date only if "Yes" is specified opposite "Step-Up Provisions" and if the second box is selected in the definition of Covered Prior Seller.  The Shift Date is the date published by the LSTA and is that date determined by the LSTA to be the date on which market convention for transferring the Debt shifted from par documentation to distressed documentation (the "Shift Date").  The Parties shall include the Shift Date published by the LSTA, or, if the Shift Date has not been published by the LSTA, either party may request in writing (a "Shift Date Request") that the LSTA determine whether market convention for transferring the Debt has shifted from par documentation to distressed documentation and, if it so determines, to select and publish the Shift Date.  To submit a Shift Date Request, send a request that includes the name of Borrower, the title and date of the Credit Agreement, the deal CUSIP (or facility CUSIP, if appropriate), and name of the administrative agent under the Credit Agreement to the LSTA at lstashiftdates@lsta.org.  The Shift Date published by the LSTA shall be binding on the parties.

[6] "Yes" can be elected only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary.

X  not applicable.

☐  means [the case under the Bankruptcy Code pending before the Bankruptcy Court in which Borrower is a debtor, In re _____, No. _____].

"<u>Bankruptcy Court</u>" select one:

X  not applicable.

☐  means [the United States Bankruptcy Court for the _____District of _____ (and, if appropriate, the United States District Court for that District)].

"<u>Bar Date</u>" select one:

X  not applicable.

☐  none has been set.

☐  means [specify applicable date, if any].

"<u>Buyer Purchase Price</u>" select one:

X  not applicable.

☐  means the purchase price payable by Buyer to Original Buyer pursuant to the Netting Letter (this applies if there are three (3) parties involved in the netting arrangement).

☐  means the purchase price payable by Buyer to Penultimate Buyer pursuant to the Netting Letter (this applies if there are four (4) or more parties involved in the netting arrangement).

"<u>Commitments</u>" select one:

X  none.

☐  means [identify applicable commitment tranche(s) using Credit Agreement definitions] in the principal amount of $/£/€_____ [in each case specify the aggregate amount of the Loans, the Unfunded Commitments and the portion, if any, of the Commitments that is irrevocably "frozen" (<u>i.e.</u>, that is not subject to future drawing)].

"<u>Covered Prior Seller</u>" select one:

X  not applicable.

☐  means each Prior Seller that transferred the Loans and Commitments (if any)[7] on or after the Shift Date [but prior to the transfer pursuant to which _____[8] transferred such Loans and Commitments (if any) on a distressed documentation basis pursuant to the Purchase and Sale Agreement for Distressed Trades dated as of _____, as set forth in the Annex].[9]

"<u>Filing Date</u>" select one:

X  not applicable.

☐  means [identify date on which Borrower filed Bankruptcy Case].

"<u>Loans</u>" means Term Loans and Revolving Loans in the aggregate outstanding principal amount of $25,768,831.03

"<u>Netting Letter</u>" select one:

X  not applicable.

☐  means that certain Multilateral Netting Agreement in the form currently published by the LSTA dated on or as of the Agreement Date among Seller, Buyer [and] [,] Original Buyer [, Penultimate Buyer] and [describe any other parties to the Netting Letter]].

---

[7] If applicable to only a portion of the Loans and Commitments (if any), specify the portion that applies, <u>e.g.</u>, "each Prior Seller that transferred the [Name of applicable Covered Prior Seller] Loans (as defined in Section 1 of the Annex)."

[8] Specify the first Entity that transferred the Loans and Commitments (if any) on a distressed documentation basis on or after the Shift Date.

[9] The bracketed language applies where the relevant Predecessor Transfer Documents include a distressed trade that settled after the par/near par trade which settled on or after the Shift Date.

"Original Buyer" select one:

    X  not applicable.

    ☐  means [specify original buyer in the netting arrangement].

"Penultimate Buyer" select one:

    X  not applicable.

    ☐  none ("none" is applicable if there are only three (3) parties involved in the netting arrangement).

    ☐  means [_____].

"Required Consents" means [specify consent(s), acknowledgement(s) and/or notice(s) required by the Transaction Documents to transfer the Transferred Rights].

"Seller Purchase Price" select one:

    X  not applicable.

    ☐  means the purchase price payable by Original Buyer to Seller pursuant to the Netting Letter.

"Transfer Fee" means $3,500.

"Unfunded Commitments" means none..

**2.    SECTION 4 (SELLER'S REPRESENTATIONS AND WARRANTIES)**

The following specified terms shall apply to the sections referenced in this Section B:

|  | **Flat Representation** | **Flip Representation** | **Step-Up Representation** |
|---|---|---|---|
|  | If "No" is specified opposite both "Flip Representations" and "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Flip Representations" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: |
| Section 4.1(d) (Title) | Section 4.1(d)(i) | Section 4.1(d)(ii) | Section 4.1(d)(i) |
| Section 4.1(e) (Proceedings) | Section 4.1(e)(i) | Section 4.1(e)(i) | Section 4.1(e)(ii) |
| Section 4.1(f) (Principal Amount) | Section 4.1(f)(i) | Section 4.1(f)(ii) | Section 4.1(f)(i) |
| Section 4.1(g) (Future Funding) | Section 4.1(g)(i) | Section 4.1(g)(ii) | Section 4.1(g)(iii) |
| Section 4.1(h) (Acts and Omissions) | Section 4.1(h)(i) | Section 4.1(h)(i) | Section 4.1(h)(ii) |
| Section 4.1(i) (Performance of Obligations) | Section 4.1(i)(i) | Section 4.1(i)(i) | Section 4.1(i)(ii) |
| Section 4.1(l) (Setoff) | Section 4.1(l)(i) | Section 4.1(l)(i) | Section 4.1(l)(ii) |
| Section 4.1(t) (Consents and Waivers) | Section 4.1(t)(i) | Section 4.1(t)(i) | Section 4.1(t)(ii) |
| Section 4.1(u) (Other Documents) | Section 4.1(u)(i) | Section 4.1(u)(i) | Section 4.1(u)(ii) |
| Section 4.1(v) (Proof of Claim) | Section 4.1(v)(i) | Section 4.1(v)(ii) | Section 4.1(v)(i) |

Section 4.1(k) (<u>Purchase Price</u>); <u>Netting Arrangements</u>.
If "Yes" is specified opposite Netting Arrangements in the Transaction Summary, Section 4.1(k) shall be amended in its entirety as follows:

"(k) [intentionally omitted]."[10]

Section 4.1(r) (<u>Predecessor Transfer Agreements</u>).
☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to par/near par loans.
☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to distressed loans.
☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to both par/near par loans and distressed loans.
X  Not applicable.

Section 4.1(u) (<u>Other Documents</u>).
X  None.
☐ The following: _____.

Section 4.1(v) (<u>Proof of Claim</u>).
☐ The Proof of Claim was duly and timely filed, on or prior to the Bar Date, by
    ☐ the Agent on behalf of the Lenders.
    ☐ Seller or a Prior Seller.
☐ The Bar Date specified in the Transaction Specific Terms has been set in the Bankruptcy Case and no Proof of Claim has been filed.
☐ No Bar Date has been set in the Bankruptcy Case and no Proof of Claim has been filed.
X  Not applicable.

**3.    SECTION 5 (BUYER'S REPRESENTATIONS AND WARRANTIES)**

3.1    Section 5.1(n) (<u>Buyer Status</u>).  [Specify Buyer's status for purposes of determining any Required Consents, minimum assignment amount requirements or Transfer Fee requirements.]

☐ Buyer is not a Lender.
X  Buyer is a Lender.
☐ Buyer is an Affiliate [substitute Credit Agreement defined term if different] (as defined in the Credit Agreement) of a Lender.
☐ Buyer is an Approved Fund [substitute Credit Agreement defined term if different] of a Lender.

