**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>ONE AVIATION CORPORATION, *et al.*,<br><br>Debtors.[1] | Chapter 7<br><br>Case No. 18-12309 (JKS)<br><br>Jointly Administered |
| DILIGENT ENTERPRISE<br>MANAGEMENT, LLC,<br><br>Plaintiff,<br><br>v.<br><br>AML GLOBAL ECLIPSE, LLC, and DWC<br>PINE INVESTMENTS I, LTD,<br><br>Defendants. | Adv. No. 25-52065 (JKS) |

<u>**DILIGENT ENTERPRISE MANAGEMENT, LLC'S MEMORANDUM OF LAW IN**</u>
<u>**OPPOSITION TO AML GLOBAL ECLIPSE, LLC'S MOTION TO DISMISS**</u>

**CHRISTENSEN LAW LLC**

Joseph L. Christensen (#5146)
Levi Akkerman (#7015)
1201 N. Market Street, Suite 1404
Wilmington, DE 19801
(302) 212-4330
joe@christensenlawde.com
lakkerman@christensenlawde.com

Dated: November 3, 2025

*Counsel for Diligent Enterprise*
*Management LLC*

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each debtor's tax identification number, as applicable, are: ONE Aviation Corporation (9649); ACC Manufacturing, Inc. (1364); Aircraft Design Company (1364); Brigadoon Aircraft Maintenance, LLC (9000); DR Management, LLC (8703); Eclipse Aerospace, Inc. (9000); Innovatus Holding Company (9129); Kestrel  Aircraft Company, Inc. (2053); Kestrel Brunswick Corporation (6741); Kestrel Manufacturing, LLC (1810); Kestrel Tooling Company (9439); and OAC Management, Inc. (9986). The Debtors' corporate headquarters is located at 3250 Spirit Drive SE, Albuquerque, NM 87106.

# TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS ........................................................... 1

SUMMARY OF THE ARGUMENT ............................................................................. 2

STATEMENT OF FACTS ......................................................................................... 3

    I.      The Main Bankruptcy Case ......................................................................... 3

    II.     The Delaware District Court Appeal ........................................................... 6

    III.    Third Circuit Appeal ................................................................................... 6

    IV.    AML Closes the Sale ................................................................................... 6

    V.     Further Litigation in the Main Bankruptcy Case .......................................... 6

ARGUMENT ............................................................................................................ 8

    I.      The Complaint Adequately Pleads a Claim for Tortious Interference With Contract ...................................................................................................... 9

          A.     New York Law Applies To Diligent's Claims ............................................ 9

               1.     New York Law Governs Diligent's Claims Because of the Expansive New York Choice of Law Provisions ........................... 9

               2.     New York Law Governs Diligent's Claims Pursuant to Conflict-of-Law Principles .............................................................................. 10

          B.     The Complaint Plausibly Alleges A Claim For Tortious Interference With Contract ........................................................................................... 12

          C.     The Complaint Sets Forth a Plausible Claim For Tortious Interference With the Intercreditor Agreement Under Delaware Law ......................... 15

    II.     The Complaint Plausibly Alleges AML Conspired With DWC Pine to Tortiously Interfere With the Intercreditor Agreement .......................................................... 18

          A.     The Complaint Pleads a Claim for Civil Conspiracy................................. 18

          B.     The Complaint Sets Forth a Plausible Claim for Civil Conspiracy Under Delaware Law ......................................................................................... 19

    III.    AML's Preclusion Arguments Fail ..................................................................... 21

          A.     Law of the Case Does Not Preclude Diligent's Claims............................. 23

       B.     Claim Preclusion Does Not Apply ............................................................. 24

       C.     Issue Preclusion Does Not Apply .............................................................. 28

CONCLUSION ...................................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acrisure, LLC v. Woodruff-Sawyer & Co.*,
    84 Misc. 3d 1262(A), (N.Y. Sup. Ct. 2024) ...............................................13, 14

*American Capital Acquisition Partners, LLC v. LPL Holdings, Inc.*,
    2014 WL 354496 (Del. Ch. Feb. 3, 2015) .......................................................20

*ASDI, Inc. v. Beard Rsch., Inc.*,
    11 A.3d 749 (Del. 2010) .................................................................................15

*BFI Grp. Divino Corp. v. JSC Russian Aluminum*,
    481 F. Supp. 2d 274 (S.D.N.Y. 2007)..............................................................10

*Carvel Corp. v. Noonan*,
    818 N.E.2d 1100 (N.Y. 2004)............................................................................9

*CoreStates Bank, N.A. v. Huls Am., Inc*,
    176 F.3d 187 (3d Cir. 1999)......................................................................27, 28

*Czech Beer Importers, Inc. v. C. Haven Imports, LLC*,
    2005 WL 1490097 (S.D.N.Y. June 23, 2005) ...................................................11

*In re DMK Pharms. Corp v. USWM*,
    2025 BL 140323 (Bankr. D. Del. Apr. 25, 2025) .............................................8

*Eastern Minerals & Chems. Co. v. Mahan*,
    225 F.3d 330 (3d Cir. 2000)................................................................24, 25, 26

*Gold Medal Farms, Inc. v. Rutland County Co-op. Creamery, Inc.*,
    9 A.D. 2d 473 (N.Y. 3d Dept 1959).................................................................12

*Great Lakes Motor Corp. v. Johnson*,
    156 A.D.3d 1369 (2017) ..................................................................................18

*Grocery Leasing Corp. v. P & C Merrick Realty Co.*,
    LLC, 197 A.D.3d 628 (2021)......................................................................13, 14

*Krock v. Lipsay*,
    97 F.3d 640 (2d Cir. 1996)..............................................................................11

*Kuroda v. SPJS Holdings, L.L.C.*,
    971 A.2d 872 (Del. Ch. 2009).........................................................................20

*Manbro Energy Corp. v. Chatterjee Advisors, LLC*,
    2021 WL 2037552 (S.D.N.Y. May 21, 2021) ...........................................10, 11

*MasterCard Int'l Inc. v. Nike, Inc.*,
    164 F. Supp. 3d 592 (S.D.N.Y. 2016)................................................................11

*McKenna v. Singer*,
    2017 WL 3500241 (Del. Ch. July 31, 2017).......................................................21

*MUFG Union Bank, N.A. v. Axos Bank*,
    225 A.D.3d 545 (App. Div. 1st Dep't 2024) ......................................................12

*MVB Collision, Inc. v. Allstate Ins. Co.*,
    129 A.D.3d 1041 (2015) ....................................................................................12

*NACCO Indus., Inc. v. Applica Inc.*,
    997 A.2d 1, 35 (Del. Ch. 2009).........................................................................20

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*,
    87 N.Y.2d 614 (1996) ..................................................................................13, 14

*New Enter. Assocs. 14, L.P. v. Rich*,
    292 A.3d 112 (Del. Ch. 2023)...........................................................................15

*Nicosia v. Bd. of Managers of Weber House Condo.*,
    77 A.D.3d 455-56 (2010) ..................................................................................14

*In re OODC, LLC*,
    321 B.R. 128 (Bankr. D. Del. 2005) ...................................................................9

*Pentacon BV v. Vanderhaegen*,
    725 F. Supp. 3d 350 (S.D.N.Y. 2024),
    *reconsideration denied*, 2024 WL 3835334 (S.D.N.Y. Aug. 15, 2024)..............9

*Philip Servs. Corp. v. Luntz (In re Philip Servs. (Delaware), Inc.)*,
    267 B.R. 62 (Bankr. D. Del. 2001) ..............................................................23, 24

