**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

**J. KATE STICKLES**
**JUDGE**

**824 NORTH MARKET STREET**
**WILMINGTON, DELAWARE**
**302-252-3820**

August 31, 2026

**VIA EM/ECF**

Mary F. Caloway, Esq.
Pachulski Stang Ziehl &
Jones LLP
919 N. Market Street
17th Floor
P.O. Box 8705
Wilmington, DE 19899

Michael C. Keats, Esq.
Fried Frank Harris
Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004

Joseph L. Christensen, Esq.
Christensen Law LLC
1201 N. Market Street
Suite 1404
Wilmington, DE 19801

**Re: In re One Aviation Corp., et al.,[1] Case No. 18-12309 (JKS)**
**Diligent Enter. Mgmt. v. AML Global Eclipse, LLC,**
**Adv. Pro. No. 25-52065 (JKS)[2]**
**Related Adv. D.I. Nos. 4, 6, 7, 10, 11, and 13**

Dear Counsel:

Presently before the Court is Defendant AML Global Eclipse, LLC's ("AML") Motion to Dismiss the Complaint[3] (the "Motion to Dismiss") and the responsive pleadings.[4] For the reasons discussed below, the Court will grant the Motion to Dismiss.

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each debtor's tax identification number, as applicable, are: One Aviation Corporation (9649); ACC Manufacturing, Inc. (1364); Aircraft Design Company (1364); Brigadoon Aircraft Maintenance, LLC (9000); DR Management, LLC (8703); Eclipse Aerospace, Inc. (9000); Innovatus Holding Company (9129); Kestrel Aircraft Company, Inc. (2053); Kestrel Brunswick Corporation (6741); Kestrel Manufacturing, LLC (1810); Kestrel Tooling Company (9439); and OAC Management, Inc. (9986). The Debtors' corporate headquarters is located at 3250 Spirit Drive SE, Albuquerque, NM 87106.

[2] Citations to D.I. reference the docket entries in the lead bankruptcy case and citations to Adv. D.I. reference the docket entries in this adversary proceeding.

[3] Adv. D.I. 6 and the Memorandum of Law in Support of the Motion to Dismiss (Adv. D.I. 7).

[4] Plaintiff Diligent Enterprise Management, LLC's ("Diligent") Memorandum in Opposition to the Motion to Dismiss (Adv. D.I. 10) and AML's Reply Memorandum in Support of the Motion to Dismiss (Adv. D.I. 11). Diligent has standing to bring these claims pursuant to the Assignment of Claims and Causes of Action, dated June

**Jurisdiction**

Plaintiff commenced this adversary proceeding by filing a complaint (the "Complaint") in New York state court in the action captioned *Diligent Enterprise Management, LLC v. AML Global Eclipse, LLC*, et al., Index No. 651374/2024. The action was removed to New York federal court and then transferred to the District Court for the District of Delaware.[5] By Order dated August 12, 2025, the adversary proceeding was referred to this Court.[6] The two counts of the Complaint at issue involve interpretation of an order of this Court and, therefore, the Court has subject matter jurisdiction.[7]

**Legal Standard**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7012(b), challenges the sufficiency of the factual allegations in a complaint.[8] "The test in reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6) is whether, under any 'plausible' reading of the pleadings, the plaintiff would be entitled to relief."[9] "A claim will be dismissed if after accepting all well-pled facts as true and resolving all inferences in favor of the plaintiff, the court finds no entitlement to relief."[10] The court "need not accept as true assertions that are contradicted by matters of public record or matters of which a court may take judicial notice, such as previous court proceedings."[11]

---

23, 2023, from Citiking International US LLC ("Citiking"), as assignor, to Diligent, as assignee (Adv. D.I. 4 (Compl.) at ¶ 1). The Defendants filed a Request for Oral Argument (Adv. D.I. 13) and Notice of Completion of Briefing (Adv. D.I. 14). The Court did not hear oral argument on the Motion to Dismiss because the facts and legal arguments are adequately presented in the briefs, and the decisional process would not be significantly aided by oral argument.

[5] Adv. D.I. 3 (*Citiking Int'l US LLC v. One Aviation Corp. (In re One Aviation Corp.)*, Case No. 20-cv-1569 (D. Del. 2020), D.I. 1, 58, 60, and 61).

[6] Adv. D.I. 2.

[7] *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151, 129 S. Ct. 2195, 2205, 174 L. Ed. 2d 99 (2009) (holding that the Bankruptcy Court has jurisdiction to interpret and enforce its own prior orders); *see also In re Essar Steel Minnesota, LLC*, 47 F.4th 193, 201 (3d Cir. 2022).

[8] *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).

[9] *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[10] *McGovern v. City of Phila.*, 554 F.3d 114, 115 (3d Cir. 2009).

[11] *In re La Paloma Generating Company, LLC*, Case No. 16-12700 (JTD), 2020 WL 224569 (Bankr. D. Del. 2020) (citing *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 401, 426-27 (3d Cir. 1999)); *Gupta v. Wipro Limited*, 749 Fed. App'x. 94, 97 (3d Cir. 2018).

## Factual Allegations and Background[12]

### A. One Aviation Corporation

One Aviation Corp. ("One Aviation") and its affiliates focused on aircraft service and upgrades, aircraft remanufacturing, and new aircraft manufacturing and sales. One Aviation was an original equipment manufacturer of twin-engine light jet aircraft, primarily serving the owner/operator, corporate, and aircraft charter markets as well as international markets.[13]

### B. First Tranche Loans

DWC Pine Investments I, Ltd. ("DW") was One Aviation's lender. On or about November 10, 2017, Citiking and DW entered into a Purchase and Sale Agreement for Distressed Trades (the "First PSA"), pursuant to which DW sold and assigned loans in the approximate amount of $21,000,000 to Citiking (the "First Tranche Loans").[14]

The First Tranche Loans consisted of loan obligations due to DW from borrowers, Eclipse Aerospace, Inc. ("Eclipse") and Brigadoon Aircraft Maintenance, LLC ("Brigadoon"), affiliates of One Aviation (the "Affiliates"). The First Tranche Loans were secured by a blanket lien against the assets of the Affiliates and One Aviation and guaranteed by One Aviation.[15] Citiking made the payments to DW as required under the First PSA and owns the First Tranche Loans.[16]

### C. Intercreditor Agreement and Right of First Refusal

At the closing of the sale of the First Tranche Loans to Citiking, DW continued to own other loan obligations due to DW from the Affiliates (the "Second Tranche Loans"). The Second Tranche Loans were also secured by a blanket lien against the assets of the Affiliates and One Aviation and guaranteed by One Aviation.[17] Upon closing the sale of the First Tranche Loans, DW and Citiking entered an "Intercreditor Agreement" governing their relationship.[18]

The Intercreditor Agreement provides both DW and Citiking with a Right of First Refusal requiring that in the event that either DW or Citiking accepts an offer from a third party

---

[12] The Court adopts the facts from the Complaint, accepting all of the Complaint's well-pleaded facts as true and disregarding any legal conclusions. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009).