3.2    If "Yes" is specified opposite "Delivery of Credit Documents" in the Transaction Summary, Buyer represents and warrants that it (i) was not a Lender on the Trade Date and (ii) requested copies of the Credit Documents from Seller on or prior to the Trade Date.

**4.    SECTION 6 (INDEMNIFICATION)**

Section 6.1 (<u>Seller's Indemnities</u>); <u>Step-Up Indemnities</u>.

    (i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(b) shall apply (and the alternate indemnities contained in Section 6.1(a) shall not apply).

    (ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(a) shall apply (and the alternate indemnities contained in Section 6.1(b) shall not apply).

---

[10] Seller should add, and Buyer should cause Original Buyer or Penultimate Buyer, as applicable, to add, a comparable representation to the Netting Letter in lieu of this representation.

5. **SECTION 7 (COSTS AND EXPENSES)**

☐ The Transfer Fee shall be paid by Seller to the Agent and the Purchase Price shall be increased by an amount equal to
    ☐ one-half thereof.
    ☐ other relevant fraction or percentage, _____, thereof.
☐ The Transfer Fee shall be paid by Buyer to the Agent and Buyer shall receive a credit to the Purchase Price equal to
    ☐ one-half thereof.
    ☐ other relevant fraction or percentage, _____, thereof.
☐ The Transfer Fee shall be paid and allocated in the manner specified in the Netting Letter.
☐ The Transfer Fee has been waived by the Agent and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.
X  There is no Transfer Fee and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.

6. **SECTION 8 (DISTRIBUTIONS; INTEREST AND FEES; PAYMENTS)**

6.1    Section 8.2 (Distributions); Step-Up Distributions Covenant.

    (i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(b) shall apply (and the alternate covenants contained in Section 8.2(a) shall not apply).

    (ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(a) shall apply (and the alternate covenants contained in Section 8.2(b) shall not apply).

6.2    Section 8.5 (Wire Instructions).

Buyer's Wire Instructions:

Bank of America
Citiking International US LLC
Account number: ██████1300
Routing number: 026009593 (wires)
Swift code: BOFAUS3N

Seller's Wire Instructions:

Bank: Bank of America
ABA: 026009593
Acct. Name:  DWC Pine Investments I Ltd
Acct. #: ██████3128

7. **SECTION 9 (NOTICES)**

Buyer's Address for Notices and Delivery:

Citiking International US, LLC
14 Wall Street, 20th Floor
New York, NY 10005
Attention: Huan Wang, Secretary
Telephone:631-880-2989
Electronic Mail Address: citikingus@gmail.com

Seller's Address for Notices and Delivery:

DWC Pine Investments I, Ltd.
590 Madison Avenue, 13th Floor
New York, NY 10022
Attn: DW Legal
Email: DW.Legal@dwpartners.com and joel.biran@dwpartners.com

## 8. SECTION 27 (ADDITIONAL PROVISIONS)

The following additional provisions, including any modifications to existing provisions, apply:

The Agreement is amended by deleting the text of the definitions of "Operative Documents" and "Settlement Date" and substituting therefor the following:

**"Operative Documents"** means (i) this Agreement, (ii) the Assignment, (iii) the Purchase Price Letter, (iv) if "Yes" is specified opposite "Transfer Notice" in the Transaction Summary, the Transfer Notice, (v) the Continuing Obligations Agreement, and (vi) the Escrow Agreement.

**"Settlement Date"** means the date on which Seller receives the First Installment.

The following definitions are added to the Agreement:

"**Continuin**g **Obligations Agreement**" means the Continuing Obligations Agreement, dated the date of this Agreement, between Buyer and Seller that specifies the obligations of Seller and Buyer with respect to the Transferred Rights after the payment of the First Installment.

"**Escrow Agreement**" means the Escrow Agreement, dated the date hereof, among Buyer, Seller, and the Agent.

"**Final Installment**" means $7,650,000.

"**First Installment**" means $2,000,000.

"**Second Installment**" means $7,500,000.

"**Installments**" means the First Installment, the Second Installment and the Final Installment, collectively.

Section 3.2 of the Agreement is amended by deleting the word "Purchase Price" in clause (d) thereof and substituting therefor "First Installment"

The Agreement is amended by inserting the following at the end of Article 8 as Section 8.7:

Notwithstanding anything to the contrary in the Confirmation, or the Operative Documents, the Purchase Price shall be paid in three installments. Buyer shall pay to seller, the First Installment on the date of this Agreement, the Second Installment on or before 5 p.m. (New York Time) on August 24, 2018 (the "**Second Installment Date**"), and the Final Installment on or before 5 p.m. (New York Time) on October 8, 2018 (the "**Final Installment Date**" and together with the Second Installment Date, the "**Installment Dates**").



**IN WITNESS WHEREOF**, Seller and Buyer have executed this Agreement by their duly authorized officers or representatives as of the Agreement Date.

SELLER

**DWC PINE INVESTMENTS I, LTD.**

By: _____

     Name:     Houdin Honarvar
     Title:      Director

BUYER

**CITIKING INTERNATIONAL US, LLC**

By:_____

     Name:     Huan Wang
     Title:      Secretary



**IN WITNESS WHEREOF**, Seller and Buyer have executed this Agreement by their duly authorized officers or representatives as of the Agreement Date.

**SELLER**

**DWC PINE INVESTMENTS I, LTD.**

By: _____
     Name:    Houdin Honarvar
     Title:     Director

**BUYER**

**CITIKING INTERNATIONAL US, LLC**

By: _____
     Name:    Huan Wang
     Title:     Secretary

**ANNEX TO PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES**[1]

1.    If "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, list of Predecessor Transfer Agreements[2] and principal amount, as of the Settlement Date, of the portion of the Loans and Commitments (if any) thereunder assigned hereby for purposes of Section 4.1(r) and Section 5.1(k)(i) hereof, and designation as to whether such Predecessor Transfer Agreements relate to par/near par loans or distressed loans. N/A

2.    List of Credit Agreement and any other Credit Documents delivered pursuant to Section 4.1(s) hereof.[3] N/A

3.    Description of Proof of Claim (if any).[4] N/A

4.    Description of Adequate Protection Order (if any).[5] N/A

5.    List any exceptions to Section 4.1(w) (Notice of Impairment).[6] N/A

6.    The amount of any PIK Interest that accreted to the principal amount of the Loans on or after the Trade Date but on or prior to the Settlement Date is $/£/€_____.[7] N/A

---

[1] For purposes of Sections 1 through 6 in this Annex, terms such as "none", "not applicable", "n/a", "irrelevant" and "zero" should be given the same meaning.

[2] List (i) any Predecessor Transfer Agreement to which Seller is a party, (ii) any Predecessor Transfer Agreement of Prior Sellers relating to distressed loans delivered to Seller by Immediate Prior Seller and (iii) any Predecessor Transfer Agreement of Prior Sellers relating to par loans listed in any Predecessor Transfer Agreement described in the preceding clause (ii).

[3] If not applicable, so state.

[4] May apply only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary.  If not applicable, so state.  If applicable, note that according to the Standard Terms, failure to state is not failure to convey rights or obligations with respect thereto.

[5] May apply only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary.  If not applicable, so state.  If applicable, note that according to the Standard Terms, failure to state is not failure to convey rights or obligations with respect thereto.

[6] If none, so state.

[7] In addition to the terms listed in footnote 1 of this Annex, amounts listed as 0 or 0.00, with or without a currency sign, should be given the same meaning.