*In re Prosser*,
    534 F. App'x 126 (3d Cir. 2013) .......................................................................28

*Santiago v. Warminster Twp.*,
    629 F.3d 121 (3d Cir. 2010)............................................................................8, 9

*Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*,
    694 F. Supp. 3d 467 (D. Del. 2023).............................................................. 15-16

*UbiquiTel Inc. v. Sprint Corp.*,
    2005 WL 3533697, n. 58, 80 (Del. Ch. Dec. 14, 2005)...............................20, 21

*WaveDivision Holdings, LLC v. Highland Capital Mgmt., LP*,
    49 A.3d 1168 (Del. 2012) ..................................................................................17

**Statutes and Rules**

11 U.S.C. § 363 ................................................................................................................4, 6, 21

Federal Rule of Civil Procedure 12(b)(6) ...................................................................................2, 8

Plaintiff Diligent Enterprise Management, LLC ("Diligent"), respectfully submits this memorandum of law in support of its opposition to Defendant AML Global Eclipse, LLC ("AML")'s motion to dismiss the complaint (the "Complaint") filed by Diligent.[2]

## NATURE AND STAGE OF THE PROCEEDINGS

1.      This adversary proceeding arises in the chapter 7 proceedings of One Aviation Corporation ("One Aviation") and its affiliated debtors (collectively with One Aviation, the "Debtors").

2.      Plaintiff commenced this Adversary Proceeding on March 15, 2024, by filing the Complaint in New York state court in the action captioned Diligent Enterprise Management, LLC v. AML Global Eclipse, LLC, et al., Index No. 651374/2024. The action was removed to New York federal court on March 25, 2024. D.D.I. 1.

3.      On May 27, 2025, the United States Court for the Southern District of New York, granted the defendant's motion to transfer. D.D.I. 60.

4.      This matter was transferred to the United States District Court for the District of Delaware on June 4, 2025. The matter was assigned to Chief Judge Colm F. Connolly.

5.      On June 17, 2025, AML Global filed an Unopposed Motion to Extend Time (the "Extension Motion"). D.D.I. 67. The Extension Motion provided that (i) Plaintiff must file an amended complaint by August 21, 2025; and (ii) Defendants must answer, move, or otherwise respond to the complaint by October 6, 2025. D.D.I. at 2.

6.      Judge Connolly granted the Extension Motion on June 18, 2025. D.D.I. 68.

---

[2] References herein to documents in the Main Bankruptcy Case will be cited as "D.I.", those in the Adversary Proceeding will be cited as "A.D.I."; those in the appeal to the District of Delaware, Case No. 201569-CFC, will be cited as "D.D.A.I."; and those in the appeal to the United States Court of Appeals for the Third Circuit, Case No. 20- 03406, will be cited as "C.A.3 D.I." and those in the transferred case to the District of Delaware, Case No. 25-689- CFC, will be cited as "D.D.I." All citations, internal quotations, and alterations are omitted unless otherwise noted.

7.      On August 12, 2025, Judge Connolly referred this Adversary Proceeding to the United States Bankruptcy Court for the District of Delaware. D.D.I. 72.

8.      Diligent chose not to file an amended Complaint. On September 29, 2025, Diligent filed a Notice of Dismissal dismissing with prejudice all claims against certain individual defendants. A.D.I. 5.

9.      On October 6, 2-025, AML moved to dismiss the counts in the Complaint against AML pursuant to Civil Rule 12(b)(6). A.D.I. 7.

10.     On October 10, 2025, this Court entered an Order approving the Parties' Joint Stipulation on an extension of time to respond to the motion to dismiss, scheduling Diligent's deadline to respond to November 3, 2025.

11.     Diligent now timely moves to oppose AML's motion to dismiss.

## SUMMARY OF THE ARGUMENT

12.     Diligent's Complaint plausibly alleges that AML tortiously interfered with the Intercreditor Agreement and conspired to tortiously interfere with the Intercreditor Agreement under New York law.

13.     New York law applies to Diligent's claims pursuant to the choice of law provisions set forth in (a) the Intercreditor Agreement and (b) the Credit and Security Agreement, which is incorporated by reference into the Intercreditor Agreement. New York law also applies to Diligent's claims pursuant to conflict of laws principles. But even if this Court were to apply Delaware law to Diligent's claims, the result is the same: Diligent has plausibly alleged its claims and the Court should deny the motion to dismiss.

14.     AML knew about the Intercreditor Agreement and the right of first refusal contained therein, directly and proximately caused DWC Pine to breach its right of first refusal

provision, and caused damages to Citiking through its breach. AML conspired with DWC Pine to have DWC Pine breach the right of first refusal provision.

15.     AML's brief in support of its motion to dismiss (the "Brief" or "Br.")[3] centers on preclusion doctrines. According to AML, this issue of whether AML was a good-faith purchaser of the Debtors' assets in bankruptcy determines the separate issue of whether AML tortiously interfered with the Intercreditor Agreement by entering, in DWC Pine's own words, into a "private transaction" with DWC Pine. The law of the case, claim preclusion, and issue preclusion doctrines require an essential element which is absent here. They require the same issue to have been litigated and adjudicated. Diligent's claims have never been litigated or adjudicated. AML's preclusion arguments fail.

16.     Because Diligent has plausibly alleged claims for tortious interference with contract and civil conspiracy, this Court should deny AML's motion to dismiss.

## STATEMENT OF FACTS

### I.     The Main Bankruptcy Case

On August 28, 2020, the Debtors filed (i) an emergency motion for authorization to seek alternative funding (the "Second DIP Motion") [D.I. 877] and (ii) a motion (the "SE Falcon Sale Motion") for authorization to initiate a sale process with SE Falcon [D.I. 878].

Through the Second DIP Motion, the Debtors sought to, among other things, enter into a Senior DIP Loan Term Sheet with DWC Pine and SE Falcon. SE Falcon was a proposed assignee of DWC Pine and would be the sole funder of a new DIP Facility that would prime Citiking's existing DIP Loan.

---

[3] Capitalized terms used, but not otherwise defined herein, have the meaning given to them in the Brief.

On September 1, 2020, Citiking objected to the Second DIP Motion and the SE Falcon Sale Motion. (the "Citiking DIP Objection"). D.I. 892. Citiking objected because, among other things, through the Second DIP Motion, DWC Pine sought to subordinate Citiking's secured claims in violation of the Continuing Obligations Agreement (the "COA"). *Id.* at ¶ 13. Citiking also objected to the SE Falcon Sale Motion because it proposed a "short sale" of the Debtors' assets without consent from Citiking in violation of section 363(f) of the Bankruptcy Code. *Id.* at ¶¶ 15-17. The Debtors and DWC Pine both asserted that there was a valid subordination agreement between Citiking and DW that allowed DW to obtain superpriority loans over Citiking. *Id.* at ¶ 13.

On September 2 and 3, 2020, the Court held a hearing regarding the Second DIP Motion and the SE Falcon Sale Motion. In discussing the subordination agreement, this Court held that the subordination agreement was valid and enforceable "for purposes of the DIP f[u]nding." 09.04.20 tr. at 41:22-23. Judge Sontchi specifically said:

> "I am not certainly trying to finally adjudicate that issue between those two parties; I'm deciding whether to provide adequate protection to a party and in getting to that answer, I'm making a decision that the subordination agreement is valid and enforceable, which has the effect of meaning adequate protection is not required. That's all I'm doing. If you want to sue each other in federal or state court in New York, they're more than welcome to."