[13] Adv. D.I. 4 (Compl.) at ¶ 13.

[14] Adv. D.I. 4 (Compl.) at ¶ 14 and Ex. 1.

[15] Adv. D.I. 4 (Compl.) at ¶ 15.

[16] Adv. D.I. 4 (Compl.) at ¶ 16 and Ex. 2.

[17] Adv. D.I. 4 (Compl.) at ¶ 17.

[18] Adv. D.I. 4 (Compl.) at ¶ 18 and Ex. 3.

for the purchase and sale of any rights, title, and interests in the First Tranche Loans or the Second Tranche Loans, the other party shall have the opportunity to enter into the same agreement (the "ROFR").[19]

**D. Subsequent Transactions Between DW and Citiking**

In July 2018, Citiking and DW entered into a second Purchase and Sale Agreement for Distressed Trades (the "Second PSA"), pursuant to which DW sold and assigned the Second Tranche Loans in the amount of $26,105,837.10 to Citiking (the First Tranche Loans and the Second Tranche Loans are collectively referred to as the "Loans").[20] According to the Second PSA, Citiking made the first installment payment to DW in the amount of $2,000,000 on or about July 10, 2018.[21]

Contemporaneously with the purchase and sale of the Second Tranche Loans, Citiking and DW entered into a Continuing Obligations Agreement (the "COA"),[22] which provided remedies if Citiking defaulted under the Second PSA.[23] If Citiking defaulted by failing to make the second or third installment payments under the Second PSA, DW would have the right, after delivery of a default notice, to repurchase the Second Tranche Loans from Citiking (the "Repurchase").[24]

Also contemporaneously, DW and Citiking entered into an "Escrow Agreement."[25] Pursuant to the Escrow Agreement, Citiking delivered to Cantor Fitzgerald Securities (the "Escrow Agent"), an executed Assignment and Assumption Agreement (the "DW Assignment"), wherein Citiking assigned the Second Tranche Loans it was purchasing from DW back to DW.

---

[19] Adv. D.I. 4 (Compl.) at ¶ 19. The Intercreditor Agreement states:

> [E]ach lender agrees that in the event that it receives an offer for the purchase and sale of any or all of its right, title and interest in and to the Obligations or the Loan Documents from an unaffiliated third party… *prior to accepting the Third Party Purchase Offer, the receiving Lender shall make an offer in writing to the other Loan Party (the "ROFR") to enter into the same purchase and sale transaction on the same terms as the Third Party Purchase Offer.*

Adv. D.I. 4 (Compl.) at Ex. 3 (Intercreditor Agreement) at ¶ 5 (emphasis supplied).

[20] Adv. D.I. 4 (Compl.) at ¶ 20 and Ex. 4.

[21] Adv. D.I. 4 (Compl.) at ¶ 22 and Ex. 5 (Assignment and Assumption Agreement).

[22] Adv. D.I. 4 (Compl.) at ¶ 23 and Ex. 6.

[23] Adv. D.I. 4 (Compl.) at ¶¶ 23-29.

[24] Adv. D.I. 4 (Compl) at ¶ 25. The Repurchase required DW to pay Citiking an amount equal to the sum of (1) any portion of the purchase price previously paid by Citiking, minus (2) any default interest and other amounts owing or payable by Citiking to DW under the Second PSA, minus (3) $1,000,000. COA at ¶ 6(b).

[25] Adv. D.I. 4 (Compl.) at ¶ 30 and Ex. 7.

The obligation of the Escrow Agent to release from escrow and deliver the DW Assignment could be triggered by one of two events. In the first instance, the Escrow Agreement provided that the Escrow Agent would release the DW Assignment from escrow and deliver it to DW upon DW certifying its right to Repurchase the Second Tranche Loans.[26] In the second instance, the Escrow Agent would release the DW Assignment from escrow and deliver it to Citiking upon notice from DW that it was fully paid, or the passage of 120 days without a default notice from DW.[27]

**E. Default Under Second PSA, DW's Repurchase of the Second Tranche Loans, and Second Purchase of the Second Tranche Loans**

DW issued four Default Notices to Citiking.[28] On January 18, 2019, DW provided a Default Notice to the Escrow Agent, certifying that DW was entitled to Repurchase from Citiking the Second Tranche Loans.[29]

On July 25, 2019, Citiking and DW entered into a Letter Agreement (the "Letter Agreement"), whereby Citiking agreed to purchase, for the second time, the Second Tranche Loans that were now held by DW pursuant to the Repurchase.[30] Pursuant to the Letter Agreement, the purchase price for Citiking's second purchase of the Second Tranche Loans was $16,150,000 (the "Purchase Price") with interest accruing on unpaid installments at the per annum rate of 12%. The Letter Agreement provides Citiking a credit in the total amount of $1,683,500 representing the Default Penalty and Default Interest that DW had previously charged Citiking in connection with the Repurchase of the Second Tranche Loans.[31] The Letter Agreement incorporates the terms of the Second PSA requiring DW to deliver the Second Tranche Loans to Citiking on the settlement date.[32] Citiking paid DW approximately $6,500,000 in principal payments towards the $16,150,000 purchase price for its second purchase of the Second Tranche Loans.[33] Citiking also paid DW monthly interest payments in the amount of 12% per annum. Citiking asserts that DW failed to deliver the Second Tranche Loans to Citiking.[34]

---

[26] Escrow Agreement at ¶ 2.

[27] Escrow Agreement at ¶ 2.

[28] Adv. D.I. 4 (Compl.) at ¶ 33.