# EXHIBIT 5

EXECUTION COPY

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "**Assignment**") is dated as of the Effective Date set forth below and is entered into by and between DWC Pine Investments I, Ltd. (the "**Assignor**") and Citiking International US, LLC (the "**Assignee**"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as it may be amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, the interest in and to all of the Assignor's rights and obligations under the Credit Agreement and any other documents or instruments delivered pursuant thereto that represents the amount and percentage interest identified below of all of the Assignor's outstanding rights and obligations under the respective facilities identified below (the "**Assigned Interest**"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and the Credit Agreement, without representation or warranty by the Assignor.

| | | |
|---|---|---|
| 1. | Assignor: | DWC Pine Investments I, Ltd. |
| 2. | Assignee: | Citiking International US, LLC |
| 3. | Borrower(s): | Eclipse Aerospace, Inc. |
| | | Brigadoon Aircraft Maintenance, LLC |
| 4. | Administrative Agent: | Cantor Fitzgerald Securities, as the administrative agent under the Credit Agreement |
| 5. | Credit Agreement: | The Credit and Security Agreement, dated as of July 20, 2012, by and among the lenders party thereto from time to time, Eclipse Aerospace, Inc. a Delaware corporation ("Eclipse"), Brigadoon Aircraft Maintenance, LLC, a Delaware limited liability company ("Brigadoon", and, together with Eclipse, the "Borrowers"), the Guarantors party thereto from time to time and Cantor Fitzgerald Securities, as Administrative Agent and Collateral Agent for the Lenders. |

6.      Assigned Interest:

| Facility Assigned | Aggregate Amount of Commitment/Loans for all Lender | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitment/Loans |
|---|---|---|---|
| Term Loan | $46,367,173.30 | $23,260,865.27 | 50.0000% |
| Revolving Commitment | $7,698,581.85 | $2,844,971.88 | 36.9545% |

Effective Date: July 10, 2018

7.      Notice and Wire Instructions:

**Citiking International US, LLC**          **DWC Pine Investment I, Ltd.**

Notices:                                   Notices:

     Citiking International US, LLC               DWC Pine Investments I, Ltd.
     14 Wall Street, 20th Floor                  590 Madison Avenue, 13th Floor
     New York, NY 10005                          New York, NY 10022
     Attention:  Huan Wang, Secretary            Attn: DW Legal
     Email: citikingus@gmail.com                 Email:  DW.Legal@dwpartners.com
                                                         joel.biran@dwpartners.com

with a copy to:

     Emmet, Marvin & Martin, LLP
     120 Broadway, 32nd Floor
     New York, NY 10271
     Attention: Thomas A. Pitta, Esq.
     Email: tpitta@emmetmarvin.com

Wire Instructions:                         Wire Instructions:

Citiking International US LLC               Bank: Bank of America
Account number: ■■■■1300                    ABA: 026009593
Routing number: 026009593 (wires)          Acct. Name:  DWC Pine Investments I Ltd
Swift code: BOFAUS3N                        Acct. #: ■■■■3128

The terms set forth in this Assignment are hereby agreed to:

ASSIGNEE
**CITIKING INTERNATIONAL US, LLC**

By:_____

    Name:    Huan Wang
    Title:    Secretary

ASSIGNOR
**DWC PINE INVESTMENTS I, LTD.**

By:_____

    Name:    Houdin Honarvar
    Title:    Director

Accepted:

**CANTOR FITZGERALD SECURITIES**, as
  Administrative Agent

By:_____

    Name:
    Title:

*[Signature page for Initial Assignment and Assumption Agreement]*

Case 1:25-cv-00825-JGK   Document 42   Filed 08/18/25   Page 64 of 103 PageID #: 76

The terms set forth in this Assignment are hereby agreed to:

ASSIGNEE
**CITIKING INTERNATIONAL US, LLC**

By:_____
    Name:    Huan Wang
    Title:     Secretary

ASSIGNOR
**DWC PINE INVESTMENTS I, LTD.**

By:_____
    Name:    Houdin Honarvar
    Title:     Director

Accepted:

**CANTOR FITZGERALD SECURITIES**, as
  Administrative Agent

By:_____
    Name:
    Title:

*[Signature page for Initial Assignment and Assumption Agreement]*

The terms set forth in this Assignment are hereby agreed to:

ASSIGNEE
**CITIKING INTERNATIONAL US, LLC**

By: _____
    Name:    Huan Wang
    Title:    Secretary

ASSIGNOR
**DWC PINE INVESTMENTS I, LTD.**

By: _____
    Name:    Houdin Honarvar
    Title:    Director

Accepted:

**CANTOR FITZGERALD SECURITIES**, as
    Administrative Agent

By: _____
    Name:    James Buccola
    Title:    Head of Fixed Income

*[Signature page for Initial Assignment and Assumption Agreement]*

ANNEX 1

## STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
## AND ASSUMPTION AGREEMENT

1.     **Representations and Warranties.**

    1.1.     Assignor. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with any Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other instrument or document delivered pursuant thereto, other than this Assignment (herein collectively the "Loan Documents"), or any collateral thereunder, (iii) the financial condition of the Company, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

    1.2.     Assignee. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder and (iv) it has received a copy of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at that time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.     Payments. From and after the Effective Date, the Administrative Agent shall make all payments in respect of Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date. Notwithstanding the foregoing, the Administrative Agent shall make all

Case 1:25-cv-00825-JKS Document 42 Filed 08/18/24 Page 67 of 103 PageID #: 79

payments of interest, fees or other amounts paid or payable in kind from and after the Effective Date to the Assignee.

3.  <u>General Provisions</u>.  This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment. This Assignment shall be governed by, and construed in accordance with, the internal laws of the State of New York without regard to conflict of laws principles thereof.

FILED: NEW YORK COUNTY CLERK 03/15/2024 11:21 AM
NYSCEF DOC. NO.

INDEX NO. 651374/2024
RECEIVED NYSCEF: 03/15/2024

Case 1:25-cv-04938-LAK-RWL Document 42 Filed 08/18/24 Page 69 of 104 PageID #: 80

# EXHIBIT 6

CONTINUING OBLIGATIONS AGREEMENT

SELLER:      **DWC PINE INVESTMENTS I, LTD**
Address:     590 Madison Avenue
             13th Floor
             New York, NY 10022
             Attention: Joel Biran

Telephone:
Email:       dw.legal@dwpartners.com and joel.biran@dwpartners.com


BUYER:       **CITIKING INTERNATIONAL US, LLC**

Address:     14 Wall Street
             20th Floor
             New York, NY 10005
             Attention: Huan Wang, Secretary

Telephone:
Email:       citikingus@gmail.com

DATE OF THIS AGREEMENT:      July 10, 2018

BORROWER:

    1.    <u>Defined Terms</u>.  Reference is made to the LSTA Purchase and Sale Agreement for Distressed Trades, dated the date hereof, made by Seller (the "<u>Purchase Agreement</u>").  This is the Continuing Obligations Agreement referred to therein.  Capitalized terms used herein and not otherwise defined shall have the meaning ascribed thereto in the Purchase Agreement.

    2.    <u>Default Interest</u>.  Buyer agrees that if the Second Installment or the Third Installment is not paid within fifteen (15) days after the date such payment is due, such amount shall thereafter bear interest at an interest rate per annum equal to 15%, to the fullest extent permitted by applicable laws.  Accrued and unpaid interest on past due amounts ("<u>Default Interest</u>") shall be due and payable upon demand.