*Id.* at 42:3-10. The Court ultimately entered an order ("Interim DWC DIP Order") approving the Second DIP Motion on an interim basis. D.I. 911.

On October 8, 2020, the Debtors withdrew the SE Falcon Sale Motion. D.I. 951.

On October 20, 2020, the Debtors filed the Sale Motion seeking to sell a group of assets to AML after the sale to SE Falcon fell through.

On October 23, 2020, Citiking filed a joint (i) motion to vacate the Interim DW DIP Order and (ii) an objection to entry of the Second DIP Motion on a final basis (the "Motion to Vacate"). D.I. 986.

On November 2, 2020, AML entered its appearance in the Main Bankruptcy Case. D.I. 1006.

On November 3, 2020, Citiking objected to the Sale Motion (the "Citiking Sale Objection"). While Citiking raised issues based on the COA, Citiking did not raise the Intercreditor Agreement in its objection.

On November 17, 2020, the Court held a hearing regarding the Motion to Vacate.[4] The Court agreed with Citiking on key points. Importantly, the Court agreed with Citiking that intercreditor contract issues should not have been resolved at that stage of the proceedings and ultimately these issues may be left for New York courts.  D.I. 1060 at 106:13-21.

On November 20, 2020, the Court held a hearing regarding the Sale Motion. At the hearing, this Court approved the Sale Motion and stated that despite its approval of the Sale Motion "there is a dispute, a genuine dispute in connection with [DW and Citiking] . . . ." D.I. 1070 at 49:20-21. In fact, the Debtors acknowledged that the approval of the sale would allow for a sale to AML free and clear of all liens, but that the proceeds would be escrowed until the intercreditor disputes were settled. *Id.* at 43:12:15. Simply put, the Court's approval of the Sale Motion did not meaningfully address the intercreditor disputes surrounding subordination and did not address the Intercreditor Agreement in any meaningful way.

---

[4] AML focuses on the findings from the September 2 and 3 hearings regarding the Second DIP Motion. Br. at 6. However, many of the findings from those hearings, including findings regarding Citiking's conduct were walked back during this hearing. *See* D.I. 1060.

On November 20, 2020, the Court entered an order approving the AML Sale Motion (the "AML Sale Order"). D.I. 1063.

## II.      The Delaware District Court Appeal

On November 22, 2020, Citiking appealed the AML Sale Order. D.D.A.I. 4. Citiking argued a stay of the Sale Order was necessary and appropriate. *Id.* ¶ 1. The issue of whether AML tortiously interfered with the Intercreditor Agreement and conspired with DWC Pine was never raised. The focus of the appeal concerned a reversal of the Sale Order. The District Court denied Citiking's emergency stay motion. Br. at 9.

## III.     Third Circuit Appeal

On November 25, 2020, Citiking filed a notice of appeal and an emergency stay motion in the Third Circuit, C.A.3. D.I. 1, 5, arguing that "[f]undamental rights of secured creditors in chapter 11 bankruptcy cases are at stake in this appeal, including the right of a secured creditor . . . to credit bid up to the face amount of its debt to re-take its collateral and protect itself from an undervalue sale, in accordance with section 363(k) of the Bankruptcy Code." C.A.3. D.I. 5 at 2. The current issues raised by Diligent's Complaint were never litigated or adjudicated. The Third Circuit issued an order on November 27, 2020 denying this emergency motion. Br. at 9.

## IV.     AML Closes the Sale

17.     On November 30, 2020, the sale to AML closed and Citiking ultimately stipulated to the dismissal of the Third Circuit appeal. Br. at 10. The District Court appeal was dismissed because Citiking did not prosecute it. *Id.*

## V.      Further Litigation in the Main Bankruptcy Case

In July 2021, Citiking objected "to the allowance of any claim asserted by AML Global" against Debtors or their estates (the "Claim Objection"). D.I. 1224. In the Claim Objection, Citiking argued the sale to AML should be set aside pursuant to section 363(n) of the Bankruptcy

Code. *Id.* at ¶ 6. Alternatively, if not set aside, AML's acquired claim should be equitably subordinated. *Id.* at ¶¶ 7, 10, 34-39. Citiking argued that DWC Pine's deal with AML "raise[d] questions concerning the integrity and transparency of the Sale process." *Id.* at ¶ 22 (emphasis added).

Citiking raised the Intercreditor Agreement and its right of first refusal to support Citiking's argument that the "conduct—which prejudiced Citiking and injured the estate—should not be rewarded equitably or contractually and AML's purported acquired claim should not be allowed. Citiking disputes that AML holds a first (or any) lien position with respect to the Sale proceeds and objects to AML asserting such a claim." *Id.* at ¶ 41. Additionally, Citiking argued that AML failed to file a notice of transfer of claim and failed to file a proof of claim. *Id.* at ¶¶ 43-47. Citiking argued the "Court should not reward AML's misconduct, its failure to adhere to the terms of the Intercreditor Agreement or Pre-Petition Credit Agreement and ignoring important Bankruptcy rules concerning disclosure and notification." *Id.* at ¶ 48. Citiking never argued that AML should be held liable separately for tortiously interfering with the Intercreditor Agreement.

AML responded, arguing that its "business reasons and motives for acquiring DW's debt in a private transaction before the Sale Hearing are irrelevant." D.I. 1227 at ¶ 30. AML also added: "Finally, and as should be obvious to Citiking, AML is not a party to the Intercreditor Agreement and the Pre-Petition Credit Agreement, and any alleged breaches thereof *are not relevant in the context of AML's claims against the Debtors' estates*." *Id.* at ¶ 42 (emphasis added). Citiking adjourned the Claim Objection in September 2021. D.I. 1246.

Citiking raised the same issues in its opposition to a distribution settlement reached by the Chapter 7 Trustee, AML Global, and other parties in interest in the Main Bankruptcy Case. D.I. 1263. Specifically, Citiking referenced its Claim Objection [D.I. 1227] and the arguments made

therein. *Id.* at ¶ 2. Citiking argued that an AML claim was objectionable since "DW lacked the contractual right to unilaterally loan funds post-petition to the Debtors pursuant to the Intercreditor Agreement ... and, therefore, DW's claim is invalid." The issue of whether AML should be held liable for tortiously interfering with the Intercreditor Agreement was never adjudicated. *Id.* at ¶ 43. To this day, this Court has not issued an order or made any finding of fact relating to any dispute in which the Intercreditor Agreement's role was meaningfully discussed.

## ARGUMENT

"To survive a motion to dismiss" made pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *In re DMK Pharms. Corp v. USWM*, 2025 WL 2375228, at *3 (Bankr. D. Del. Apr. 25, 2025) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The court must draw all reasonable inferences in favor of the plaintiff, and the movant 'bears the burden to show that the plaintiff's claims are not plausible.'" *Id.* (quoting *In re LSC Wind Down, LLC*, 610 B.R. 779, 783 (Bankr. D. Del. 2020)).

Third Circuit courts follow a three-part analysis when weighing motions to dismiss. *Id.* "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). "Second, the court must separate the factual and legal elements of the claim, accepting all of the complaint's well-pled facts as true and disregarding any legal conclusions." *In re DMK Pharms. Corp*, 2025 WL 2375228, at *3 (citing *Santiago*, 629 F.3d at 130). "Third, the court must determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief." *Id.* (citing *Santiago*, 629 F.3d at 130). "After conducting this analysis, the court may conclude that a claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct."