[29] Adv. D.I. 4 (Compl.) at ¶ 34 and Ex. 8.

[30] Adv. D.I. 4 (Compl.) at ¶ 36 and Ex. 9.

[31] Adv. D.I. 4 (Compl.) at ¶ 37 and Ex. 9.

[32] Adv. D.I. 4 (Compl.) at ¶ 38.

[33] Adv. D.I. 4 (Compl.) at ¶ 42.

[34] Adv. D.I. 4 (Compl.) at ¶ 43.

**F. One Aviation and its Affiliates' Chapter 11 Cases**

On October 9, 2018, One Aviation and various affiliates, including the Affiliates, filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Citiking was the debtor in possession lender[35] and funded a $19.1 million DIP Loan, plus approximately $7 million post-confirmation pursuant to the Debtors' Second Amended Joint Prepackaged Plan of Reorganization (the "Plan").[36] The Plan did not go effective.[37]

**G. Debtors' Motions to Sell Their Assets**

On June 17, 2019, the Debtors filed a motion seeking entry of an order approving a sale of their assets free and clear of liens, bidding procedures, and a stalking horse agreement with Citiking as the stalking horse buyer (the "First Sale Motion").[38] The terms of the bidding procedures permitted Citiking to credit bid the amounts due and owing to it by the Debtors. The First Sale Motion was subsequently withdrawn by the Debtors.[39]

---

[35] On November 27, 2018, the Bankruptcy Court entered the Final Order (i) Authorizing Debtor Borrowers to (a) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(3), 364(d)(1) and 364(e), (b) Grant Senior Liens and Superpriority Administrative Expense Status, and (c) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (ii) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364; and (iii) Granting Related Relief ("Final DIP Order") (D.I. 208). The Court later found the Final DIP Order void, in part. *See* D.I. 912 (Tr. Hr'g. Sept. 3, 2020) at 38:18-40:7.

[36] D.I. 703 (Plan), D.I. 707 (Order (a) Approving the Adequacy of the Debtors' Disclosure Statement and (b) Confirming the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization (As Modified) of One Aviation Corporation and Its Debtor Affiliates), and Adv. D.I. 4 (Compl.) at ¶ 50.

[37] *See* D.I. 831 (Motion of the Official Committee of Unsecured Creditors to Convert Debtors' Case to Chapter 7) at ¶¶ 12, 13, and 16; D.I. 877 (Debtors' Emergency Motion for Entry of a Final Order (I) Authorizing Debtors to (A) Obtain Additional Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying Existing Final DIP Financing Order, (V) Modifying Automatic Stay, and (VI) Granting Related Relief) at ¶ 21 ("Citiking (a) breached its obligations under the Letter Agreement by, among other things, failing to make the required payments to DW or to declare the Plan effective within the time permitted by the Letter Agreement, (b) as a result of its breach of the Letter Agreement, continued to be in breach of the PSA and the Continuing Obligations Agreement due to its failure to pay the purchase price of the Second Debt Assignment,11 and (c) failed to work in good faith to consummate the transactions set forth in the Plan or to fund administrative expense claims and the distributions as provided for under the Plan."); and D.I. 912 (Tr. Hr'g Sept. 3, 2020) at 38:13-17 ("[The Court finds] that the confirmation order is, under its clear terms, null and void. There is no confirmation order in existence at this time and, as such, there is no confirmed plan, so there's no reason not to do anything that might be contrary to a null and void contract or an order . . .").

[38] D.I. 561.

[39] D.I. 633. In conjunction with the withdrawal of the First Sale Motion, Citiking and DW entered into the Letter Agreement. The confirmed Plan contemplated that Citiking would own 100% of the reorganized Debtors' equity upon emergence from bankruptcy. Pursuant with the Plan and Letter Agreement, Citiking was to fund various settlements and distributions, reach exit financing agreements with other parties, provide exit financing funding, and

On August 28, 2020, the Debtors filed a second motion to sell their assets (the "Second Sale Motion").[40] This time the stalking horse buyer was SEF OA LLC. The Second Sale Motion also allowed Citiking to credit bid. The Second Sale Motion was subsequently withdrawn by the Debtors.[41]

On October 20, 2020, the Debtors filed a third motion to sell their assets to AML Global Eclipse LLC ("AML") as the stalking horse bidder (the "Third Sale Motion").[42] The Third Sale Motion provided that AML would purchase the Debtors' assets for $5,250,000, subject to higher and better offers, and the proceeds would be used to pay "Administrative Expense Claims." In the Third Sale Motion, the Debtors acknowledged that DW intended to exercise its alleged right to credit bid against AML stating "DW has informed the Debtors that it may submit a competing offer in the form of a credit bid up to and/or at the Sale Hearing."[43]

On November 5, 2020, the Debtors filed a Notice of Bidding Procedures, providing that a qualifying bid "shall . . . generally contain terms no less favorable (in the Debtors' reasonable business judgment) than the Stalking Horse Agreement" with AML.[44] On or about November 10, 2020, AML voluntarily increased its cash deposit to the full amount of the purchase price which remained subject to higher and better offers at auction.[45]

Citiking objected to the motion,[46] and argued at the hearing on the Third Sale Motion (the "Sale Hearing") that: (i) the Notice of Revised Bidding Procedures, together with AML's deposit of the full cash purchase price, barred credit bidding because it required all bidders to make a cash deposit in an escrow account for the full price of the bid,[47] and further maintained that Citiking was "entitled to have the opportunity to credit bid" under section 363(f) of the Bankruptcy Code; (ii) Debtors "unilaterally issued bidding procedures requiring the entire

---

take the Plan effective by December 1, 2019. Adv. D.I. 4 (Compl.) at Ex. 9, ¶ 5(i)-(v); D.I. 703 (Plan) at §§ 2.2(b), 9.1.2, and 9.1.9. Citiking failed to fund the settlements and distributions, and the Plan did not go effective. *See* D.I. 880 (Decl. of James Patrick Carroll in Support of the Debtors' Additional DIP Financing and Sale Motions and Motion to Shorten) at ¶¶ 10-11, 18, and 24.

[40] D.I. 878.