    3.    <u>Negative Covenants</u>

        Buyer hereby covenants and agrees that on the Settlement Date and thereafter until the date that the Final Installment is paid in full, Buyer shall not, directly or indirectly:

        (a)    <u>Negative Pledge</u>.  Create, incur, assume or suffer to exist any Encumbrance upon any of its property, assets or revenues, whether now owned or hereafter acquired, except for the following:

        (i)    Encumbrances in favor of the Seller;

FILED: NEW YORK COUNTY CLERK 03/15/2024 11:21 AM    INDEX NO. 651374/2024

NYSCEF DOC. NO. 1    Case 1:25-cv-04316-JGK Document 4    Filed 06/18/25    Page 70 of 103 PageID #: 82    RECEIVED NYSCEF: 03/15/2024

(ii)    Encumbrances for taxes not yet due or which are being contested in good faith; and

(iii)    bankers' liens, rights of setoff and other similar Encumbrance existing solely with respect to cash and cash equivalents on deposit in one or more accounts maintained by the Buyer in each case in the ordinary course of business in favor of the bank or banks with which such accounts are maintained.

(b)    <u>Replacement of Agent</u>.  Cause the Requisite Lenders (as defined in the Credit Agreement) to give direction to terminate or replace Cantor Fitzgerald ("<u>Cantor</u>") as Agent without cause, without the prior consent of Seller;

(c)    <u>Release of Liens</u>.  Cause the Requisite Lenders (as defined in the Credit Agreement) to give direction to the Agent to release Liens against the assets of the Borrower, forgive debt of the Borrower, or initiate a foreclosure, assignment for the benefit of creditors, receivership, liquidation, or any other similar proceeding against the Borrower;

(d)    <u>Eviction or Suspension of License</u>.  Cause the entry of an order of eviction with respect to Borrower's and Guarantor's premises in Albuquerque, NM or an order suspending the Borrower's FAA production certificate as a result of the failure of the Buyer to fund the rent obligations payable under the existing lease or the amounts required to satisfy the requirements of the FAA in accordance with the report from the Borrower's most recent FAA inspection, respectively;

(e)    <u>Insolvency Proceedings, Etc.</u>  Cause the Borrower to institute or consent to the institution of any proceeding under Chapter 7 of the Bankruptcy Code, or permit any proceeding under Chapter 7 of the Bankruptcy Code relating to the Borrower (or cause or permit an existing proceeding under Chapter 11 of the Bankruptcy Code to be converted to a proceeding under Chapter 7 of the Bankruptcy Code) (collectively, a "<u>Chapter 7 Case</u>") as a result of the failure of Buyer to advance to the Borrower such funds as are reasonable and necessary to avoid the institution of such a Chapter 7 Case;

(f)    <u>Borrower Liens</u>.  Permit Borrower to sell, license or transfer, or grant any Lien superior to the Liens of the Agent any of the Collateral, excluding ordinary course transactions;

(g)    <u>Censure or Conviction</u>.  Cause or permit the censure or conviction of Buyer by any Governmental Authority, which censure or conviction renders Buyer unable to comply with the terms of this Agreement and the other Operative Documents; and

(h)    <u>Change in Control.</u>  Permit Chenliang Zhang to cease to (i) own, beneficially and of record, directly or indirectly, in the aggregate at least a majority of the equity interests of Buyer and (ii) have the right to make all decisions with respect to the affairs of Buyer.

4.    <u>Plan of Reorganization</u>.  Upon Borrower's filing of a motion for approval of sale of assets, or confirmation of a plan of reorganization, Buyer shall cause the sale or plan to provide for either (a) use of any cash proceeds thereof to satisfy any amounts remaining owed by

Buyer to Seller hereunder or under the other Operative Documents, or (b) the granting to Seller of liens upon the assets of the Borrower or its successor securing the amounts remaining owed by Buyer to Seller hereunder or under the other Operative Documents.

5.     <u>Events of Default</u>.  Any of the following shall constitute an Event of Default:

(a)     <u>Non-Payment</u>.  Buyer fails to pay the Second Installment, the Third Installment, or any other amount payable hereunder or under any other Loan Document on the date such payment is due; or

(b)     <u>Other Defaults</u>.  Buyer fails to perform or observe any other covenant or agreement (not specified in clause (a) of this Section 5) contained herein on its part to be performed or observed.

6.     <u>Remedies After Default</u>.

(a)     If any Event of Default occurs and is continuing, the Buyer will immediately notify the Seller of such Event of Default.  Seller may, in its sole discretion, then deliver a notice of default to the Buyer specifying the Event of Default (the "<u>Default Notice</u>").

(b)     (i) Thirty days after delivery of a Default Notice under Section 5(a) hereof or (ii) immediately after delivery of a Default Notice under Section 5(b) hereof, Seller may, at its option, repurchase the Loans from Buyer (the "<u>Repurchase</u>") by (A) directing the Agent to record the Escrowed Assignment (as defined in the Escrow Agreement), whereby Seller shall become the sole owner of the Loans, which Loans shall be subject to the Intercreditor Agreement dated as of November 10, 2017, between Huiyin Chengtou Equity Investment Fund Management Co., Ltd. and Citiking International Limited and DW, and (B) paying to the Buyer an amount equal to the sum of (1) any portion of the Purchase Price previously paid by the Buyer, minus (2) any Default Interest and other amounts owing or payable by Buyer to Seller hereunder, minus (3) $1,000,000 (the "<u>Default Payment</u>"). Following such Repurchase, Seller and Buyer will cooperate in good faith to cause the cure of the Event of Default, if such cure is possible.

(c)     Buyer and Seller hereby agree that following the Repurchase, any indebtedness of the Borrower to Buyer (including, without limitation, debtor-in-possession loans) that exceeds the amount of the Loans (the "<u>Buyer Subordinated Debt</u>") shall be subordinate to any and all obligations of the Borrower to Seller with respect to the Transferred Rights.  The Buyer hereby further agrees that the Borrower shall not make, and the Buyer will not enforce its right to receive, payments on the Buyer Subordinated Debt unless and until all obligations of the Borrower to Seller with respect to the Transferred Rights have been paid in full.

(d)     If, within (i) forty-five days after delivery of a Default Notice under Section 5(a) hereof or (ii) fifteen days after delivery of a Default Notice under Section 5(b) hereof, as appropriate (the "<u>Cure Period</u>"), Buyer has cured the Event of Default specified in the Default Notice, and no other Events of Default have occurred and are continuing, Buyer may, at its option, repurchase the Loans from Seller for a purchase price equal to any amounts paid to

Buyer by Seller pursuant to clause (b)(ii)(B) of this Section 6 plus the reinstatement of the Buyer's obligation to pay the remaining Installments on the relevant Installment Payment Dates.

7.      <u>Security Interest</u>.    In order to secure the obligations of Buyer under this Agreement and the other Operative Documents, Buyer hereby grants to Seller a continuing lien and security interest in the Loans, the Credit Documents, all of the proceeds thereof, and any and all other assets of Buyer (the "<u>Buyer Collateral</u>").  Buyer covenants that there are no existing liens against it or against the Buyer Collateral.  Buyer authorizes Seller to file a UCC-1 financing statement in order to perfect Seller's security interest in the Buyer Collateral upon the execution of this Agreement.  Notwithstanding the foregoing, Seller agrees that it will not take any action to foreclose on the Buyer Collateral or take any other action or remedy given to a secured party under applicable law, including, but not limited to, the Uniform Commercial Code of the State of New York, but will be limited to the remedies specified in Section 6 hereof.

8.      <u>Prepayment</u>.    Buyer shall have the right to prepay the Purchase Price in full at any time prior to the Final Installment Date.  Upon the payment of the Purchase Price in full, title to the Loans shall vest indefeasibly with the Buyer and this Agreement shall have no further force and effect.