*Id.* (citing *Iqbal*, 556 U.S. at 678). "Granting a motion to dismiss is a 'disfavored' practice, and the court should grant the motion only if it finds that the plaintiff cannot prove any set of facts upon which relief may be granted." *In re OODC, LLC*, 321 B.R. 128, 134 (Bankr. D. Del. 2005) (citation omitted).

## I.   The Complaint Adequately Pleads a Claim for Tortious Interference With Contract

### A.   New York Law Applies To Diligent's Claims

#### 1.   New York Law Governs Diligent's Claims Because of the Expansive New York Choice of Law Provisions

New York law applies to Diligent's claims. The Intercreditor Agreement (Compl., Ex. 3) and Credit and Security Agreement (incorporated into the Intercreditor Agreement by reference) each contain an "explicit and conspicuously broad" New York choice of law provisions. *See Pentacon BV v. Vanderhaegen*, 725 F. Supp. 3d 350, 367 (S.D.N.Y. 2024), *reconsideration denied*, 2024 WL 3835334 (S.D.N.Y. Aug. 15, 2024); *see also Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1102 (N.Y. 2004) ("Each agreement contains a New York choice of law clause, and it is not disputed that New York law governs both the contract and tort claims."). New York law applies to tortious interference claims when "the [contract] contains an explicit and conspicuously broad choice-of-law provision." *Pentacon BV* 725 F. Supp. 3d at 367. Specifically, the *Pentacon BV* court found that the following language was sufficiently broad for the application of substantive New York law:

> This Agreement and any claim arising out of or in connection with this Agreement shall be governed by, construed, and enforced in accordance with the Laws of the State of New York *without giving effect to any conflict-of-law rules or principles that would result in the application of the Laws of any other jurisdiction*."

*Id.* (emphasis in original).

Section 6(f) of the Intercreditor Agreement contains nearly identical language:

Applicable Law. THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK, *WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THAT RESULT IN THE APPLICATION OF THE LAWS OF A DIFFERENT JURISDICTION.*

Compl. Ex. 3, § 6(f) (emphasis added).

The choice of law provision in the Credit and Security Agreement (which is wholly incorporated into the Intercreditor Agreement) provides:

THE VALIDITY OF THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS . . . , THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO AS WELL AS ALL CLAIMS, CONTROVERSIES OR DISPUTES ARISING UNDER OR RELATED TO THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

D.I. 1017-2, Ex. A, § 13(a).

Because of these choice of law provisions, New York substantive law applies and a conflict-of-laws analysis is unnecessary.

### 2.    New York Law Governs Diligent's Claims Pursuant to Conflict-of-Law Principles

Even if this Court were to apply New York conflict-of-law principles, New York law still applies to Diligent's claims pursuant to the "interest analysis." *See Manbro Energy Corp. v. Chatterjee Advisors, LLC*, 2021 WL 2037552, at *2 (S.D.N.Y. May 21, 2021). "New York courts look for guidance to the factors listed in section 145 of the Restatement of the Law (2nd) Conflict of Laws" when determining which state's tort laws should apply. *BFI Grp. Divino Corp. v. JSC Russian Aluminum*, 481 F. Supp. 2d 274, 285 (S.D.N.Y. 2007) (citation omitted). These factors

include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Id.* (quoting Section 145 of the Restatement of the Law (2nd) Conflict of Laws).

"For so-called conduct regulating torts, including tortious interference with contract, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Manbro Energy Corp.*, 2021 WL 2037552, at *3 (cleaned up). Pursuant to the "interest analysis," deference is granted to the "situs of the tort [which] is where the last event necessary for liability occurred." *Id.* (citation omitted). For tortious interference claims, "injury" is the last event giving rise to liability, which is deemed to occur at the plaintiff's headquarters or domicile. *See id.*; *MasterCard Int'l Inc. v. Nike, Inc.*, 164 F. Supp. 3d 592, 605 (S.D.N.Y. 2016)). Moreover, "[w]here the parties are domiciled in different states, the locus of the tort will almost always be determinative in cases involving conduct-regulating laws." *Krock v. Lipsay*, 97 F.3d 640, 646 (2d Cir. 1996). "New York has a strong interest in regulating behavior within its borders." *Czech Beer Importers, Inc. v. C. Haven Imports, LLC*, 2005 WL 1490097, at *5 (S.D.N.Y. June 23, 2005).

The interest analysis factors weigh in favor of applying New York law here. First, the Intercreditor Agreement and Security and Credit Agreement contain New York choice of law provisions. Second, Citiking was headquartered in New York at the time of its injuries resulting from AML's tortious conduct. Third, Citiking and DWC Pine were both located in New York when they negotiated and executed the Intercreditor Agreement. Fourth, performance of the Intercreditor Agreement was intended to be carried out in New York. Fifth, DWC Pine was in New York when AML tortiously interfered with the Intercreditor Agreement and conspired with DWC

Pine. Pursuant to the "interest analysis," New York has the greatest interest in regulating conduct which occurs in its borders. New York law applies to Diligent's claims.

### B.  The Complaint Plausibly Alleges A Claim For Tortious Interference With Contract

Under New York law, "[t]he elements of . . . tortious interference with contract are [1] the existence of a valid contract between it and a third party, [2] the defendant's knowledge of that contract, [3] the defendant's intentional procurement of the third party's breach of that contract without justification, and [4] damages." *MVB Collision, Inc. v. Allstate Ins. Co.*, 129 A.D.3d 1041, 1043 (App. Div. 2d Dep't 2015) (citation omitted). Diligent's Complaint satisfies each of the four elements.

First, the Complaint plausibly alleges the existence of a valid contract between Diligent and DWC Pine in the form of the Intercreditor Agreement. *See* Compl. ¶¶ 18, 19, 90-92.

Second, the Complaint plausibly alleges AML had "knowledge of" the Intercreditor Agreement, including the right of first refusal provision. Full knowledge of the detailed terms of the existing contract is unnecessary to establish knowledge. Knowledge of the contract's existence suffices. *See Gold Medal Farms, Inc. v. Rutland County Co-op. Creamery, Inc.*, 9 A.D. 2d 473, 479 (N.Y. 3d Dept 1959). In *Gold Medal Farms*, the court rejected defendants' arguments that they "must have full knowledge of the detailed terms of the existing contract" and that "some additional wrong, such as actual malice, fraud or deceit, independent of the actual inducement of the breach with knowledge of the contract is essential." *Id.* at 478-79. It sufficed to show defendants "with actual knowledge of the existence of the contract . . . intentionally made an offer of better terms to Rutland with the intent of persuading it to breach its contract. *Id.* at 479; *see also MUFG Union Bank, N.A. v. Axos Bank*, 225 A.D.3d 545, 546 (App. Div. 1st Dep't 2024).

12

Diligent plausibly alleges AML was aware of the right-of-first refusal provision. *See* Compl. ¶ 62 ("AML was undeniably an integral part of the Bankruptcy Case and was fully aware of the obligations and rights retained by DW and Citiking with respect to the Second Tranche Loans and the ROFR associated with the Loans in their entirety."), ¶ 110 ("AML was aware and had knowledge of the Intercreditor Agreement and the ROFR set forth therein."), ¶ 118 ("AML was also aware of the obligations owed to Citiking based upon AML's involvement in the Bankruptcy Case and DW's express mention of the Intercreditor Agreement and the rights provided to Citiking thereunder."). Moreover, as set forth in more detail below, the Bankruptcy docket is littered with references to the Intercreditor Agreement. AML, a sophisticated party, must have had knowledge of the Intercreditor Agreement before the sale closed.