[41] D.I. 951. The Debtors also filed a motion to obtain additional DIP financing from DW. D.I. 877. The Court entered an interim order granting the additional DIP financing in the amount of $9.75 million as a "Junior DIP Facility." *See* D.I. 910. The Junior DIP Facility included a roll-up of $7 million First Tranche Loans which were being assigned to SEF OA LLC. D.I. 910. A final order was never entered on the Junior DIP Facility.

[42] D.I. 969.

[43] D.I. 969 at n. 8.

[44] D.I. 1024, Ex. A (Bidding Procedures) at ¶3(a)(ii).

[45] *See* D.I. 1040 ("Notice of Revised Bidding Procedures").

[46] D.I. 1019.

[47] Citiking also raised the issue in the Complaint. *See* Adv. D.I. 4 (Compl.) at ¶¶ 67-68.

purchase price to be deposited in advance;" and (iii) the sale was "the result of an insufficient process" because the marketing and auction process was not robust.[48]

On November 20, 2020, the Bankruptcy Court overruled Citiking's objection[49] and approved the sale of the Debtors' assets to AML for a cash price of $5,250,000, free and clear of all liens, claims, encumbrances, and other interests, other than permitted encumbrances as defined in the Purchase Agreement.[50] The Court stayed the Sale Order until November 27, 2020 to afford creditors the opportunity to appeal.[51]

Also at the Sale Hearing, and prior to presentation of objections to the sale, counsel for DW reported that DW and AML entered into an agreement for AML to purchase DW's secured debt, including the Second Tranche Loans.[52] Citiking alleges "that at the time of DW's alleged sale of the Second Tranche Loans to AML, DW had already sold the Second Tranche Loans to Citiking and DW was in default of the Second PSA and Letter Agreement by failing to deliver the Second Tranche Loans to Citiking on the Settlement Date;"[53] and *even if* DW had *not* sold the Second Tranche Loans to Citiking, DW was required to provide Citiking with a ROFR under the Intercreditor Agreement before selling the Second Tranche Loans to AML.[54]

Citiking appealed the Sale Order to the District Court and filed an emergency motion to stay the Sale Order pending appeal.[55] The District Court denied the motion to stay the Sale Order and Citiking appealed to the Third Circuit Court of Appeals.[56] The Third Circuit denied

---

[48] D.I. 1070 (Tr. Hr'g Nov. 20, 2020) at 33:22-23; 35:25-36:2; and 34:2-5.

[49] D.I. 1070 (Tr. Hr'g Nov. 20, 2020) at 51:16.

[50] D.I. 1063 (Order (i) Approving Purchase Agreement, (ii) Authorizing Sale Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and (iii) Granting Related Relief) (the "Sale Order")).

[51] D.I. 1070 (Tr. Hr'g Nov. 20, 2020) at 50:18–20 ("I am going to stay the effectiveness of the [Sale] [O]rder . . . through November 27th . . . .").

[52] D.I. 1070 (Tr. Hr'g Nov. 20, 2020) at 14:5-24 (disclosing private sale transaction between DW and AML of DW's "senior secured prepetition . . . [loan] in excess of $20 million").

[53] Adv. D.I. 4 (Compl.) at ¶ 75.

[54] Adv. D.I. 4 (Compl.) at ¶ 76.

[55] Citiking International US LLC's Emergency Motion for Stay Pending Appeal of Order (I) Approving Purchase Agreement, (II) Authorizing Sale Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and (III) Granting Related Relief, *Citiking Int'l US LLC v. One Aviation Corp. (In re One Aviation Corp.)*, Case No. 20-cv-1569 (D. Del. 2020), D.I. 4.

[56] Notice of Appeal of Oral Order Denying Citiking International US LLC's Emergency Motion for Stay Pending Appeal, *Citiking Int'l US LLC v. One Aviation Corp. (In re One Aviation Corp.)*, Case No. 20-cv-1569 (D. Del. 2020), D.I. 18.

Citiking's emergency motion to stay the Sale Order.[57] The appeal of the Sale Order was dismissed by the District Court for failure to prosecute. Citiking stipulated to the voluntary dismissal of the Third Circuit appeal, and the Court entered an Order dismissing the case.[58]

The sale to AML closed on November 30, 2020.[59]

**H. Conversion of the Debtors' Cases**

On February 18, 2021, the Court converted the Debtors' chapter 11 cases to cases under chapter 7.[60]

**I. Additional Litigation in the Bankruptcy Case: Citiking's Objection to AML's Claim and the Distribution Settlement Motion**

In July 2021, Citiking objected to the allowance of any claims asserted by AML against the Debtors or their estates.[61] Citiking argued that (i) AML and DW "scheme[d]" to "lock in AML as the successful bidder" and "deprive Citiking of its right to credit bid;" (ii) "DW's unilateral sale of its secured debt position to AML violated Citiking's right of first refusal under the Intercreditor Agreement;" and (iii) DW's November 20, 2020 disclosure to this Court regarding the sale of its interest in Debtors' debt to AML "raises questions concerning the integrity and transparency of the Sale process."[62] Citiking adjourned the claims objection indefinitely.[63] The objection was never prosecuted, nor adjudicated.

In March 2022, Citiking raised these arguments again in opposition[64] to a distribution settlement motion reached by the chapter 7 trustee, chapter 11 estate professionals, and AML.[65]

---

57 Order Denying Emergency Motion filed by Appellant Citiking International US LLC for Interim Stay of Bankruptcy Sale from November 27, 2020 Until Court Considers Stay or for Stay of Sale Pending Appeal, *One Aviation Corp. v. Citiking Int'l US* LLC, Case No. 20-3406 (3d Cir. 2020), D.I. 8.

58 D.I. 1066 and 1259. *See, generally, Citiking Int'l US LLC v. One Aviation Corp. (In re One Aviation Corp.)*, Case No. 20-cv-1569 (D. Del. 2020-22), and *One Aviation Corp. v. Citiking Int'l US LLC*, Case No. 20-3406 (3d Cir. 2020-21).

59 D.I. 1074.

60 D.I. 1086 and 1152.

61 D.I. 1224.

62 D.I. 1224 at ¶¶ 2, 3, 8, and 23.

63 *See* D.I. 1246 (Notice of Agenda of Matters Scheduled for Hearing on Sept. 17, 2021 at 2:00 p.m.).