9.      <u>Governing Law; Counterparts; Signatures</u>.    This Agreement shall be governed by and construed in accordance with the laws of the State of New York without giving regard to conflicts of law principles.  Each party submits to the jurisdiction of the federal or state courts located in the Borough of Manhattan, State of New York and agrees that any litigation relating to this Agreement shall be brought only in such courts.  Each party hereto consents to service of process by certified mail at its address listed above.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by telefacsimile or electronic transmission in portable document format (.pdf) shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telefacsimile or electronic transmission in portable document format (.pdf) also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

10.     <u>Further Assurances</u>.  Each party hereto agrees to execute and deliver, or to cause to be executed and delivered, all such instruments and documents, and to take all such action as the other party may reasonably request, promptly upon the request of such party, in order to effectuate the intent and purpose of, and to carry out the terms of, this Agreement.

11.     <u>Entire Agreement</u>.    This Agreement and the other Operative Documents constitutes the entire agreement and understanding between the parties with respect to the subject matter hereof and supersedes all prior agreements, understandings or representations pertaining to the subject matter hereof, whether oral or written.  There are no warranties, representations or other agreements between the parties in connection with the subject matter hereof except as specifically and expressly set forth herein.  No amendment of any provision of this Agreement shall be effective unless it is in writing and signed by the parties and no waiver of any provision

of this Agreement, nor consent to any departure by either party from it, shall be effective unless it is in writing and signed by the affected party, and then such waiver or consent shall effective only in the specific instance and for the specific purpose for which given.

12.    WAIVER OF JURY TRIAL.  THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

13.    Notice.  All demands, notices, consents, and communications hereunder shall be in writing and shall be deemed to have been duly given when hand-delivered or duly deposited in the mails, by certified or registered mail, postage prepaid-return-receipt requested, to the addresses set forth above, or such other address as may be furnished hereafter by notice in writing.   All payments by Seller to Buyer and Buyer to Seller under this Agreement shall be made in the lawful currency of the United States by wire transfer of immediately available funds to Seller and Buyer, as applicable, in accordance with the wire instructions specified in the Purchase Price Letter.

[signature page follows]

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement by their duly authorized representatives as of the date first written above.


SELLER:

**DWC PINE INVESTMENTS I, LTD.**


By: _Houdin Honarvar_
Name: Houdin Honarvar
Title:  Director




BUYER:

**CITIKING INTERNATIONAL US, LLC**


By: _____
Name: Huan Wang
Title:  Secretary

*[Signature Page for Continuing Obligations Agreement]*

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement by their duly authorized representatives as of the date first written above.

SELLER:

**DWC PINE INVESTMENTS I, LTD**

By: _____
Name: Houdin Honarvar
Title:   Director

BUYER:

**CITIKING INTERNATIONAL US, LLC**

By: _____
Name: Huan Wang
Title:   Secretary

*[Signature Page for Continuing Obligations Agreement]*

Case 1:25-cv-04635-JKB Document 4 Filed 00/18/24 Page 76 of 103 PageID #: 88

# EXHIBIT 7

EXECUTION COPY

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (the "Escrow Agreement") is made as of the 10th of July, 2018, by and among **DWC PINE INVESTMENTS I, LTD** (the "Seller") and **CITIKING INTERNATIONAL US, LLC** (the "Buyer") (the Seller and the Buyer are from time to time hereafter referred to collectively as the "Parties") and **CANTOR FITZGERALD SECURITIES** (the "Escrow Agent").

WHEREAS, simultaneous to the execution of this Escrow Agreement, the Parties are entering into a Purchase and Sale Agreement (the "PSA") and a Continuing Obligations Agreement (the "Agreement")[1] in connection with the sale by Seller to Buyer of its claims against Eclipse Aerospace, Inc. on account of Loans made pursuant to the Credit Agreement; and

WHEREAS, the Parties have also executed the Assignment Agreement attached hereto as Exhibit A providing for the transfer from Buyer to Seller of the Loans, which Assignment Agreement is only to become effective upon the occurrence of certain Events of Default under the Agreement and, where applicable, the passage of certain waiting periods after the occurrence of such Events of Default; and

WHEREAS, the Seller has refused to sell the Loans to the Buyer unless the Buyer enters into this Escrow Agreement; and

NOW THEREFORE, in consideration of the mutual promises, covenants and agreements herein set forth and for other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.      The Parties hereby deliver to the Escrow Agent the Assignment Agreement to be held in accordance with the terms of this Escrow Agreement. The Parties hereby agree and acknowledge that the Assignment Agreement is being held by the Escrow Agent solely for and until the Buyer pays the full Purchase Price to the Seller.

2.      Escrow Agent shall deliver the Assignment Agreement to Buyer or to the Administrative Agent to effect the assignment for Seller's benefit, as the case may be, as follows:

(a)     to the Administrative Agent to effect the assignment for Seller's benefit, after receipt by the Escrow Agent of a notice from Seller certifying that it is entitled to Repurchase the Loans pursuant to Section 6(b) of the Agreement (a "Default Notice"); or

---

[1]      Capitalized terms not otherwise defined herein shall retain the meanings ascribed thereto in the Agreement.

(b) to the Buyer upon (i) receipt by the Escrow Agent of a notice from Seller that the Purchase Price has been paid in full or (ii) upon the passage of 120 days from the execution of this agreement if no Default Notice has been delivered to the Escrow Agent by Seller.

3.  Any Default Notice delivered by Seller to the Escrow Agent must simultaneously be delivered by Seller to Buyer and its counsel.

4.  If Escrow Agent is uncertain for any reason whatsoever as to its duties or rights hereunder (and whether or not Escrow Agent has received any written demand under Paragraph 2), notwithstanding anything to the contrary herein, Escrow Agent may hold the Assignment Agreement and decline to take any other action whatsoever. Following delivery by Seller of a Default Notice, the Escrow Agent may consult with, and obtain advice from, legal counsel in the event of any question as to any of the provisions hereof or the duties hereunder, and it shall incur no liability and shall be fully protected in acting in good faith in accordance with the opinion and instructions of such counsel. The reasonable and documented costs of such counsel's services shall be paid to the Escrow Agent (which the Parties shall share equally, but for which the Parties shall be jointly and severally liable).

5.  Escrow Agent shall have no duties or responsibilities except those set forth herein, which the parties agree are ministerial in nature, and shall under no circumstance be deemed a fiduciary of any of the Parties to this Escrow Agreement. The Escrow Agent shall neither be responsible for, nor chargeable with knowledge of, the terms and conditions of any other agreement, instrument or document between the other parties hereto, including, without limitation, the PSA or the Agreement. Except for Escrow Agent's own willful default or gross negligence: (a) Escrow Agent shall have no liability of any kind whatsoever for the performance of any duties imposed upon Escrow Agent under this Escrow Agreement; (b) Escrow Agent may rely and/or act upon any instrument or document believed by Escrow Agent in good faith to be genuine and to be executed and/or delivered by the proper person. The Escrow Agent shall not be required to take any action hereunder involving any expense unless the payment of such expense is made or provided for in a manner reasonably satisfactory to it.  This Escrow Agreement sets forth all matters pertinent to the escrow contemplated hereunder, and no additional obligations of the Escrow Agent shall be inferred from the terms of this Escrow Agreement or any other agreement, instrument or document.