Third, the Complaint plausibly alleges that AML intentionally procured DWC Pine's breach of the right of first refusal provision set forth in the Intercreditor Agreement without justification. Under New York law, "persuasion to breach alone … is sufficient to constitute a procurement of a breach of contract." *Acrisure, LLC v. Woodruff-Sawyer & Co.*, 84 Misc. 3d 1262(A), at *4 (N.Y. Sup. Ct. 2024) (citing *Nostalgic Partners, LLC v. New York Yankees Partn.*, 168 N.Y.S.3d 444, 448 (1st Dept. 2022)). Additionally, "where there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior." *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 664 N.E.2d 492, 496 (N.Y. 1996).

The intentional procurement element is satisfied when the plaintiff alleges that the contract would not have been breached "but for" the defendant's conduct. *Grocery Leasing Corp. v. P & C Merrick Realty Co*., LLC, 197 A.D.3d 628, 629 (App. Div. 2d Dep't 2021) (citation omitted).

In *Grocery Leasing Corp.*, the complaint "adequately allege[d] that the plaintiff sustained damages when the defendants intentionally and improperly interfered with [a] lease ... and aided ... in [the] breach of the contract." *Id.*; *see also Nicosia v. Bd. of Managers of Weber House Condo.*, 77 A.D.3d 455-56 (App. Div. 1st Dep't 2010).

The Complaint plausibly alleges that DWC Pine would not have breached the Intercreditor Agreement "but for" AML's conduct. It alleges that "AML is the proximate and direct cause of DW's breach of the Intercreditor Agreement. Because AML and DW were colluding with one another to effectively freeze Citiking out of the bidding process by eliminating the opportunity to credit bid, DW did not offer Citiking the right of first refusal to match AML's offer as required under the Intercreditor Agreement." Compl. ¶¶ 111-12. The Complaint further alleges DW sold the Second Tranche Loans to Citiking, thereby violating the ROFR, "to freeze Citiking out by stripping it of its ability to credit bid." Compl. ¶ 82.

AML argues "issue preclusion bars relitigating whether there was collusion that affected the sufficiency of the sale process and, without those allegations, the Complaint is bereft of any allegations that AML Global committed an intentional act that was a significant factor in causing a breach of the Intercreditor Agreement." Br. at 25. This argument fails for two reasons. First, pursuant to New York law, it sufficed for Diligent to allege that the Intercreditor Agreement would not have been breached "but for" AML's conduct. *See Grocery Leasing Corp.* 197 A.D.3d at 629. Persuasion to breach alone suffices to constitute a procurement of a breach of contract, *Acrisure, LLC*, 84 Misc. 3d 1262(A) at *4, and "a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior." *NBT Bancorp Inc*, 87 N.Y.2d at 621. Second, as set forth in more detail below, issue preclusion does not bar Diligent from alleging there was collusion between AML and DWC Pine in a manner that does

not implicate maximizing the value for the Debtors' estates. The Complaint, therefore, plausibly alleges AML intentionally procured DWC Pine's breach of the Intercreditor Agreement.

Fourth, the Complaint plausibly alleges damages resulting from AML's tortious interference. The Complaint alleges that "[a]s a result of AML's misconduct, Citiking has been damaged in an amount exceeding $7,500,000, the amount that Citiking paid for the purchase of the Second Tranche Loans, $7,500,000 plus interest, reasonable attorneys' fees, and costs." Compl. ¶ 113.

The Complaint plausibly alleges each of the necessary elements of tortious interference under New York law.

### C.    The Complaint Sets Forth a Plausible Claim For Tortious Interference With the Intercreditor Agreement Under Delaware Law

Even if Delaware law were to apply (it does not), the Complaint alleges a plausible claim for tortious interference with contract. Under Delaware law, "a plaintiff must plead (1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury." *New Enter. Assocs. 14, L.P. v. Rich*, 292 A.3d 112, 140 (Del. Ch. 2023) (cleaned up). "[T]he case law reflects that a defendant's tortious conduct that induces a third party to terminate a contract with the plaintiff *unlawfully* will suffice to establish a claim of tortious interference with contractual relations." *ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010) (emphasis in the original). As set forth above, (a) it is undisputed that there was a valid contract in the form of the Intercreditor Agreement and (b) Diligent plausibly alleged it suffered damages from AML's tortious interference with the Intercreditor Agreement. The other three elements are also satisfied.

First, the Complaint plausibly satisfies the knowledge element. "[T]o satisfy the [knowledge] element," a defendant "must have had actual or imputed knowledge of the substance

of the contract rights, even if it did not know about the exact terms." *Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*, 694 F. Supp. 3d 467, 489 (D. Del. 2023) (citing *WaveDivision Holdings, LLC v. Highland Capital Mgmt., LP*, 49 A.3d 1168, 1176 (Del. 2012)). AML had actual and imputed knowledge of the Intercreditor Agreement and its right of first refusal provision. As set forth in the Complaint, "AML was also aware of the obligations owed to Citiking based upon AML's involvement in the Bankruptcy Case and DW's express mention of the Intercreditor Agreement and the rights provided to Citiking thereunder." Compl. ¶ 118.

The record in the Main Bankruptcy Proceeding is replete with references to the Intercreditor Agreement prior to the close of the sale to AML. *See* D.I. 1005 (DWC Pine's response to Citiking's objection to debtor's motion for entry of final order), ¶ 16 ("There also is a certain Intercreditor Agreement dated November 7, 2017, which provides for additional rights between the parties.") (cleaned up); *id.* at ¶ 27; D.I. 1060 (transcript of November 17, 2020 hearing), 89:18-21 ("We've seen their memo, which is just in our exhibits at Exhibit Number 5, and that sets out the proper analysis for Citiking's intercreditor agreements, even in the worst case for Citiking."); D.I. 56 (transcript of first day hearing) at 43:15-22 ("And there are agreements between us -- and you'll see them listed in the provision; the purchase-and-sale agreement, the continuing obligations agreements, the escrow agreements, *and intercreditor agreement* -- and DW wanted to be sure that nothing in this order would impact the rights, vis-à-vis, Citiking and DW, with respect to DW's ability to enforce its remedies under those agreements against Citiking."); D.I. 208, ¶ 47 (original final DIP order).

AML, a sophisticated entity represented by sophisticated counsel, knew of the Intercreditor Agreement which was discussed by their contract counterparty. At the very least, the Complaint pleads knowledge sufficiently to survive a motion to dismiss.

Second, the Complaint plausibly alleges that AML committed an intentional act which was a significant factor in causing the breach of the Intercreditor Agreement. *See* Compl. ¶ 110 ("AML was aware and had knowledge of the Intercreditor Agreement and the ROFR set forth therein."); Compl. ¶ 111 ("AML is the proximate and direct cause of DW's breach of the Intercreditor Agreement."); Compl. ¶ 112 ("Because AML and DW were colluding with one another to effectively freeze Citiking out of the bidding process by eliminating the opportunity to credit bid, DW did not offer Citiking the right of first refusal to match AML's offer as required under the Intercreditor Agreement."); *see also* Compl. ¶¶ 71-82.

Third, the Complaint plausibly alleges that AML acted without justification in committing an intentional act which was a significant factor in causing the breach of the Intercreditor Agreement.