64 D.I. 1263 at ¶ 43 ("Citiking asserts that DW lacked the contractual right to unilaterally loan funds post-petition to the Debtors pursuant to the Intercreditor Agreement (in addition to the fact the loan by DW was made before it was approved by the Court) and, therefore, DW's claim is invalid. … Citiking has a pending objection to AML's claim, … .").

65 D.I. 1260.

Citiking later resolved and withdrew its objection in exchange for an agreed distribution. The Court approved the settlement motion and the distribution to Citiking.[66]

**J. Count IV and Count V of the Complaint and AML's Motion to Dismiss**

The Complaint contains nine-counts[67] against AML, DW, and various individuals.[68] Count IV alleges tortious interference with contract against AML[69] and states, in part:

> Because AML and DW were colluding with one another to effectively freeze Citiking out of the bidding process by eliminating the opportunity to credit bid, DW did not offer Citiking the right of first refusal to match AML's offer as required under the Intercreditor Agreement.[70]

Count V alleges civil conspiracy against AML and DW[71] and states, in part:

> DW and AML conspired together to eliminate credit bidding at the auction in the Debtors' Bankruptcy Case for the purpose of enabling AML to purchase the Debtors' assets at far below market value and DW to recover on the Second Tranche Loans through the sale of the loans to AML.[72]

AML seeks dismissal of Count IV and Count V of the Complaint (the "Counts" or "Counts IV and V")[73] arguing the Counts are barred by the "law of the case" doctrine and the claim and issue preclusion doctrines, and the Counts fail to plead factual allegations necessary to properly state each of the claims.

---

[66] D.I. 1350 and 1351.

[67] Adv. D.I. 4 (Compl.) at ¶¶ 89-152.

[68] The Claims against the individual defendants were dismissed. *See* Adv. D.I. 5 (Notice of Dismissal).

[69] Adv. D.I. 4 (Compl.) at ¶¶ 108-113.

[70] Adv. D.I. 4 (Compl.) at ¶ 112.

[71] Adv. D.I. 4 (Compl.) at ¶¶ 114-121.

[72] Adv. D.I. 4 (Compl.) at ¶ 115.

[73] Adv. D.I. 6 and 7.

## Legal Analysis

### A. Preclusion Doctrines

#### 1. Law of the Case

"The doctrine of the law of the case dictates that when a court decides upon a rule of law, that rule should continue to govern the same issues in subsequent stages in the litigation."[74] The Third Circuit counsels that the doctrine "only applies within the same case," "and affects only issues that were 'expressly' or 'necessarily resolved' by prior decisions in the same case."[75] The doctrine pertains to "subsequent rulings by the same judge in the same case or a closely related one [and] to rulings by different judges at the same level."[76] Further, "[t]he doctrine applies to factual findings made in a main bankruptcy proceeding and is binding on parties to a subsequent adversary proceeding."[77] The doctrine "directs a court's discretion, it does not limit the tribunal's power."[78] Additionally, dismissal of an appeal "terminates the cause of action and the judgment of the district court becomes the law of the case."[79]

AML argues that the claims asserted against it are barred or enjoined by the Sale Order. It argues the Court already "found, concluded, and determined" that AML was a good faith purchaser pursuant to section 363(m) and did "not collude[] with any of the other bidders, potential bidders, or any other parties interested in the Purchased Assets."[80]

Diligent responds that the Complaint adequately pleads claims for tortious interference with contract and civil conspiracy and that the issues raised in the Complaint were never litigated and adjudicated. Diligent maintains that the sale of DW's rights to AML was a private transaction that was disclosed to the Court as a private transaction and had no bearing on the Court's approval of the sale of the Debtor's assets to AML or the Court's finding that AML was a good faith purchaser of the Debtors' assets. Diligent continues that the alleged collusion

---

[74] *Resyn Corp. v. United States (Matter of Resyn Corp.)*, 945 F.2d 1279, 1281 (3d Cir. 1991) (cleaned up; citations omitted).

[75] *Home Depot USA, Inc. v. Lafarge N. Am., Inc.*, 59 F.4th 55, 61 (3d Cir. 2023) (citing *Farina v. Nokia Inc.*, 625 F.3d 97, 117 n. 21 (3d Cir. 2010)); *PDX N., Inc. v. Comm'r N.J. Dep't of Lab. & Workforce Dev.*, 978 F.3d 871, 881 n.10 (3d Cir. 2020)) (cleaned up).

[76] *In re La Paloma Generating Co., LLC*, Case No. 16-12700 (JTD), 2020 WL 224569 at *3 (citation omitted).

[77] *Id.* (citation omitted).

[78] *Arizona v. California*, 460 U.S. 605, 618, 103 S. Ct. 1382, 1391, 75 L. Ed. 2d 318 (1983), decision supplemented, 466 U.S. 144, 104 S. Ct. 1900, 80 L. Ed. 2d 194 (1984) (citations omitted) (holding that a court "retains jurisdiction to accommodate changed circumstances"). *See also Joy Glob., Inc. v. Wis. Dep't of Workforce Dev. (In re Joy Glob., Inc.)*, 381 B.R. 603, 610 (D. Del. 2007) (citations omitted).

[79] *Deisler v. McCormack Aggregates, Co.*, 54 F.3d 1074, 1086 (3d Cir. 1995).

[80] D.I. 1063 (Sale Order) at ¶¶ 44-45.

between AML and DW to effectively freeze Citiking out of the bidding process explains "AML's motive to tortiously interfere with the Intercreditor Agreement."

The record reflects that the Court heard evidence and considered the arguments presented at the Sale Hearing. Citiking objected to the proposed sale to AML on the grounds that (i) Citiking was denied the right to credit bid, (ii) Debtors "unilaterally issued bidding procedures" requiring the entire purchase price to be deposited in advance, and (iii) the sale was "the result of an insufficient process" because the marketing and auction process was not robust.[81] The Court overruled all of Citiking's objections.