6.  Any Notice or other communication that may or must be sent, given or made under this Escrow Agreement (any such communication, a "Notice") shall be delivered in writing via electronic mail, with a copy sent via overnight delivery service, and addressed to the parties as follows (or to any other address for a party which such party may designate by notice to the other party):

If to Seller:

DWC Pine Investments I, Ltd.
590 Madison Avenue, 13th Floor
New York, NY 10022
Attn: DW Legal
Email: DW.Legal@dwpartners.com and joel.biran@dwpartners.com

If to Buyer:

Citiking International US, LLC
14 Wall Street, 20th Floor
New York, NY 10005
Attn: Huan Wang, Secretary
citikingus@gmail.com

With a copy to:
Emmet, Marvin & Martin, LLP
120 Broadway, 32nd Floor
New York, NY 10271
Attn: Thomas A. Pitta, Esq.
tpitta@emmetmarvin.com
If to Escrow Agent:

Cantor Fitzgerald Securities

Attn: Mr. Jon Stapleton
jstapleton@cantor.com; and
Mr. Nils E. Horning
Nhorning@cantor.com

with a copy to:

Richards Kibbe & Orbe, LLP
200 Liberty Street
New York, NY 10281-1003
Attn: Paul Haskel, Esq.
Phaskel@rkollp.com; and
Gregory Gennady Plotko, Esq.
gplotko@rkollp.com

7.      Any Notice shall be deemed sent, given or made on the date sent.

8.      Buyer and Seller agree to pay Escrow Agent a non-refundable annual fee of
$5,000 for its services ("Annual Fee") which initial payment shall be due and payable on

Case 1:25-cv-04659-JKS Document 2 Filed 03/18/25 Page 80 of 103 PageID #: 92

the date hereof. All subsequent Annual Fees shall be due and payable on the first day of the next one-year period. Each Annual Fee shall not be pro-rated for any reason.

9.      Buyer and Seller agree to indemnify and hold the Escrow Agent harmless from all liability, costs, expenses damages or other charges which may be imposed upon, or incurred by the Escrow Agent, in connection with the performance of its duties hereunder or which shall arise as a result of any claim, action, suit or proceeding in which the Escrow Agent is or becomes a party, except with respect to any liability, cost or expense incurred as a result of the Escrow Agent's willful misconduct or gross negligence.

10.     Upon delivering the Assignment Agreement in accordance with the provisions of this Escrow Agreement, the Escrow Agent shall be relieved and discharged of all claims and liabilities relating to the Assignment Agreement and shall not be subject to claims or surcharge made by or on behalf of any party hereto.

11.     This Escrow Agreement shall be construed and enforced in accordance with, and governed by, the laws of the State of New York. This Escrow Agreement embodies the entire agreement and understanding among the parties and supersedes all prior agreements and understandings relating to the subject matter hereof. This Escrow Agreement may not be modified or amended, or any term or provision hereof waived or discharged, except in writing signed by the party against whom such amendment, modification, waiver or discharge is to be enforced. All the terms of this Escrow Agreement, whether so expressed or not, shall be binding upon the respective permitted successors and assigns of the parties hereto and shall inure to the benefit of and be enforceable by the parties hereto and their respective permitted successors and assigns. This Escrow Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12.     Both Parties waive any claim of conflict of interest by reason of Escrow Agent's actions in that capacity under this Escrow Agreement.

 

 

 

        IN WITNESS WHEREOF, the parties have executed this Escrow Agreement as of the day and year first above written.

 

 

                              BUYER:

                              **CITIKING INTERNATIONAL US, LLC**

                              By: _____

                                  Name: Huan Wang
                                  Title:   Secretary

 

 

 

                              SELLER:

                              **DWC PINE INVESTMENTS I, LTD**

                              By: _____

                                  Name: Houdin Honarvar
                                  Title:   Director

                              ESCROW AGENT:

                              **CANTOR FITZGERALD SECURITIES**

                              By: _____

                                  Name:
                                  Title:

 

 

*[Signature Page to Escrow Agreement]*

IN WITNESS WHEREOF, the parties have executed this Escrow Agreement as of the day and year first above written.

BUYER:

**CITIKING INTERNATIONAL US, LLC**

By: _____
        Name: Huan Wang
        Title:  Secretary

SELLER:

**DWC PINE INVESTMENTS I, LTD.**

By: _____
        Name: Houdin Honarvar
        Title:  Director

ESCROW AGENT:

**CANTOR FITZGERALD SECURITIES**

By: _____
        Name:
        Title:

IN WITNESS WHEREOF, the parties have executed this Escrow Agreement as of the day and year first above written.

BUYER:

**CITIKING INTERNATIONAL US, LLC**

By: _____
     Name: Huan Wang
     Title:  Secretary

SELLER:

**DWC PINE INVESTMENTS I, LTD**

By: _____
     Name: Houdin Honarvar
     Title:  Director

ESCROW AGENT:

**CANTOR FITZGERALD SECURITIES**

By: _____
     Name: James Buccola
     Title:  Head of Fixed Income

*[Signature Page to Escrow Agreement]*

5

Case 1:25-cv-04563-JKS Document 2    Filed 03/15/24    Page 845 of 103 PageID #: 96

**EXECUTION COPY**

Exhibit A

**(ASSIGNMENT AGREEMENT)**

Case 1:25-cv-00853-JKS Document 2    Filed 03/18/24    Page 85 of 103 PageID #: 97

<b>EXECUTION COPY</b>

<b>ASSIGNMENT AND ASSUMPTION AGREEMENT</b>

This Assignment and Assumption Agreement (the "**Assignment**") is dated as of the Effective Date set forth below and is entered into by and between Citiking International US, LLC (the "**Assignor**") and DWC Pine Investments I, Ltd. (the "**Assignee**"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as it may be amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, the interest in and to all of the Assignor's rights and obligations under the Credit Agreement and any other documents or instruments delivered pursuant thereto that represents the amount and percentage interest identified below of all of the Assignor's outstanding rights and obligations under the respective facilities identified below  (the "**Assigned Interest**"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and the Credit Agreement, without representation or warranty by the Assignor.

1. Assignor:                 Citiking International US, LLC
2. Assignee:                DWC Pine Investments I, Ltd.
3. Borrower(s):            Eclipse Aerospace, Inc.
                                         Brigadoon Aircraft Maintenance, LLC
4. Administrative Agent:   Cantor Fitzgerald Securities, as the administrative agent under the Credit Agreement
5. Credit Agreement:      The Credit and Security Agreement, dated as of July 20, 2012, by and among the lenders party thereto from time to time, Eclipse Aerospace, Inc. a Delaware corporation ("Eclipse"), Brigadoon Aircraft Maintenance, LLC, a Delaware limited liability company ("Brigadoon", and, together with Eclipse, the "Borrowers"), the Guarantors party thereto from time to time and Cantor Fitzgerald Securities, as Administrative Agent and Collateral Agent for the Lenders.
6. Assigned Interest:      The amounts below plus any interest accrued thereon from July 10, 2018 through the Effective Date hereof.

| Facility Assigned | Aggregate Amount of Commitment/Loans for all Lender | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitment/Loans |
|---|---|---|---|
| Term Loan | $46,367,173.30 | $23,260,865.27 | 50.0000% |
| Revolving Commitment | $7,698,581.85 | $2,844,971.88 | 36.9545% |

7524662_2

Effective Date: _____, 2018

7.      Notice and Wire Instructions:

**Citiking International US, LLC**          **DWC Pine Investment I, Ltd.**

<u>Notices</u>:                                        <u>Notices</u>:

> Citiking International US, LLC              DWC Pine Investments I, Ltd.
> 14 Wall Street, 20th Floor                  590 Madison Avenue, 13th Floor
> New York, NY 10005                          New York, NY 10022
> Attention:  Huan Wang, Secretary            Attn: DW Legal
> Email: citikingus@gmail.com                 Email:    DW.Legal@dwpartners.com
>                                                        joel.biran@dwpartners.com

with a copy to:

> Emmet, Marvin & Martin, LLP
> 120 Broadway, 32nd Floor
> New York, NY 10271
> Attention: Thomas A. Pitta, Esq.
> Email: tpitta@emmetmarvin.com

<u>Wire Instructions</u>:                            <u>Wire Instructions</u>:

Citiking International US LLC                    Bank: Bank of America
**Account number:** ████1300                    ABA: 026009593
**Routing number:** 026009593 (wires)           Acct. Name:  DWC Pine Investments I Ltd
**Swift code:** BOFAUS3N                         Acct. #: ████3128