> Delaware courts follow Section 766 of the Restatement (Second) of Torts in assessing a tortious interference claim. . . . [T]he Restatement cites the following factors to consider in determining if intentional interference with another's contract is improper or without justification: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties."

*WaveDivision Holdings, LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012) (citing Restatement (Second) of Torts § 767 (1979)).

These factors weigh against AML. As set forth in the Complaint, AML acted with an improper motive in furtherance of improper interests. "There was no valid business reason for AML to acquire the secured indebtedness from DW unless there was an undisclosed side deal between DW and AML." Compl. ¶ 80. Instead, AML and DWC Pine conspired with each other "to freeze Citiking out by stripping it of its ability to credit bid, satisfy the claim of DW on the

Second Tranche Loans and allow AML to purchase the Debtors' assets at a theoretical face value far below market value." Compl. ¶ 82. "The end result of AML and DW's secret purchase and sale of the Second Tranche Loans in breach of the ROFR and in violation of Citiking's ownership rights, left Citiking holding the proverbial bag. AML was able to purchase the Debtors' assets for pennies on the dollar in an amount much lower than what AML would have, and should have, paid." Compl. ¶ 83. "Because AML and DW were colluding with one another to effectively freeze Citiking out of the bidding process by eliminating the opportunity to credit bid, DW did not offer Citiking the right of first refusal to match AML's offer as required under the Intercreditor Agreement." Compl. ¶ 112. Thus, AML's conduct directly interfered with Citiking's first refusal rights. On the other hand, Citiking had a valid, negotiated-for interest in the right of first refusal provision set forth in the Intercreditor Agreement.

The Complaint plausibly alleges a cause of action against AML for tortious interference with the Intercreditor Agreement under Delaware law.

## II.   The Complaint Plausibly Alleges AML Conspired With DWC Pine to Tortiously Interfere With the Intercreditor Agreement

### A.   The Complaint Pleads a Claim for Civil Conspiracy

"Although New York does not recognize civil conspiracy to commit a tort as an independent cause of action, such a claim or cause of action may be asserted where there are allegations of a primary tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." *Great Lakes Motor Corp. v. Johnson*, 156 A.D.3d 1369, 1371-72 (2017) (cleaned up). Tortious interference with contract may serve as the primary tort to a civil conspiracy claim. *See id.* at 1372 (citations omitted).

18

The Complaint plausibly alleges these elements. Compl. ¶ 82; *see also* Compl. ¶ 115 ("DW and AML conspired together to eliminate credit bidding at the auction in the Debtors' Bankruptcy Case for the purpose of enabling AML to purchase the Debtors' assets at far below market value and DW to recover on the Second Tranche Loans through the sale of the loans to AML."); Compl. ¶ 119 ("Upon information and belief, DW and AML devised a scheme whereby they sought to eliminate Citiking's right to credit bid and did so by violating the rights owed to Citiking under the Intercreditor Agreement.").

The Complaint alleges AML committed an overt act in furtherance of the agreement to conspire against Citiking and intentionally participated in furtherance of a plan pursuant to which AML would tortiously interfere with the right of first refusal provision in the Intercreditor Agreement. Compl. ¶ 116 ("DW and AML unlawfully conspired together to tortiously interfere with Citiking's rights under the Intercreditor Agreement."); ¶¶ 76-85; 114-22. AML and DWC Pine's agreement to conspire caused damages to Citiking when AML tortiously interfered with the Intercreditor Agreement. Compl. ¶¶ 121-22 ("AML purchased the Debtors' assets at a fraction of their value while DW received cash for its debt and avoided a priority dispute with Citiking concerning the priority of payment for the sale proceeds. Citiking was damaged in an amount to be proven at trial as a result of the conspiracy between AML and DW."); *see also* Compl. ¶¶ 83-84. In sum, the Complaint sets forth a prima facie case of civil conspiracy against AML for tortiously interfering with the Intercreditor Agreement.

## B.   The Complaint Sets Forth a Plausible Claim for Civil Conspiracy Under Delaware Law

As set forth above, New York applies to Diligent's claims. Even if this Court were to apply Delaware law, Diligent plausibly alleges a cause of action for civil conspiracy to commit tortious interference. As an initial matter, AML argues tortious interference cannot serve as the predicate

wrong for civil conspiracy under Delaware law. Br. at 26. The cases cited by AML do not support this proposition. In *American Capital Acquisition Partners, LLC v. LPL Holdings, Inc*, the court did not hold tortious interference with contract cannot serve as the underlying tort to hold a third party liable. 2014 WL 354496, at *11 (Del. Ch. Feb. 3, 2015). Tortious interference cannot serve as the underlying tort with a contract counterparty. *Id.* ("To the extent the Plaintiffs seek to hold the Defendants liable under a civil conspiracy theory for a third party's tortious inference with contract in order to circumvent our law that breach of contract does not constitute a tort, that attempt must fail.").

Other cases cited by AML do not hold that tortious interference cannot serve as the underlying tort against a third party like AML. In *NACCO Industries, Inc. v. Applica Inc.*, the Court held that "NACCO fares no better to the extent it means to suggest that *Harbinger* has engaged in tortious interference with contract, *and that Applica can be held liable* under a theory of civil conspiracy for that tort." 997 A.2d 1, 35 (Del. Ch. 2009). (emphasis added); *see also Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, at 892 n. 73 (Del. Ch. 2009) ("Just as a plaintiff generally cannot use a claim for tortious interference with contract to impose additional damages on contracting parties (or their agents), a plaintiff cannot use a claim for civil conspiracy to impose *on contracting parties (or their agents)* additional damages for breach of a contract, beyond those available under contract law for breach of the contract.") (emphasis added).

Tortious interference with contract can serve as the predicate tort for civil conspiracy against a third party who is not a party to the contract. In *UbiquiTel Inc. v. Sprint Corp.*, a third party was liable for tortious interference where it conspired with a contracting party to tortiously interfere. 2005 WL 3533697, n.58 (Del. Ch. Dec. 14, 2005) ("The Court finds that UbiquiTel also has adequately alleged a claim for tortious interference with contract under Delaware law"); *Id.*,

at n.80 ("The Court finds that UbiquiTel has adequately alleged a cause of action for civil conspiracy under Delaware law."). AML's tortious interference with the Intercreditor Agreement can serve as the predicate tort for Diligent's civil conspiracy claim against AML.

The Complaint alleges a plausible claim for civil conspiracy. "[T]o prove civil conspiracy, the following elements are required, (1) the existence of a confederation or combination of two or more persons; (2) that an unlawful act was done in furtherance of the conspiracy; and (3) that the conspirators caused actual damage to the plaintiff." *McKenna v. Singer*, 2017 WL 3500241, at *20 (Del. Ch. July 31, 2017) (cleaned up). Diligent satisfies these elements.

The Complaint alleges the existence of a confederation or combination of two persons: AML and DWC Pine. AML argues that this element fails since the confederation here is DWC Pine and AML Global but, as a party to the Intercreditor Agreement, DWC Pine cannot tortiously interfere with that contract. Br. at 26 n. 5 (citing *CrewFacilities.com, LLC v. HotelEngine, Inc.*, 2021 WL 2649758, at *5 (D. Del., 2021)). But AML is not a party to the Intercreditor Agreement. The court's holding in *HotelEngine, Inc.* that a party to a contract cannot tortiously interfere with that contract does not mean that AML, a non-party to the Intercreditor Agreement, is immune.