As set forth in the Sale Order, the Court "found, concluded and determined that:"

- "The terms contained in the Purchase Agreement constitute the highest or otherwise best offer for the Purchased Assets, and will provide a greater recovery for the Debtors' bankruptcy estates for the Purchased Assets than would be provided by any other available alternative. The Debtors' determination that the Purchase Agreement constitutes the highest or otherwise best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment."[82]
- "The Purchase Agreement and the Sale contemplated thereby represent a fair and reasonable offer to purchase the Purchased Assets. No higher or otherwise better offer was submitted to the Debtors to purchase the Purchased Assets for greater economic value to the Debtors' bankruptcy estates than provided by the Buyer pursuant to the Purchase Agreement."[83]
- "Approval of the Motion and the Purchase Agreement and the consummation of the Sale contemplated thereby is in the best interests of the Debtors, their respective bankruptcy estates and creditors and other parties in interest in these Chapter 11 Cases."[84]
- "The Buyer is purchasing the Purchased Assets in good faith, is a good-faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and is not an "insider" (as defined under section 101(31) of the Bankruptcy Code) of the Debtors, and therefore is entitled to the full benefits and protections of section 363(m) of the Bankruptcy Code, and otherwise has proceeded in good faith in all respects in connection with the Sale in that: (i) the Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the

---

[81] D.I. 1070 (Tr. Hr'g Nov. 20, 2020) at 33:22-34:1; 35:25-36:2; 34:2-36:17; and 51:16-17.

[82] D.I. 1063 (Sale Order) at ¶ P.

[83] D.I. 1063 (Sale Order) at ¶ Q.

[84] D.I. 1063 (Sale Order) at ¶ R.

Purchased Assets; (ii) all payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed; (iii) the Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (iv) the Buyer agreed to provisions in the Purchase Agreement that would enable the Debtors to accept a higher or better offer in respect of the Sale; and (v) the negotiation and execution of the Purchase Agreement, including the Sale contemplated thereby, were at arms' length and in good faith. The Buyer has at all times acted in good faith and will continue to be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the Purchase Agreement."[85]

- "The Purchase Agreement and the transactions contemplated thereby cannot be avoided under section 363(n) of the Bankruptcy Code. The Debtors, the Buyer and their respective agents, representatives and affiliates have not engaged in any conduct that would cause or permit the Purchase Agreement or the consummation of the transactions contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code."[86]
- "None of the transactions contemplated by the Purchase Agreement, including, without limitation, the Sale or the assumption and assignment of any Assigned Contracts, is being undertaken for the purpose of hindering, delaying, or defrauding any creditors under the Bankruptcy Code, under the laws of the United States, or under the laws of any state, territory, possession, or the District of Columbia."[87]

Further, by the Sale Order, the Court "Ordered, Adjudged and Decreed" among other things, that:

- "The Sale is undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code . . .. The Buyer is a good-faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and as such is entitled to the full benefits and protections of such section."[88]
- "As a good-faith purchaser of the Purchased Assets, the Buyer has not colluded with any of the other bidders, potential bidders, or any other parties interested in

[85] D.I. 1063 (Sale Order) at ¶ S.

[86] D.I. 1063 (Sale Order) at ¶ T.

[87] D.I. 1063 (Sale Order) at ¶ V.

[88] D.I. 1063 (Sale Order) at ¶ 44.

> the Purchased Assets, and therefore the sale of the Purchased Assets may not be avoided pursuant to section 363(n) of the Bankruptcy Code."[89]

These findings and rulings are foundational to the Sale Order[90] and were subject to appeal. Ultimately, appeals to the District Court and Third Circuit were dismissed. As a result, the Court's findings and rulings are the law of the case.[91]

Count IV and Count V of the Complaint allege as follows:

> Count IV: "Because AML and DW were colluding with one another to effectively freeze Citiking out of the bidding process by eliminating the opportunity to credit bid . . . ."[92]
>
> Count V: "DW and AML conspired together to eliminate credit bidding at the auction in the Debtors' Bankruptcy Case for the purpose of enabling AML to purchase the Debtors' assets at far below market value . . . ."[93]

The Court finds that the law of the case doctrine precludes re-litigating the allegations in Counts IV and V of the Complaint because those issues were previously decided by the Bankruptcy Court. As set forth above, the Court specifically found and ruled that "the Buyer [AML] is a good-faith buyer pursuant to section 363(m) of the Bankruptcy Code" and "Buyer [AML] has not colluded with any of the other bidders, potential bidders, or any other parties interested in the Purchased Assets." Although Citiking argued it had effectively been denied the right to credit bid, the Court rejected that argument and overruled the objection. Now, as a result, Diligent cannot allege that AML "colluded," "conspired," or "schemed" with DW in an effort to: (i) "explain" AML's purported motives, (ii) support a count for tortious interference, (iii) establish that Citiking's inability to credit bid perverted the sale process, or (iv) assert that the assets were sold below market value.[94] The law of the case doctrine precludes Diligent from re-litigating findings and rulings made in the bankruptcy case in this adversary proceeding. Consequently, the Motion to Dismiss will be granted as to Counts IV and V of the Complaint.

---

[89] D.I. 1063 (Sale Order) at ¶ 45.

[90] D.I. 1070 (Tr. Hr'g Nov. 20, 2020) at 18:12-15 (stating that AML would not close without the terms of the proposed order).

[91] *Deisler v. McCormack Aggregates, Co.*, 54 F.3d at 1086.

[92] Adv. D.I. 4 (Compl.) at ¶ 112.

[93] Adv. D.I. 4 (Compl.) at ¶ 115.

[94] *See Bourdeau Brother, Inc. v Montagne (In re Montagne)*, No. 08-1024, 2010 WL 271347, at *12 (Bankr. D. Vt. Jan. 22, 2010) (holding that the court has addressed numerous challenges by the movants, both implicitly and explicitly, and would prevent further argument based on law of the case).

**2. Claim Preclusion**

Even if Counts IV and V were not barred under the law of the case doctrine, which they are, these Counts would be dismissed under the doctrine of claim preclusion.

The doctrine of claim preclusion bars a suit where the following three elements are present: "(i) a final judgment on the merits in a prior suit, involving (ii) the same parties or their privies, and (iii) a subsequent suit on the same cause of action."[95] "The principle of claim preclusion bars not only claims that were brought, but also those that could have been brought, in a previous action."[96] Applying the facts, the Court finds that the elements of claim preclusion are satisfied and Counts IV and V must be barred.

Here, the first element of claim preclusion is satisfied because the Sale Order is a final judgment on the merits. Although Citiking appealed the Sale Order,[97] the appeals were dismissed. Consequently, the Sale Order is a final judgment.