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR
**CITIKING INTERNATIONAL US, LLC**

By:_____
    Name:    Huan Wang
    Title:     Secretary


ASSIGNEE
**DWC PINE INVESTMENTS I, LTD.**


By:_____
    Name:    Houdin Honarvar
    Title:     Director


Accepted:

**CANTOR FITZGERALD SECURITIES**, as
  Administrative Agent


By:_____
    Name:
    Title:

*[Signature page for Escrowed Assignment and Assumption Agreement]*

Case 1:25-cv-00945-JGK   Case 25-2065   Document 4   Filed 03/28/25   Page 89 of 103 PageID #: 100

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR
**CITIKING INTERNATIONAL US, LLC**

By:_____
    Name:    Huan Wang
    Title:    Secretary

ASSIGNEE
**DWC PINE INVESTMENTS I, LTD.**

By:_____
    Name:    Houdin Honarvar
    Title:    Director

Accepted:

**CANTOR FITZGERALD SECURITIES**, as
  Administrative Agent

By:_____
    Name:
    Title:

*[Signature page for Escrowed Assignment and Assumption Agreement]*

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR
**CITIKING INTERNATIONAL US, LLC**

By: _____
     Name:   Huan Wang
     Title:    Secretary

ASSIGNEE
**DWC PINE INVESTMENTS I, LTD.**

By: _____
     Name:   Houdin Honarvar
     Title:    Director

Accepted:

**CANTOR FITZGERALD SECURITIES**, as
  Administrative Agent

By: _____
  Name:
  Title:

James Buccola
Head of Fixed Income

*[Signature page for Escrowed Assignment and Assumption Agreement]*

FILED: NEW YORK COUNTY CLERK 03/15/2024 11:21 AM          INDEX NO. 651374/2024

NYSCEF DOC. NO. 8          Case 1:25-cv-00590-JKB Document 4     Filed 03/28/25     Page 90 of 103 PageID #: 102          RECEIVED NYSCEF: 03/15/2024

ANNEX 1

## STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT AND ASSUMPTION AGREEMENT

1.     Representations and Warranties.

1.1.    Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with any Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other  instrument or document delivered pursuant thereto, other than this Assignment (herein collectively the "Loan Documents"), or any collateral thereunder, (iii) the financial condition of the Company, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.    Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder and (iv) it has received a copy of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at that time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.     Payments.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.  Notwithstanding the foregoing, the Administrative Agent shall make all

payments of interest, fees or other amounts paid or payable in kind from and after the Effective Date to the Assignee.

3.  <u>General Provisions</u>.  This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment. This Assignment shall be governed by, and construed in accordance with, the internal laws of the State of New York without regard to conflict of laws principles thereof.

# EXHIBIT 8

## DEFAULT NOTICE

January 18, 2019

**BY ELECTRONIC MAIL AND**
**OVERNIGHT COURIER**

Cantor Fitzgerald Securities
110 East 59th Street
New York, NY 10022
Attn:   Mr. Jon Stapleton (jstapleton@cantor.com)
       Mr. Nils E. Horning (nhorning@cantor.com)

Gentlemen:

Reference is made to the Escrow Agreement, dated as of July 10, 2018, among you (as "Escrow Agent"), us (as "Seller"), and Citiking International US, LLC (as "Buyer"). Capitalized terms used but not defined herein have the meanings given to them in the Escrow Agreement.

**The Seller hereby certifies pursuant to Section 2(a) of the Escrow Agreement, that (on account of the defaults and Events of Default described in the enclosed Repurchase Notice) the Seller is entitled to Repurchase the Loans pursuant to Section 6(b) of the Agreement. <u>Accordingly, the Escrow Agent is now obligated to deliver the Assignment Agreement to the Administrative Agent to effect the assignment described therein for the Seller's benefit</u>.**

Pursuant to Section 3 of the Escrow Agreement, a copy of this Default Notice is being simultaneously delivered to the Buyer and its counsel.

Nothing herein (including the Repurchase effected hereby) is intended to be, or should be construed as, a waiver of any claim, right, or remedy of the Seller against the Buyer, all of which are expressly reserved.

       Very truly yours,

       DWC Pine Investments I, Ltd.

       By DW Partners, LP, its investment manager

       By: _____
       Name:  Houdin Honarvar
       Title:  General Counsel and Chief Compliance Officer

Encl.
Copies to:    Citiking International US
           14 Wall Street, 20th Floor
           New York, New York 10005
           Attn:   Mr. Huan Wang

Emmet, Marvin & Martin, LLP
120 Broadway, 32nd Floor
New York, New York 10271
Attn:   Thomas A. Pitta, Esq. (tpitta@emmetmarvin.com)

Richard Kibbe & Orbe, LLP
200 Liberty Street
New York, New York 10281
Attn:   Paul Haskel, Esq. (phaskel@rkollp.com)
        Gregory Gennady Plotko, Esq. (gplotko@rkollp.com)

## REPURCHASE NOTICE

January 18, 2019

**BY CERTIFIED, OVERNIGHT
AND ELECTRONIC MAIL**

Mr. Huan Wang
Citiking International US
14 Wall Street, 20th Floor
New York, New York 10005
citikingus@gmail.com

Dear Mr. Wang:

Reference is made to the Purchase and Sale Agreement for Distressed Trades (the "Purchase Agreement") between us (as "Seller" and "Buyer," respectively), dated as of July 10, 2018, together with each of (i) the Continuing Obligations Agreement, (ii) the Escrow Agreement, and (iii) the Purchase Price Letter Agreement entered into in connection therewith. Capitalized terms used but not defined herein have the meanings given to them in the Continuing Obligations Agreement.

The Seller has previously delivered Default Notices, dated as of August 24, September 10, and September 24, 2018 (collectively, the "Default Notices") to the Buyer with regard to Events of Default arising from the Buyer's payment defaults under Section 5(a) of the Continuing Obligations Agreement. Thirty days have passed from the delivery of the first Default Notice.

**Notice is hereby given, pursuant to Section 6(b) of the Continuing Obligations Agreement of Seller's Repurchase of the Loans from the Buyer. Accordingly, without any further action but with immediate effect, the Seller is now the sole owner of the Loans.**

Contemporaneously herewith, the Seller is wiring the amount required under Section 6(b) of the Continuing Obligations Agreement to Buyer pursuant to the wire instructions set forth in the Purchase Price Letter agreement. The amount is $316,500.00 as set forth per the attached calculations.

Nothing herein (including the Repurchase effected hereby) is intended to be, or should be construed as, a waiver of any claim, right, or remedy of the Seller against the Buyer, all of which are expressly reserved.

[Signature page follows]

Very truly yours,

DWC Pine Investments I, Ltd.