Diligent has also plausibly alleged that an unlawful act was done in furtherance of the conspiracy and the conspirators caused actual damage to Diligent as set forth above in discussing civil conspiracy under New York law. The Complaint therefore plausibly asserts a claim for civil conspiracy against AML under Delaware law.

## III.   AML's Preclusion Arguments Fail

All of AML's preclusion arguments fail because Plaintiff's claims for tortious interference with contract and civil conspiracy were never litigated before or addressed by this Court. Simply put, this Court entered a *Sale Order* providing that AML was a "good faith purchaser" of *the Debtor's* assets pursuant to 11 U.S.C. § 363(m). This Court never addressed or decided whether

AML tortiously interfered with the Intercreditor Agreement or was a good-faith purchaser of *DWC Pine's rights*. To the contrary, DWC Pine expressly referred to its deal with AML as a "private transaction." AML never explains any nexus between Diligent's tortious interference and civil conspiracy claims and the Court's finding that AML was a good-faith purchaser. If anything is conclusory, it is AML's allegation that the Court's Sale Order encompassed Diligent's claims.

AML relies on DWC Pine's statement to the Court at the Sale Hearing informing the Court it had sold its interests in debtor's debt to AML. Br. at 7 (citing D.I. 1070 at 14:14–21). But AML omitted the rest of DWC Pine's statement: "*Again, I think that is a private transaction*, but I didn't want it later to be said that the court was unaware of that. *I am not sure it's particularly relevant to today.*" D.I. 1070 at 14:14-21 (emphases added). DWC Pine was right. Its sale to AML was not relevant that day. It was a "private transaction" that had no bearing on the Court approving the sale of Debtor's assets to AML and finding that AML was a good-faith purchaser of those assets. The same "private transaction" which was not relevant is the private transaction which forms the basis of Diligent's claims against AML.

AML references the Court's Citiking DIP order. Br. at 6. n. 4. It provides as follows:

> Notwithstanding anything herein or in the DIP Facility Agreement, the other DIP Facility Documents, the DIP Motion, or any other First Day Motion (as defined in the First Day Declaration) to the contrary, neither the entry of this Order nor any of the relief granted hereunder . . . proposed *or to be proposed by any party or subsequently approved or confirmed by the Court,* is intended to, or shall, impair in any way any claim, right, or remedy of DWC Pine Investments I, Ltd., or any affiliate thereof (collectively, "DW") under any of the "Purchase and Sale Agreement," the "Continuing Obligations Agreement,: the "Escrow Agreement," or the *"Intercreditor Agreement"* … between DW and Citiking International US LLC ….

D.I. 102 at ¶ 47 (emphasis added)

AML also relies on its response to the Claim Objection. Br. at 10 and 17 (citing D.1. 1224). In the Claim Objection, Citiking had argued for equitable subordination of any secured claim acquired by AML from DWC Pine. Citiking also argued that AML should not be allowed to benefit from the breach of the Intercreditor Agreement and therefore the claim should be disallowed. These arguments were made in objection to a claim made by AML. Citiking was not litigating whether AML should separately be held liable in an adversary proceeding for tortiously interfering with the Intercreditor Agreement. AML made this clear in its Response to Citiking's Objection (D.I. 1227):

> Finally, and as should be obvious to Citiking, AML is not a party to the Intercreditor Agreement and the Pre-Petition Credit Agreement, and any alleged breaches thereof *are not relevant in the context of AML's claims against the Debtors' estates*.

D.I. 1227 at ¶ 42.

### A.    Law of the Case Does Not Preclude Diligent's Claims

The law of the case doctrine "only applies to issues that were actually litigated and decided by the court." *In re Philip Servs. (Delaware), Inc.*, 267 B.R. 62, 66 (Bankr. D. Del. 2001); *see also id.* ("In this case, the issue of the avoidability of the guarantee was never litigated …. Nor did any other party raise the issue by objection to the Cash Collateral Stipulation or by the filing of a fraudulent conveyance action against the Pre-Petition Secured Lenders. Therefore, the matter has not been previously litigated before the Court. The doctrine of law of the case, therefore, has no applicability."). The law of the case doctrine does not preclude Diligent's claims because this Court never decided the issue of whether AML tortiously interfered with the Intercreditor Agreement or whether AML conspired with DWC Pine to tortiously interfere with the Intercreditor Agreement. This Court held only that AML was a good-faith purchaser. D.I. 1063, ¶¶ 44, 45. Additionally, "the law of the case doctrine does not act as an absolute bar on relitigation (in contrast

to the doctrines of claim and issue preclusion). Rather the law of the case doctrine merely directs the court's discretion not to rehear matters ad nauseam." *Philip Servs. Corp.*, 267 B.R. at 66 (citation omitted).

AML argues that "the thrust of Plaintiff's claims against AML Global—that AML Global colluded, conspired, and schemed with DWC Pine—is entirely barred and precluded by this Court's Sale Order." Br. at 12. But this was not the "thrust" of Diligent's claims. The Complaint alleges that "because AML and DW were colluding with one another to effectively freeze Citiking out of the bidding process by eliminating the opportunity to credit bid," Compl. ¶ 112, but this is to explain AML's motive to tortiously interfere with the Intercreditor Agreement, the result being that "DW did not offer Citiking the right of first refusal to match AML's offer as required under the Intercreditor Agreement." The thrust of the claim is tortious interference with the Intercreditor Agreement. This Court never made any findings regarding Diligent's claim or AML's relationship to the Intercreditor Agreement and Diligent's claims are not barred by the law of the case doctrine.

## B.    Claim Preclusion Does Not Apply

"[T]he fact that a particular party may have an interest in a motion does not require that party to raise all interests or claims that it has in the bankruptcy case generally at the time that the motion is heard …. To apply *res judicata* so broadly would bring bankruptcy cases to a halt." *Philip Servs. Corp.*, 267 B.R. at 68. The Third Circuit provided guidance on the application of *res judicata* in bankruptcy cases in *Eastern Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 337-38 (3d Cir. 2000). In *Eastern Minerals*, the district court had held claim preclusion barred Eastern Minerals & Chemicals Co. from pursuing an alter ego claim against Gary Mahan, the sole shareholder of Delta Carbonate Inc., after Delta's bankruptcy proceedings. *Id.* at 335. On appeal, the Third Circuit stated that "the issue facing us, therefore, is whether the claim currently being

asserted by Eastern against Mahan is *based on the same cause of action* as the claims actually asserted by Eastern in Delta's bankruptcy such that its instant claim should have been asserted in that forum." *Id.* at 336 (emphasis in original). The court reasoned that "we consider whether there is an 'essential similarity of the underlying events' to determine whether the prior and current claim arise from the same cause of action." *Id.* at 337 (quoting *United States v. Athlone Industries, Inc.*, 746 F.2d 977, 984 (3d Cir.1984)). The court further reasoned that:

> Although some of the underlying events and relationships are described in terms that are similar (and indeed sometimes nearly identical) in both Eastern's complaint against Mahan and various documents Eastern circulated in Delta's bankruptcy case (*e.g.*, the draft equitable subordination complaint), the similarity of certain events in and of itself does not trigger a bar of Eastern's subsequent complaint against Mahan. Surely the mere existence of overlapping facts and events in this setting is not sufficient to foreclose Eastern's current claim. To properly apply the affirmative defense of claim preclusion, we must take a closer look.