It is undisputed that the second element is satisfied because both AML and Diligent are parties to both actions. Citiking assigned its claims to Diligent. Therefore, Citiking and Diligent are privities.[98]

Diligent argues that the third element of AML's preclusion argument fails because claims for tortious interference with contract and civil conspiracy were never addressed by the Court. It relies on the Third Circuit's decision in *Eastern Minerals & Chemicals Co. v. Maham* in which the Court concluded that in a bankruptcy setting, "a claim should not be barred unless the factual underpinnings, theory of the case, and relief sought against the parties to the proceeding are so close to a claim actually litigated in the bankruptcy that it would be unreasonable not to have brought them both at the same time in the bankruptcy forum."[99]

AML responds that *Eastern Minerals* supports application of claim preclusion in the instant case. It maintains that the factual underpinnings and Diligent's theory of the case in both the bankruptcy case and this adversary proceeding is that the "sales process was fundamentally

---

[95] *Kennedy v. Skadden, Arps, Slate, Meager & Flom LLP (In re Radnor Holdings Corp.)*, 564 B.R. 467, 483 (D. Del.), *aff'd*, 706 F. App'x 94 (3d Cir. 2017).

[96] *Gupta*, 749 F. App'x at 96.

[97] Citiking International US LLC's Emergency Motion for Stay Pending Appeal of Order (I) Approving Purchase Agreement, (II) Authorizing Sale Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and (III) Granting Related Relief, *Citiking Int'l US LLC v. One Aviation Cor. (In re One Aviation Corp.)*, Case No. 20-cv-1569 (D. Del. 2020), D.I. 4 at ¶¶ 1-2, 29 and Emergency Motion filed by Appellant Citiking International US LLC to Stay Bankruptcy and District Court Orders Pending Appeal, *One Aviation Corp. v. Citiking Int'l US* LLC, Case No. 20-3406 (3d Cir. 2020), D.I. 5 at p. 2.

[98] Adv. D.I. 4 (Compl.) at ¶ 1.

[99] *E. Mins. & Chemicals Co. v. Mahan*, 225 F.3d 330, 337-338 (3d Cir. 2000).

flawed" and Citiking was deprived of its right to credit bid. AML further contends that the relief sought is also functionally the same.

The transcript of the Sale Hearing reflects that Citiking opposed the sale and argued:

- "Citiking is entitled to have the opportunity to credit bid …, and we have effectively been denied that right."[100]
- "The debtors cannot meet their burden to show that the sale provides the highest and best value to the estates because it is the result of an insufficient process."[101]
- "[T]he debtors cannot show that they received market value for their assets because they did not create a fair market. The debtors have not shown any valuation of these assets. They've not shown a fair process. They've not shown that they've exhausted bidding and they have effectively denied their secured creditor the right to credit bid, in violation of 363(k), by virtue of the process that they run."[102]

Following argument, the Court issued its ruling, addressing the issues and overruling all objections, including Citiking's objections.[103] Citiking's appeals of the Sale Order were dismissed.

The Court finds, based on a totality of the circumstances, that "there is an essential similarity of the underlying events given rise to the various legal claims."[104] Counts IV and V stem from the same underlying facts (credit bidding, collusion, and the sale process) that Citiking challenged at the Sale Hearing in the bankruptcy case and the Court rejected. Further, the Counts are premised upon causes of action that were or could have been raised at the time of the Sale Hearing between the parties or their privies. Finally, the Court agrees with AML that the relief sought is practically the same in that Diligent seeks to undo the economics of the Court-approved sale and re-litigate the alleged collusion between AML and DW (as well as Citiking's opportunity to credit bid) which purportedly resulted in "AML purchas[ing] the Debtors' assets at a fraction of their value."[105]

Based on the foregoing, Counts IV and V are barred by the doctrine of claim preclusion.

---

[100] D.I. 1070 (Tr. Hr'g Nov. 20, 2020) at 33:22-24.

[101] D.I. 1070 (Tr. Hr'g Nov. 20, 2020) at 34:3-5.

[102] D.I. 1070 (Tr. Hr'g Nov. 20, 2020) at 36:10-17.

[103] D.I. 1070 (Tr. Hr'g Nov. 20, 2020) at 51:16-18 ("So, I'm overruling all the objections. I'm approving the sale. I've looked at the revised order. I'm fine with it. The only change would be to the stay . . .").

[104] *CoreStates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187, 200 (3d Cir. 1999).

[105] Adv. D.I. 4 (Compl.) at ¶¶ 121.

### 3. Issue Preclusion

AML also argues that Counts IV and V are barred by the doctrine of issue preclusion. As the Court has already ruled that the factual allegations that support Counts IV and V of the Complaint are barred by law of the case and claim preclusion, the Court need not reach issue preclusion.

## B. Failure to State a Claim

In analyzing a motion to dismiss, the Third Circuit instructs courts to follow a three-part analysis. "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"[106] Second, the court must separate the factual and legal elements of the claim, accepting all of the complaint's well-pleaded facts as true and disregarding any legal conclusions.[107] Third, the court must determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief.[108] After conducting this analysis, the court may conclude that a claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct.[109]

### 1. Tortious Interference

As choice of law is disputed by the parties, the Court refers to both Delaware and New York law. "In Delaware, the elements of tortious interference are (1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury."[110] In New York, "[t]he elements of a cause of action to recover damages for tortious interference with contract are the existence of a valid contract between it and a third party, the defendant's knowledge of that contract, the defendant's intentional procurement of the third party's breach of that contract without justification, and damages."[111]

The Court finds that the Complaint fails to contain sufficient facts to establish a plausible claim for tortious interference under Delaware or New York law. First, the Complaint does not plead sufficient facts to establish that AML knew of the Intercreditor Agreement and the ROFR. The Complaint contains the following sentence setting forth the knowledge element of a tortious

---

[106] *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 675, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)).

[107] *Santiago*, 629 F.3d at 131. *See also Fowler*, 578 F.3d at 210–11 (citing *Iqbal*, 556 U.S. at 679).

[108] *Santiago*, 629 F.3d at 128.

[109] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556) (footnotes omitted).