By DW Partners, LP, its investment manager

By: _____

Name:  Houdin Honarvar

Title:  General Counsel and Chief Compliance Officer

cc:  Thomas A. Pitta, Esq. (tpitta@emmetmarvin.com)

## ATTACHMENT TO REPURCHASE NOTICE

1/17/2019

| Category | |
|---|---|
| Purchase Price | 17,150,000.00 |
| | |
| Second Installment Purchase Price | 7,500,000.00 |
| Accrual Start Period | 9/8/2018 |
| Current Date | 1/17/2019 |
| Days of Accrued Interest | 131 |
| Current Period Interest Rate | 15.000% |
| Accrued Default Interest ($) | (409,375.00) |
| | |
| Third Installment Purchase Price | 7,650,000.00 |
| Accrual Start Period | 10/23/2018 |
| Current Date | 1/17/2019 |
| Days of Accrued Interest | 86 |
| Current Period Interest Rate | 15.000% |
| Accrued Default Interest ($) | (274,125.00) |
| | |
| Default Payment | (1,000,000.00) |
| | |
| Total Purchase Price ($) | 15,466,500.00 |
| | |
| Second Unpaid Installment ($) | (7,500,000.00) |
| Final Unpaid Installment ($) | (7,650,000.00) |
| | |
| Total DW Purchase Price ($) | 316,500.00 |

# EXHIBIT 9

LETTER AGREEMENT

SELLER:    **DWC PINE INVESTMENTS I, LTD**
Address:    590 Madison Avenue
           13th Floor
           New York, NY 10022
           Attention:  Robert Clark

Telephone:
Email:       dw.legal@dwpartners.com and robert.clark@dwpartners.com

BUYER:    **CITIKING INTERNATIONAL US, LLC**

Address:    14 Wall Street
           20th Floor
           New York, NY 10005
           Attention:   Huan Wang, Secretary

Telephone:
Email:       citikingus@gmail.com

DATE OF THIS AGREEMENT:    July 25, 2019

    1.    <u>Defined Terms</u>.  Reference is made to the LSTA Purchase and Sale Agreement for Distressed Trades, dated July 10, 2018, made by Seller (the "<u>Purchase Agreement</u>").  Capitalized terms used herein and not otherwise defined shall have the meaning ascribed thereto in the Purchase Agreement.

    2.    <u>Partial Payment</u>.  Buyer agrees to pay to Seller a principal payment to be applied towards partial satisfaction of the Purchase Price in the amount of $4,000,000 (the "July 2019 Payment") on July 25, 2019.

    3.    <u>Amount Due</u>.  Upon payment of the July 2019 Payment, Buyer and Seller agree that the amount due under the Purchase Agreement as of the date hereof in total satisfaction of Buyer's obligations equals $12,150,000.00 (the "Amount Due"). The Buyer and Seller agree that the prior payment of $1,683,500 was credited as $1,000,000 of principal and $683,500 of interest. The Amount Due shall be reduced by any further principal payment including either the Outside Date Payment (as defined below) or any prepayment.

    4.    <u>Interest</u>.  The Amount Due shall bear interest at an interest rate per annum equal to 12% on an actual/360 basis to the fullest extent permitted by applicable law.  Accrued and unpaid interest ("<u>Interest</u>") shall be due and payable on the last business day of each month. Interest shall accrue from July 25, 2019. The first interest payment date shall be the last business day in August, 2019.

Case 1:25-cv-04899-JPC   Document 4   Filed 03/15/24   Page 100 of 103 PageID #: 112

5.    _Further Agreement_.  It is the intention of Buyer and Seller that the Company shall withdraw its pending Motion to Sell under Section 363 of the Bankruptcy Code of 1986, as amended, and, in its place, file a plan of reorganization (the "Plan") that will incorporate the following terms:

(i)    Seller will not object to the Plan but payment of all obligations of Buyer to Seller (or a conversion to exit financing as described below) shall be added as a condition precedent to the Plan being declared effective;

(ii)    Payment of the Amount Due and the declaration of effective date of the Plan shall occur on or before October 31, 2019 (the "Outside Date");

(iii)    If the Amount Due is not paid by the Outside Date and/or the Plan has not been declared effective by the Outside Date, Seller will make a payment of $2,500,000 towards principal reduction of the Amount Due (the "Outside Date Payment") in exchange for a thirty-day extension of the Outside Date;

(iv)    At the end of the thirty-day extension period, either: (i) the Seller must be paid the Amount Due or (ii) the Plan must be declared effective and the Seller shall have received the mutually agreed upon exit financing debt;

(v)    Upon receipt of the Outside Date Payment on or before the Outside Date, Seller will allow the Company to have the Plan declared effective, and any remaining Amounts Due (as further reduced by the Outside Date Payment and any prepayment) shall be converted to an exit financing debt of the newly emerged company from bankruptcy (the "NewCo") with all of Newco's assets and equity as collateral securing the loan;

(vi)    Upon either (i) payment in full of the remaining Amount Due or (ii) conversion of the remaining Amount Due into an exit financing debt of NewCo, (a) Seller shall release liens it holds on the assets of Buyer under the Purchase Agreement, and (b) Buyer and Seller shall mutually release each other from any and all claims, whether arising by contract or otherwise, up to such time;

(vii)    The parties agree that the exit financing, if needed, will have a maturity date of July 31, 2020, with standard and commercially reasonable terms including liens against the assets and equity of NewCo (and for the avoidance of doubt, the terms shall provide for a release of such liens in connection with a refinancing of such loan that repays the loan in full, and the Seller shall use commercially reasonable efforts as needed in connection with such release), with an interest rate of 12% per annum on an actual/360 basis to be paid in cash on the last business day of each month with a $2,000,000 principal payment due on April 30, 2020 and

(viii)    Upon complete satisfaction of any and all Amounts Due, Seller shall remove any and all liens it has placed against Buyer, the Company or NewCo, if any.

6.    _Prepayment_.  Buyer shall have the right to prepay the Amount Due, either in full or partial payments, at any time.  For the avoidance of doubt, interest accrues on the Amount Due, reflecting any reductions due to prepayment.

7.     <u>Governing Law; Counterparts; Signatures</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York without giving regard to conflicts of law principles.  Each party submits to the jurisdiction of the federal or state courts located in the Borough of Manhattan, State of New York and agrees that any litigation relating to this Agreement shall be brought only in such courts.  Each party hereto consents to service of process by certified mail at its address listed above.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by telefacsimile or electronic transmission in portable document format (.pdf) shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telefacsimile or electronic transmission in portable document format (.pdf) also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

8.     <u>Further Assurances</u>.  Each party hereto agrees to execute and deliver, or to cause to be executed and delivered, all such instruments and documents, and to take all such action as the other party may reasonably request, promptly upon the request of such party, in order to effectuate the intent and purpose of, and to carry out the terms of, this Agreement.

9.     <u>Entire Agreement</u>.   This Agreement, the LSTA Confirmation, the Escrow Agreement, the Purchase Agreement, the Continuing Obligations Agreement and the Purchase Price Letter constitutes the entire agreement and understanding between the parties with respect to the subject matter hereof and supersedes all prior agreements, understandings or representations pertaining to the subject matter hereof, whether oral or written.   There are no warranties, representations or other agreements between the parties in connection with the subject matter hereof except as specifically and expressly set forth herein.  No amendment of any provision of this Agreement shall be effective unless it is in writing and signed by the parties and no waiver of any provision of this Agreement, nor consent to any departure by either party from it, shall be effective unless it is in writing and signed by the affected party, and then such waiver or consent shall effective only in the specific instance and for the specific purpose for which given.

10.     <u>WAIVER OF JURY TRIAL</u>.  THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

11. <u>Notice</u>. All demands, notices, consents, and communications hereunder shall be in writing and shall be deemed to have been duly given when hand-delivered or duly deposited in the mails, by certified or registered mail, postage prepaid-return-receipt requested, to the addresses set forth above, or such other address as may be furnished hereafter by notice in writing. All payments by Seller to Buyer and Buyer to Seller under this Agreement shall be made in the lawful currency of the United States by wire transfer of immediately available funds to Seller and Buyer, as applicable, in accordance with the wire instructions specified in the Purchase Price Letter.

[signature page follows]

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement by their duly authorized representatives as of the date first written above.


SELLER:

**DWC PINE INVESTMENTS I, LTD**

By: _____
Name:  Houdin Honarvar
Title:   Director




BUYER:

**CITIKING INTERNATIONAL US, LLC**

By: _____
Name:  Huan Wang
Title:   Secretary

*[Signature Page for Letter Agreement]*