*Id.*

Recognizing that claim preclusion is complicated in the bankruptcy setting, the Third Circuit held that "[c]laim preclusion only bars claims arising from the same cause of action previously raised, not every conceivable claim that could have been brought in the context of a bankruptcy case over which the court would have had jurisdiction." *Id.* Additionally:

> Difficult as it may be to define the contours of a cause of action in a bankruptcy setting, we conclude that a claim should not be barred unless the factual underpinnings, theory of the case, and relief sought against the parties to the proceeding *are so close to a claim actually litigated in the bankruptcy that it would be unreasonable not to have brought them both at the same time* in the bankruptcy forum.

*Id.* at 337-38 (emphasis added). AML has previously argued that bringing claims relating to the Intercreditor Agreement would be unreasonable. *See* D.I. 1246.

Applying these principles, the Third Circuit held that Eastern Mineral's claims were not precluded. The court recognized that "Eastern's participation in Delta's bankruptcy case…was undoubtedly active and aggressive." *Eastern Minerals & Chems. Co.*, 225 F.3d 330 at 338. However, "Eastern never litigated any cause of action against Mahan that sought what its current claim would accomplish." *Id.* Moreover, "although some of the descriptions of certain events and particular relationships are common to both claims, the theory of the case and relief sought in Eastern's instant complaint are markedly different from those underlying the draft complaint to subordinate the claims of Millington and Chemical Bank that Eastern considered filing in bankruptcy court." *Id.* "[T]he key question that … we should ask whenever the affirmative defense of claim preclusion is raised on the basis of a prior bankruptcy confirmation order" is "whether the later claim arises from the same cause of action as a claim that was actually asserted or interposed in the earlier bankruptcy case and resolved in the confirmation order." *Id.* at 339. The Third Circuit held the answer was "no" and, therefore, concluded Eastern Mineral's claim was not precluded.

This Court should likewise hold Diligent's claims are not precluded based on these principles. The "factual underpinnings, theory of the case, and relief sought" by Diligent against AML are not "so close to a claim actually litigated in the bankruptcy that it would be unreasonable not to have brought them both at the same time in the bankruptcy forum." Diligent never litigated whether AML was liable for tortiously interfering with the Intercreditor Agreement. And "although some of the descriptions of certain events and particular relationships are common to both claims," such as AML's motivations for tortiously interfering with the Intercreditor Agreement to eliminate credit bidding, "the theory of the case and relief sought in" Diligent's complaint "are markedly different from those underlying" the bankruptcy proceeding. This Court never addressed Diligent's claim that AML tortiously interfered with the Intercreditor Agreement

and Diligent never sought relief for tortious interference in the bankruptcy proceedings. Thus, answer to the question of "whether the later claim arises from the same cause of action as a claim that was actually asserted or interposed in the earlier bankruptcy case" is a definitive no.

AML argues that Diligent's claims are barred by claim preclusion since Citiking appealed the Sale Order to the District Court and Third Circuit and in both instances argued that the sales process was fundamentally flawed. Br. at 13.

Additionally, AML argues that "there is an essential similarity between the underlying events that gave rise to Citiking's objections to the Sale Order… and the allegations against AML Global in the Complaint" as Citiking and Diligent both claimed the claim process was unfair. *Id.* at 15. But the issue of whether AML tortiously interfered through a private transaction was never addressed by this Court. *See* D.I. 56, 44:7-12 (THE COURT: "Okay. I'm perfectly happy to sign something saying *I have no influence over a dispute between two non-debtor parties* .... There's a whole universe of things I'm not doing and that's one of them.") That Diligent alleges the "process was unfair" does not "give rise" to Diligent's tortious interference and civil conspiracy claims.

AML argues that "[i]t makes no difference that Diligent re-casts Citiking's objections as tortious interference and civil conspiracy claims" since the same cause of action requirement relates to the factual circumstances underlying the claims and not their legal basis. Br. 15 (quoting *CoreStates Bank, N.A. v. Huls Am., Inc*, 176 F.3d 187, 206 (3d Cir. 1999)). The Third Circuit did not hold claims are precluded whenever facts overlap. Instead, it explained that the claims at issue were precluded "because of the coincidence of several unusual circumstances" including that "the objection and CoreStates's present claim addressed the same factual issue: who should receive and retain the $600,000 UCT was prepared to pay." *CoreStates Bank, N.A.*, 176 F.3d 187 at 206-07.

AML also argues that Diligent can't "escape the effects of claim preclusion by relying on AML's purchase of debt from DWC Pine. That transaction was disclosed during the Sale Hearing." Br. at 15. During that very same disclosure, DWC Pine told the Court that "I think that this is a private transaction … I am not sure it's particularly relevant to today." D.I. 1070 at 14:14-21. It was not relevant. The Sale Hearing concerned the Sale of the Debtors' assets just as the Sale Order did. D.I. 1063. AML argues Citiking had an opportunity to incorporate the debt purchase into its objection, failed to do so, and claim preclusion applies to claims that could have been raised. *Id.* (citing *CoreStates Bank*, 176 F.3d at 199). AML misstates the law. The Third Circuit holds that creditors typically do not have to raise claims against other creditors to avoid claim preclusion: "in general, a creditor who does not raise a claim against another party to the bankruptcy proceeding cannot be precluded from later asserting a claim." *CoreStates Bank*, 176 F.3d at 199-200.

### C.    Issue Preclusion Does Not Apply

AML's issue preclusion argument fails because the issues of whether AML tortiously interfered with the Intercreditor Agreement and whether DWC Pine and AML conspired to tortiously interfere were never adjudicated or litigated. "Collateral estoppel bars relitigation of an issue where: (1) the issue sought to be precluded [is] the same as that involved in a prior action; (2) that issue was actually litigated; (3) it was determined to be a final and valid judgment; and (4) the determination was essential to the prior judgment." *In re Prosser*, 534 F. App'x 126, 129 (3d Cir. 2013) (cleaned up). It does not suffice for the "the facts underlying the cases" to be the same. *Id.* Instead, the question is "whether the same issue has been conclusively determined in a prior decision." *Id.* (emphasis in the original). In *Prosser*, the Third Circuit held claim preclusion did not apply even where "the same factual scenario gave rise to the two actions, the issues decided in each were entirely distinct." *Id.*

AML argues that "Citiking fully litigated and lost on its objection that the sales process for Debtors' assets was deficient and supposedly vitiated Citiking's right under bankruptcy law to credit bid." Br. at 17. Once again, while it is true that the sale process was litigated and adjudicated, the entirely separate issue of whether AML tortiously interfered with the Intercreditor Agreement (referred to as a "private transaction" by DWC Pine) was never adjudicated or litigated. AML fails to explain how these issues are the same. Instead, AML argues Diligent's claims are "directly contrary to, and impossible to square with, the Sale Order entered by this Court." Br. at 17. But AML fails to explain how so. Diligent is not attempting to unwind or undo the Sale Order. Diligent seeks recourse for AML's tortious interference with the Intercreditor Agreement and conspiracy to tortiously interfere, both entirely separate issues which have never been adjudicated.

## CONCLUSION

For the reasons addressed herein, Diligent respectfully requests that the Court deny AML's Motion to Dismiss and grant any further or additional relief deemed warranted by the Court.

Respectfully submitted,

Dated: November 3, 2025

**CHRISTENSEN LAW LLC**

 _/s/ Joseph L.Christensen_
Joseph L. Christensen (#5146)
Levi Akkerman (#7015)
1201 N. Market Street, Suite 1404
Wilmington, DE 19801
(302) 212-4330
joe@christensenlawde.com
lakkerman@christensenlawde.com