[110] *Aclate, Inc. v. Eclipse Mktg. LLC*, No. CV 20-576-RGA, 2020 WL 6158579, at *4 (D. Del. Oct. 21, 2020) (cleaned up, quoting *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del. Ch. 1987).

[111] *MVB Collision, Inc. v. Allstate Ins. Co.*, 129 A.D.3d 1041, 1043, 13 N.Y.S.3d 137 (2015) (citations omitted).

interference claim: "AML was aware and had knowledge of the Intercreditor Agreement and ROFR set forth therein"[112] followed by a legal conclusion "AML is the proximate and direct cause of DW's breach of the Intercreditor Agreement."[113] The Complaint also states in conclusory fashion, and without supporting facts: "AML was undeniably an integral part of the Bankruptcy Case and was fully aware of the obligations and rights retained by DW and Citiking with respect to the Second Tranche Loans and ROFR associated with the Loans in their entirety."[114] Diligent does not plead sufficient facts for the Court "to draw the reasonable inference" that AML "had actual or imputed knowledge of the substance of the contract rights, even if it did not know about the exact terms."[115] When a complaint is challenged by a motion to dismiss under Rule 12(b)(6), the complaint "does not need detailed factual allegations, [but] a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[116] Here, presuming the knowledge element without facts is insufficient to establish a plausible claim for relief.

Similarly, the Complaint does not satisfy the intentional act element under Delaware or New York law. The Complaint concludes: "AML is the proximate and direct cause of DW's breach of the Intercreditor Agreement."[117] This statement is a legal conclusion and must be disregarded. The Complaint alleges: "Because AML and DW were colluding with one another to effectively freeze Citiking out of the bidding process by eliminating the opportunity to credit bid, DW did not offer Citiking the right of first refusal to match AML's offer as required under the Intercreditor Agreement."[118] This conclusory statement does not identify any "intentional" act committed by AML. Also, the statement is contrary to the Sale Order that found, and ruled, that AML did "not collude[] with any of the other bidders, potential bidders, or any other parties interested in the Purchased Assets."[119] The court "need not accept as true assertions that are contradicted by matters of public record," such as the Sale Order and the prior court proceedings.[120] The facts alleged in the complaint are insufficient to show that the plaintiff has a plausible claim for relief.

---

[112] Adv. D. I. 4 (Compl.) at ¶ 109.

[113] Adv. D.I. 4 (Compl.) at ¶ 111.

[114] Adv. D.I. 4 (Compl.) at ¶ 62.

[115] *Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*, 694 F.Supp.3d 467, 489 (D. Del. 2023).

[116] *Twombly*, 550 U.S. at 555 (cleaned up).

[117] Adv. D.I. 4 (Compl.) at ¶ 111.

[118] Adv. D.I. 4 (Compl.) at ¶ 112.

[119] D.I. 1063 (Sale Order) at ¶¶ 44-45.

[120] *In re La Paloma Generating Company, LLC*, Case No. 16-12700 (JTD), 2020 WL 224569 at *1 (citing *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 401, 426-27 (3d Cir. 1999); *Gupta*,

**2. Civil Conspiracy**

Diligent argues that New York law applies. Under New York law, "[t]o establish its claim of civil conspiracy, the [plaintiff] must demonstrate the primary tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury."[121] Here, Diligent alleges a primary tort of tortious interference with contract and a cause of action for civil conspiracy. As noted above, the tortious inference claim will be dismissed, consequently, Diligent has not demonstrated a primary tort to establish civil conspiracy.

Even if a primary tort were established, Diligent fails to establish sufficient facts to survive the motion to dismiss. In *Medtech Prods. Inc. v. Ranir, LLC*, the Southern District of New York explained:

> A bare conclusory allegation of conspiracy does not state a cause of action. To survive a motion to dismiss, a complaint must contain more than general allegations in support of the conspiracy. Rather, it must allege the specific times, facts, and circumstances of the alleged conspiracy. Allegations of conspiracy to violate plaintiff's constitutional rights are too conclusory to survive motion to dismiss because plaintiff did not provide any details of time and place, and he has failed to specify in detail the factual basis necessary to enable defendants to intelligently to prepare their defense.[122]

The allegations in the Complaint are vague and conclusory. The Complaint lacks the specific times, facts, and circumstances of the alleged conspiracy. To conclude, a plausible claim for civil conspiracy requires a factual leap that is not sufficiently pled.

"To state a claim for civil conspiracy under Delaware law, a plaintiff must allege '(1) the existence of a confederation or combination of two or more persons; (2) that an unlawful act was done in furtherance of the conspiracy; and (3) that the conspirators caused actual damage to the plaintiff.'"[123] "[A] tortious interference with a contract claim cannot form the basis for civil conspiracy."[124] As stated above, because the Complaint fails to adequately allege a claim for

---

749 Fed. App'x. at 97). The allegations in paragraphs 67- 68, 82, 112, 115, and 119-20 of the Complaint are contradicted by the findings in the Sale Order.

[121] *Medtech Prods. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 794 (S.D.N.Y. 2008), *citing World Wrestling Fed'n Entm't, Inc. v. Bozell*, 142 F.Supp.2d 514, 532 (S.D.N.Y.2001).

[122] *Medtech Prods. Inc.*, 596 F. Supp. 2d at 795 (cleaned up; citations omitted).

[123] *Lamplugh v. PBF Energy*, No. CV 19-218 (MN), 2020 WL 434204, at *4 (D. Del. Jan. 28, 2020) (quoting *Allied Capital Corp. v. GC–Sun Holdings, L.P.*, 910 A.2d 1020, 1036 (Del. Ch. 2006)).

[124] *Lamplugh v. PBF Energy*, No. CV 19-218 (MN), 2020 WL 434204, at *4 (D. Del. Jan. 28, 2020),

tortious interference with contract, the civil conspiracy claim also fails under Delaware law. Again, the allegations that DW and AML "conspired" and "schemed" are not supported by the record in the bankruptcy case and are insufficient to allege a plausible civil conspiracy claim.

Accordingly, Count V does not survive the Motion to Dismiss.

**Conclusion**

The Court will grant the Motion to Dismiss. Counts IV and V of the Complaint will be dismissed as barred by law of the case and claim preclusion doctrines, and for failure to state a claim. An order will issue.

Very truly yours,

J. Kate Stickles
United States Bankruptcy Judge